IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DORIS DENISE NORRIS, individually and as next friend of M.N., an injured minor, | § § § |
| Plaintiff, | § § |
| V. | § CIVIL ACTION NO. H-16-2424 |
| KAWASAKI MOTORS CORP, USA, *et al.*, | § § § |
| Defendants. | § § |

**MEMORANDUM AND OPINION**

Doris Norris, the mother of M.N., a minor, sued three Kawasaki entities—Kawasaki Motors Corp., U.S.A., Kawasaki Motors Manufacturing Corp., U.S.A., and Kawasaki Heavy Industries, Ltd., (collectively, "Kawasaki")—alleging a design defect in the 2013 Kawasaki Mule 4010, model KAF620R, a task-utility off-road vehicle. M.N. was in the rear passenger-side seat of the Mule when it tipped over. Another minor, M.C., was driving. M.N. was ejected, and the Mule's roll bar landed on her leg, causing a crush fracture. M.N. also suffered a broken wrist. She was not wearing a seatbelt. Norris asserted claims for defective product design and marketing and a claim for gross negligence.

Kawasaki moved to exclude the testimony of Norris's design-defect and biomechanical experts and for summary judgment, arguing that the claims fail without the expert testimony supporting them. (Docket Entries No. 49, 50, 51). Norris responded to the motions, arguing that the testimony is admissible and adequately supports her claims, and that there are factual disputes material to determining defect and causation. (Docket Entries No. 56, 58). Kawasaki replied, and Norris surreplied. (Docket Entries No. 64, 68, 69).

Based on a careful review of the pleadings; the motions, responses, replies, and surreply; the record; and the applicable law, Kawasaki's motions to exclude the expert testimony, (Docket Entries No. 50, 51), are granted in part and denied in part, and Kawasaki's motion for summary judgment, (Docket Entry No. 49), is denied. The reasons for these rulings are explained below.

I.  **The Motions to Exclude Expert Testimony**

Norris's claims are based on the absence of rear doors and "shoulder bolsters" for the rear passenger seats of the Mule. Herbert Newbold, a mechanical engineer, and Dr. Mariusz Ziejewski, a mechanical engineer offered as a biomechanics expert, testified that an alternative design equipping the Mule with rear doors and a shoulder bolster would have made the vehicle reasonably safe. Kawasaki argues that the testimony is unreliable and inadmissible under Rule 702 of the Federal Rules of Evidence, *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The motion to exclude Newbold's testimony, (Docket Entry No. 50), is granted as to the testimony about the alternative product design featuring side netting. Except for that testimony, the motion to exclude is denied. The motion to exclude Ziejewski's testimony, (Docket Entry No. 51), is granted as to his opinion that "[i]ntegrated nets more probably than not would have lessened the risk of injury to M.N. in this rollover event." The motion to exclude the other parts of Ziejewski's is denied.

   A.  **The Legal Standard**

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

2

>  (b) the testimony is based on sufficient facts or data;
>
>  (c) the testimony is the product of reliable principles and methods; and
>
>  (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Rule 702 "charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 592–93). Expert testimony must be both "relevant and reliable" to be admissible. *See United States v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003) ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

Witnesses may be qualified to give expert testimony if they possess specialized knowledge, skill, experience, training, or education. FED. R. EVID. 702. Expertise in the general area is required, but not expertise in the specialized area directly pertinent to the issues in question. *United States v. Marler*, 614 F.2d 47, 50 (5th Cir. 1980). The court must determine whether the proposed expert's testimony is sufficiently related to the issues and evidence before the court that it will help the trier of fact understand the evidence or decide the facts in issue. FED. R. EVID. 702; *Daubert*, 509 U.S. at 591; *Pipitone*, 288 F.3d at 245; *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562–63 (5th Cir. 2004).

Admissibility of expert testimony is an issue for the trial judge under Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592–93; *Brumley*, 200 F.R.D. at 601. The party offering the testimony must prove by a preponderance of the evidence that the expert's opinion is relevant and reliable. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Brumley*, 200 F.R.D. at 601.

In determining reliability, the court does not decide if the expert's conclusions are right, but instead whether the general principles or reasoning on which the expert relies are sound and whether the methodology used to apply those principles to the facts of the case is appropriate. *Daubert*, 509 U.S. at 594–95; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir.1997); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001). These considerations apply to all types of expert testimony, whether based on "scientific, technical, or other specialized knowledge." FED. R. EVID. 702; *Kumho Tire Co.*, 526 U.S. at 147–48; *Tucker*, 345 F.3d at 327.

The factors used to judge reliability include whether the expert's technique or theory can be or has been tested; whether it has been subjected to peer review and publication; whether it has a known or potential rate of error or standards and controls guiding its operation; and whether it has been generally accepted in the scientific community. *Pipitone*, 288 F.3d at 244 (citing *Daubert*, 509 U.S. at 593). Other factors include whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995); whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, *General Elec. Co. v. Joiner*, 522 U.S. 136,

146 (1997); whether the expert has adequately accounted for obvious alternative explanations, *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir.1994); whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); and whether the expert's claimed field of expertise is known to reach reliable results for the type of opinion the expert would give, *Kumho Tire Co.*, 526 U.S. at 151.

The test for reliability is flexible. The specific factors neither necessarily nor exclusively apply to all experts or in every case. *Kumho Tire Co.*, 526 U.S. at 150. A court has latitude to decide how to determine reliability, as well as to make the ultimate reliability determination. *Id.* at 152. The court's gatekeeper role is not intended to replace the adversary system, under which "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Pipitone*, 288 F.3d at 250. "[A] trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Pipitone*, 288 F.3d at 250.

### B. Herbert Newbold's Testimony

Newbold is a mechanical engineer who has testified in more than 500 all-terrain-vehicle cases. Kawasaki argues that Newbold is unqualified because: (1) he does not have professional experience in the design of utility-task-vehicle doors; (2) he has never testified for a manufacturer, and has only testified for plaintiffs; (3) he has not written articles about utility-task vehicles or doors on them; and (4) he has never designed a door except in the context of litigation. Kawasaki also argues that Newbold's opinions expressed in his report are inadmissible because he did not calculate the roll rate, used "static" rather than "dynamic" testing, did not perform a risk-utility analysis on

5

the proposed product design. Kawasaki also challenges a post-report opinion because after both his deposition and report, Newbold presented additional alternative designs.

### 1. Qualifications

"Experts qualified by 'knowledge, skill, experience, training or education' may present opinion testimony." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). Newbold's degree in mechanical engineering, his extensive experience designing and testing recreational off-road vehicles, and his experience testifying before Congress on vehicle safety, are all evidence that his education and experience qualify him to testify about off-road vehicles. He is qualified to testify about the Mule's dangerousness and about the safety value of doors. Other courts agree. *See Nester v. Textron, Inc.*, 2015 WL 7272249, at *8 (W.D. Tex. Nov. 17, 2015) ("Mr. Newbold's education in mechanical engineering and experience analyzing the design and failure of recreational motor vehicles, in addition to his experience on 'dozens' of cases involving golf carts is sufficient to allow him to reach reliable opinions concerning the safety and design of analogous vehicles like the one at issue in this case.").

Kawasaki argues that Newbold is not qualified because his proposed alternative utility-task-vehicle design, which includes doors, was not designed to be manufactured; because he has not published articles about off-road vehicle doors; and he does not have any patents for doors. (Docket Entry No. 50 at 5). But "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571 F.3d at 452. Newbold's lack of specialized expertise in designs for doors for utility-task off-road vehicles goes to the weight of his testimony, but does not make it inadmissibile.

6

## 2. Reliability

Kawasaki argues that Newbold's opinion about the Mule's dangerousness is unreliable because he has not published studies on the topic and because his opinions do not rely on peer-reviewed publications and were not subject to peer review. (Docket Entry No. 50 at 13). Publications and peer review can assist in assessing the reliability of an expert's opinion, but "the absence of an expert's reliance on published treatises or journals does not render his testimony per se unreliable." *Black v. Toys R US-Delaware, Inc.*, 2010 WL 4702344, at *4 (S.D. Tex. Nov. 10, 2010). Newbold's lack of published studies does not alone make his opinion unreliable.

Kawasaki challenges Newbold's testimony on the grounds that he did not calculate the roll rate of the accident or apply that rate to his surrogate "rotisserie" testing. (Docket Entry No. 50 at 15). The rotisserie testing consisted of elevating live female surrogates in an exemplar vehicle and turning the vehicle at various angles. Kawasaki argues that Newbold admitted that he could have calculated the roll rate, but he chose not to do so. (*Id.* at 6–7). In the testimony Kawasaki cites, Newbold does not discuss the roll rate. Instead, Newbold discusses his decision not to do dummy testing. (Docket Entry No. 50, Ex. 3 at 21, 25).

The present record does not include enough evidence to show that a roll-rate calculation was feasible, much less necessary. Norris contends that it was not possible for Newbold to calculate an accurate roll rate because there is not enough information available about the accident to do so. (Docket Entry No. 58 at 11). Ziejewski gave some testimony about the roll rate, stating only that it was "definitely less than 220 degrees per second." (Docket Entry No. 69, Ex. C). Ziejewski was no more precise than that. Kawasaki's objections about Newbold's failure to calculate the roll rate may go to the weight of his testimony, but they do not show that his testimony is unreliable. *See*

7

*Stewart v. Ford Motor Co.*, 2009 WL 10677694, at *3 (N.D. Tex. Sept. 3, 2009) ("Though the analyses performed by Ziejewski are certainly less complete than they would have been if he had more evidence, the problems in his analysis . . . go[] to the weight of his testimony, not its admissibility.").

Kawasaki also argues that Newbold's rotisserie testing did not match the force and conditions of the accident because in performing the test, Newbold "tried to do it relatively slow." (Docket Entry No. 50, Ex. B). Kawasaki argues that Newbold's test was "static," not "dynamic," and did not simulate the accident conditions. Instead, Newbold should have conducted dynamic testing with dummies.

Norris responds that the rotisserie test sufficiently simulated the accident conditions because Newbold and Ziejewski rolled the exemplar at an angle similar to the angle at which the Mule rolled over. (Docket Entry No. 58-5 at 5). Newbold and Ziejewski operated the exemplar vehicle on terrain similar to the rollover area and reconstructed the origin and dynamics of the accident based on that. (Docket Entry Nos. 58 at 10; 58-4 at 5). The rotisserie test used live female surrogates who were the same height as M.N. (Docket Entry No. 58-6 at 7).

Norris has the better argument. The steps Newbold took to test under similar accident conditions, including using the same rollover angle, similar terrain, and a surrogate the same height as M.N., are enough to make testimony about the accident and his testing method admissible. *Roman v. Western Mfg. Inc.*, 691 F.3d 686, 695 (5th Cir. 2012) ("[T]he 'district court has wide discretion to admit evidence of experiments conducted under substantially similar conditions.'" (quoting *United States v. Norris*, 217 F.3d 262, 270 (5th Cir. 2000))). Newbold's rotisserie test is supported by academic literature describing it as a recognized and acceptable method of replicating

8

rollovers. (Docket Entry No. 58-5 at 12). Even though Newbold's method was closer to a static test than a dynamic one, that is not enough to make the test unreliable and therefore inadmissible. Again, Kawasaki's objections go to the weight of Newbold's testimony, not its admissibility.

### 3. Fit

Kawasaki argues that Newbold's testimony lacks the necessary "fit" because he did not do a risk-utility analysis. (Docket Entry No. 50 at 18). "In Texas, the plaintiff must show the safety benefits from the proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety. The burden is minimal: plaintiffs need only offer *some* evidence that their alternative design . . . would not have introduced other dangers of equal or greater magnitude." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 406 (5th Cir. 2016) (emphasis in original) (quoting *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 382, 337–38 (Tex. 1998)).

In his report, Newbold stated that, "[c]onsidering the utility of the product and the risk involved in its use," the addition of the doors "would not have substantially impaired the utility of the vehicle." (Docket Entry No. 58-4 at 7). Kawasaki argues that this statement is conclusory and does not satisfy the risk-utility requirement. (Docket Entry No. 64 at 22). But the Fifth Circuit has held that an expert's similar statement is "probably" enough. *Sims*, 839 F.3d at 406 ("Here, Wallingford initially reported that the use of a fuel tank shield would not have hindered the performance of the vehicle. . . . Those assertions probably meet his minimal burden to show the risk-utility of the alternative designs."). Because Newbold evaluated the effect of his recommended additions on the vehicle's utility, his testimony meets the risk-utility analysis requirement for admissibility.

9

Kawasaki also argues that Newbold's testimony does not "fit" the fact issues the jury will decide because Newbold did not state that the safer alternative design he testified about was technologically feasible. (Docket Entry No. 50 at 18). "Under Texas law, a claimant can establish the technical feasibility of a safer alternative design by showing its use by others in the industry." *Sims*, 839 F.3d at 406. Newbold did state that Kawasaki and other manufacturers used his recommended safer alternative designs when the Mule was distributed. (Docket Entry No. 58-4 at 6). Newbold also identified other models with the shoulder bolsters and doors he recommended, models that were available when the Mule was distributed. *Id.* Newbold's testimony that other manufacturers used his recommended safety features during the relevant period meets the technological-feasibility requirement under Texas law.

Finally, Kawasaki argues that Newbold's testimony does not sufficiently show that the designs he found to be safer alternatives were economically feasible. (Docket Entry No. 50 at 18). "To establish economic feasibility, the plaintiff must introduce proof of the 'cost of incorporating this technology.'" *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 334 (5th Cir. 2014) (quoting *Honda of Am. Mfg., Inc. v. Norman*, 104 S.W.3d 600, 607 (Tex. App.—Houston [1st Dist.] 2003)). Newbold testified that he considered the costs of adding doors and shoulder bolsters and concluded that the increased costs were outweighed by the increased safety. (Docket Entry Nos. 58 at 12; 58-4 at 7; 50-3 at 8). Because Newbold considered the economic feasibility of the alternative designs, his testimony is not inadmissible on that ground.

### 4. New Opinions About Alternative Designs

Norris's response to the motion to exclude Newbold's testimony included a July 13, 2018 affidavit by Newbold. (Docket Entry No. 58-3). In this later affidavit, Newbold identified other

10

safer alternative designs, including side netting, a Kawasaki patent for a net attached to a door, and the doors Kawasaki used on the Kawasaki Teryx 4 750. Kawasaki moved to exclude Newbold's testimony about these designs and the opinions he based on them because he disclosed the designs and his opinion about them late; the designs were materially different from those described in Newbold's Rule 26 report; and Newbold did not test the effects of using netting or the Teryx door on the simulations used in this case.

Under Rule 26, experts must disclose alternative designs they rely on in a timely manner. FED. R. CIV. P. 26(a)(2)(B). Courts may exclude expert testimony that is materially different from the expert's Rule 26 report when that testimony is offered late. *See Jones v. Flowserve FCD Corp.*, 74 F. App'x 706, 709 (5th Cir. 2003) (excluding an expert's alternative-design affidavit included in an opposition to a motion for summary judgment); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603 (S.D. Tex. 2001) (excluding an expert's affidavit that was "materially different from his Rule 26 report"); *Beane v. Utility Trailer Mfg. Co.*, 935 F. Supp. 2d 871 (W.D. La. 2013) (excluding expert's affidavit offered "on the eve of summary judgment").

Under the guidance these cases offer, the court concludes that Newbold's testimony on an alternative design featuring side netting should be excluded because he did not disclose it in his Rule 26 report. In his July 13 affidavit, Newbold states that he "did not test, nor did [he] need to test, the nets . . . [because] properly designed nets are proven to be more effective in injury reduction than no nets . . . ." (Docket Entry No. 58-3 at 4). Newbold's Rule 26 report recommended adding a door and a shoulder bolster, but did not mention netting. Kawasaki had the opportunity to depose him about the alternative design using a door and shoulder bolster, but not the netting. The netting is a new proposed alternative design that Kawasaki has not had the opportunity to explore in discovery

or respond to. The testimony that adding side netting was a safer alternative design that would have significantly reduced M.N.'s risk of injuries is materially different from Newbold's Rule 26 report. It is excluded.

The motion to exclude is denied as to Newbold's testimony about the Teryx doors and the Kawasaki patent. Newbold's Rule 26 report stated that there were alternative Kawasaki models that included doors. Although the report did not specifically mention the Teryx, it did mention other Kawasaki models with doors. Kawasaki knows of its own models that have doors and of its own patented designs. At trial, Kawasaki may present evidence that the Mule and the Teryx are governed by different safety standards, that Newbold did not testify that "these other designs would have prevented or substantially reduced the risk of M.N.'s injury," or whether Kawasaki manufactured a vehicle based on the patent Newbold identified as a safer design. (Docket Entry No. 64 at 5). These issues go to weight, not admissibility.

### C. Ziejewski's Testimony

Dr. Mariusz Ziejewski is Norris's biomechanics expert. Kawasaki moved to exclude his testimony on several grounds, including that he lacks qualifications, that his methodology is not generally accepted in the relevant scientific community, and, as with its objections to Newbold's testimony, that the tests he testified to were not sufficiently similar to, and did not account for, the accident conditions.

#### 1. Qualifications

Kawasaki points out that Ziejewski is not a medical doctor and has not designed a product that has been put into production. Ziejewski has a doctorate in mechanical engineering, is the director of the Impact Biomechanics Laboratory at North Dakota State University, and has

12

extensively researched vehicle dynamics. These credentials and experiences are enough to qualify him to opine on the safety of the Mule design and whether Newbold's alternative designs would have prevented M.N.'s injuries. *See Stewart*, 2009 WL 10677594, at *3 ("It is undisputed that Dr. Ziejewski[] possesses significant qualifications. He has over 20 years of research and teaching experience in the field of biomechanics . . . .").

### 2. Methodology

Kawasaki argues that Ziejewski's methodology is not generally accepted in the scientific community because the papers he relied on used specific roll rates, and he did not calculate a specific roll rate here. In response, Norris points to Ziejewski's deposition testimony citing the engineering industry papers he relied on and stating that, although he did not calculate the roll rate, "it was definitely less than 220 degrees per second." (Docket Entry No. 69, Ex. C). Ziejewski explained why his estimation of the roll rate aligned with this accident. (Docket Entry No. 58-5 at 4).

Kawasaki also objects to Ziejewski's choice not to use computer simulations to model the occupant movant, a method he has used in other cases in which he testified as an expert. Norris responds by pointing to Ziejewski's explanation that a computer simulation would have been "misleading" in this case because M.N.'s body kinematics might have been altered by her own muscle control and by the slow speed of the utility-task vehicle at the time of the accident.

Both objections to Ziejewski's methodology—the failure to calculate the specific roll rate and the choice not to use a computer simulation—go to the weight of the testimony, not its admissibility. Ziejewski has sufficiently explained his approach to satisfy the threshold reliability requirements.

As it did with Newbold's testimony, Kawasaki challenges Ziejewski's testimony about the rotisserie testing method on the ground that it did not simulate the accident conditions. As discussed above, the rotisserie method used here, including the use of a surrogate the same height as M.N., the same terrain as the rollover area, and the same rollover angle, is sufficiently similar to the accident to make the testimony about it by a qualified witness admissible.

Finally, Kawasaki challenges two of Ziejewski's opinions: (1) that Newbold's proposed alternative door would have prevented M.N.'s ejection; and (2) that using the seatbelt would not have prevented M.N.'s injury. Kawasaki argues that Ziejewski used a lateral-acceleration force of .7g, instead of a lateral-acceleration force of at least 1.0g, which was the number corresponding to Kawasaki's own testing. Kawasaki also argues that Ziejewski's opinion that a seatbelt would not have prevented M.N.'s injury is speculative because he did not know the trajectory at which M.N. came out of the vehicle.

The record shows that both Ziejewski and Kawasaki's own expert testified that the lateral acceleration M.N. experienced was .7g. (Docket Entry No. 69, Ex. C). Although Ziejewski testified that he did not know with certainty how M.N. was ejected from the vehicle, his testing, expertise, and knowledge of M.N.'s injuries led him to believe that M.N.'s leg was outside the vehicle. This result was consistent with, and supported by, Ziejewski's testing of female surrogates who were wearing seatbelts. The explanation Ziejewski offered takes his opinion out of the "speculative" category. The objections go to the weight of Ziejewski's testimony, and do not undermine its reliability so as to make it inadmissible.

### 3. New Opinions

Kawasaki objects to several statements in Ziejewski's July 2018 affidavit submitted with Norris's response. Kawasaki filed a table comparing Ziejewski's statements in his November 2017 Rule 26 expert report and the statements in the July 2018 affidavit. (Docket Entry No. 64 at 14–15).

After a careful review of Ziejewski's November 2017 report and the July 2018 affidavit, the only materially different opinion is that "[i]ntegrated nets more probably than not would have lessened the risk of injury to M.N. in this rollover event." That statement is materially different because neither Newbold nor Ziejewski had previously noted, conducted testing on, or testified in a deposition about, an alternative design with netting. As with Newbold's late testimony about netting as a safer alternative design, Kawasaki did not have the opportunity to examine Ziejewski's opinion on netting in discovery. This part of Ziejewski's testimony is excluded, but his other conclusions and opinions, including those in the July 2018 affidavit, are admissible at this stage.

## II. The Motion for Summary Judgment

Under Texas law, a design-defect claim requires: "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Casey v. Toyota Eng'g & Mfg. N.A.*, 770 F.3d 322, 330 (5th Cir. 2014) (citing TEX. CIV. PRAC. & REM. CODE § 82.005(a)). "Generally, the requirements to prove a defect necessitate competent expert testimony and objective proof that a defect caused the injury." *Samuell v. Toyota Motor Corp.*, 2015 WL 1925902, at *4 (W.D. Tex. Apr. 27, 2015). Kawasaki argues that, because Newbold's and Ziejewski's opinions are unreliable and do not fit the facts of this case, Norris's design-defect claim fails for lack of competent expert testimony.

15

Most of Kawasaki's objections to the expert testimony go to its weight, not its admissibility. The admissible testimony adequately supports Norris's claims. The motion for summary judgment, (Docket Entry No. 49), is denied.

**IV.     Conclusion**

Kawasaki's motions to exclude the expert testimony, (Docket Entries No. 50, 51), are granted in part and denied in part. The motion for summary judgment, (Docket Entry No. 49), is denied.

SIGNED on August 6, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge