## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DORIS DENISE NORRIS, INDIVIDUALLY | ) | |
| AND AS NEXT FRIEND OF M.N., | ) | |
| AN INJURED MINOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-2424 |
| | ) | |
| KAWASAKI MOTORS CORP., U.S.A., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## KAWASAKI DEFENDANTS' MOTION IN LIMINE TO
## EXCLUDE PLAINTIFF'S EXPERT TESTIMONY REGARDING LIFE CARE PLAN

Defendants Kawasaki Motors Corp., U.S.A., Kawasaki Motors Manufacturing Corp., U.S.A., and Kawasaki Heavy Industries, Ltd. ("Kawasaki") hereby move this Court pursuant to Rule 702 of the Federal Rules of Evidence to exclude the opinions of Plaintiff's life care planning experts, Dr. Todd Cowen and William Davenport, regarding future medical expenses.

## NATURE AND STAGE OF THE CASE

This is a products liability case, in which Plaintiff asserts a design defect claim regarding a 2013 model year Kawasaki Mule 4010.  She seeks both actual and exemplary damages.

Plaintiff's liability and damages experts have been deposed, as well as Kawasaki's corporate representative and M.N.'s prior treating physician, Dr. David Antekeier.[1]  This Motion is submitted contemporaneously with the parties' proposed Joint Pretrial Order and other Motions in Limine.  The case is set for Docket Call on August 27, 2018.

---

[1] The deposition of M.N.'s current treating physician, Dr. Howard Epps, is scheduled for August 28, 2018.

## FACTUAL BACKGROUND

### A.    M.N.'s Rollover Incident and Her Mother's Lawsuit Against Kawasaki

As set forth in greater detail elsewhere, Plaintiff alleges that a 2013 Kawasaki Mule, off-road utility vehicle was defectively designed, due to a rollover incident in 2014, during which her minor daughter suffered a broken leg and wrist. At the time the vehicle was rolled, it was being driven, without permission, by an underage (12 year old) girl, M.C., who took Plaintiff's daughter, M.N. (also 12 years old) and another girl out for "fun," riding through a field on a ranch owned by M.C.'s grandfather, John Carter.  During the ride, the girls ignored the vehicle's warnings against operation by underage drivers and requiring users to wear seat belts.  The underage driver, M.C., turned the vehicle too hard and too fast, rolling the vehicle.  M.N. suffered, *inter alia*, a crush fracture to her leg when it was impacted by the vehicle's roll bar. Plaintiff's design defect theory (put forth by her liability experts, Herb Newbold (mechanical engineer) and Mariusz Ziejewski, Ph.D. (occupant kinematics)) is that the Kawasaki Mule should have had doors and shoulder bolsters, which purportedly would have prevented M.N.'s ejection.

### B.  M.N.'s Medical Condition and Improvement

Plaintiff's initial hospitalization following the rollover incident lasted a little less than one month.  *See* 000522-525 (discharge summary).[2]  Many of the procedures performed during that hospital stay dealt with compartment syndrome that had developed in M.N.'s injured leg and resulting attempts at wound management, including the use of skin grafts.  *See* 000524 (M.N. "required multiple trips to the OR for wound management and closure.  Her wounds showed improvement and skin graft took successfully.").  Near the end of September 2014, the surgeon

---

[2] Medical records contained in composite Ex. A.

provided her with crutches so that she would begin weightbearing (000917-19), and by October 2014, the internal fixation rods or hardware had been removed from the leg. (000972-74).  In January 2015, M.N. was weaning off crutches (001273-74), and by March of that year she was in a clamshell brace (001652-53).  Melanie was cleared to do sports or cheerleading using her brace in March, and in May, she was released for horse-back riding and no longer required the brace. (002820-21).  By December 2015, although she had begun developing a leg length discrepancy, she was released for "all physical activities" (002940).  As of June 2016, she had returned to her previous activities including cheerleading (003025).

More than two years after the accident, in October 2016, M.N.'s doctors performed an osteotomy and put an external fixator in place to lengthen her right leg, which at that point suffered from an approximately 2 cm length discrepancy (approx. ¾") (003211-12).  By May 2017, while still wearing the external fixator, M.N. was showing healing at the osteotomy site (004162-64).  In October 2017, M.N.'s records show presence of "bridging bone" (004517-18).  Eventually, in November 2017, the external fixator was removed from M.N.'s leg, and her records indicate that she was "doing well" and "healing well," and was able to return to some cheerleading (although not yet released for tumbling) (Norris 32034-35).[3]  In late November 2017, M.N. was able to ambulate without crutches (004640).  Her physical therapist notes that at this time, M.N. had no difficulty with activities including getting out of the bath, walking between rooms, squatting and lifting an object like a bag of groceries, or getting into or out of a car (004652-53).

---

[3] As discussed below, Plaintiff's life care plan for Melanie considers no medical records past September 2017, which is when Melanie is still wearing her external fixator. Life Care Plan at 31 (attached as Ex. B).

M.N.'s condition continued to improve in 2018.  In January 2018, M.N.'s records show that she has had no problems with the healing at the pin sites from the external fixator and that she had continued to participate in cheerleading, asking to be cleared for tumbling (Norris 032034-35).  There was no swelling of the right leg, and the x-rays continued to show regenerate and good bridging bone.  *Id*.  In March 2018, M.N. reported to her physical therapist that she had "completed cheerleading tryouts and she made the varsity team" (Norris 032154).

At an April 2018 physical therapy visit, M.N. had a Lower Extremity Functional Scale of 76 out of 80 (Norris 032196-97).  She reported "[n]o difficulty" performing most of the activities enumerated in the evaluation, including "No difficulty" with her "Usual work, housework or school activities," "Squatting," "Performing light activities around [the] home," "Performing heavy activities around [the] home," "Walking a mile," and "Standing for 1 hour." *Id*.  The highest degree of "difficulty" reported at that visit was "A Little Bit of Difficulty," and that was with respect to "[U]sual hobbies, recreational or sporting activities," "Lifting an object, like a bag of groceries, from the floor," "Running on even ground," and "Making sharp turns while running fast."  *Id*.  Additionally, the notes from that visit show that she had made "Good progress" and had been "pain free during [the] reporting period" (Norris 032199).  A physical therapy record from May 1, 2018, states that "[a]t this time patient has met all long term goals regarding the R tibia and fibula fracture and will be discharged from therapy" (Norris 32259).

### C. Plaintiff Hires PLCP to Substantiate Future Damages Claims

#### 1. PLCP's "Business" Model

To support M.N.'s claim regarding future medical expenses, Plaintiff's counsel hired Physicians Life Care Planning ("PLCP"), which provides "***damages valuation services***."[4] Offering "medically-related litigation support," they offer a variety of "products" for purchase, including "Life Care Plans."[5]  The same persons who founded the business, PLCP, ***also founded*** the American Academy of Physician Life Care Planners ("AAPLCP").  Cowen Depo. at 18:7-24 (Cowen deposition attached as Ex. D).

The President of PLCP is William Davenport, who is not a "medical person," but has a "background in finance." Cowen Depo. at 18:14-19:2.  The life care plan is a "primary product offering."  Davenport Depo. at 101:12.[6]  The life care plans produced by PLCP contain standardized language that appears in all of the PLCP life care plans.  Davenport Depo. at 98:19-99:23.  In fact, the PLCP life care plans are copyrighted (Plaintiff's counsel has been provided "[e]xtremely limited use" for the purpose of this case) and Mr. Davenport intends to "vigorously" enforce that copyright.  *Id*. at 99:9-10.  The format and language are "very proprietary," because they are developed as a "value proposition that [PLCP] deliver[s] in the marketplace."  *Id*. at 100:5-25.  Moreover, to hire PLCP to create your client's life care plan, PLCP requires the requesting attorney to sign a contract agreeing that the attorney will include PLCP recommendations in any *Daubert* motions against a PLCP witness and, according to Mr.

---

[4] *See* Physician Life Care Planning website, at "Home," available at https://www.physicianlcp.com/Index.aspx (last visited August 17, 2018) (emphasis added) (attached as Ex. C).

[5] Physician Life Care Planning website, "Products," available at https://www.physicianlcp.com/Products/index.aspx (last visited August 17, 2018) (Ex. E).

[6] Davenport Depo. excerpts attached as Ex. F.  According to Davenport, PLCP produces a "very, very high volume" of life care plans.  *Id*. at 101:13-16.

Davenport, "if they don't I'm free to go and hire an attorney at $50,000 an hour and stick him with the bill … ." *Id*. at 103:6-22.

PLCP markets their services to plaintiff attorney organizations, like the American Association for Justice (formerly "ATLA"), hoping for "platinum" level sponsorship of the organization's activities. *Id*. at 106:19-107:6. While Mr. Davenport would not discuss the amount spent by PLCP on marketing, because it is a "private company," according to him they do "a tremendous amount of marketing." *Id*. at 109:10. Describing himself as "a rather astute business person," "in the business of providing damages valuation services," Mr. Davenport takes "tremendous pride" in the fact that PLCP is "one of the largest sponsors" of such events for trial lawyers. *Id*. at 111:15-112:18.

Dr. Cowen, who has a private practice specializing in physical rehabilitation, was assigned by PLCP to draft M.N's life care plan, but he is not her doctor and has never provided her with medical care. *Id*. at 29:17-21. Dr. Cowen, is an independent contractor for PLCP. *Id*. at 47:12-19. Every life care plan created by Dr. Cowen has been for use in litigation. *Id*. at 12:15-17.[7] Dr. Cowen makes twenty to thirty percent of his income through his life care planning, litigation work. *Id.* at 42:10-14.

### 2.  PLCP's  "Proprietary Product" Life Care Plan in this Case

The life care plan provided for use in this litigation, signed by Dr. Todd Cowen, predicted a nominal value of $366,815.27 for M.N.'s future medical care through age 82 (using an average life expectancy). Life Care Plan at 1.1 (Ex. B). The present value assessment also

---

[7] His qualifications include certification as a life care planner with the International Health Commission of Health Care Certification, which required completion of five online courses and a two and a half day to three day in-person session. *Id*. at 12:18-14:18. Dr. Cowen is also a certified physician life care planner through the AAPLCP (***founded by the persons involved in the business, PLCP***), and the additional effort required by him, there, was to read a textbook and take a test. *Id*. at 16:2-21.

provided by PLCP, signed by PLCP President, William Davenport, predicted the future value of this care to be approximately $1.2M with a present value of $410,848 (applying inflation and also a discount rate).  Present Value Assessment at 1 (Ex. G).

Dr. Cowen's life care plan asserted that M.N. suffered from four diagnostic conditions:

The following represents my professional medical opinion regarding Ms. ███ diagnostic conditions (listed in order of prominence/severity), as they pertain to Ms. ███ relevant cause of injury:

- **Diagnostic Condition 1:** Status post all-terrain vehicle (ATV) rollover accident on August 12, 2014 with resultant problems as noted below.

- **Diagnostic Condition 2:** Complex crush injury and fracture of the right tibia and fibula with persistent nonunion and large bone space/defect of the tibia.

- **Diagnostic Condition 3:** Status post multiple surgical procedures for #2 above and complications of pin site infections.

- **Diagnostic Condition 4:** Right wrist fracture treated nonsurgically.

Life Care Plan at 4.1.  These four diagnostic conditions led to "consequent circumstances," identified as *six areas where M.N. suffers a purported disability*:

### 4.2.1   Disabilities

According to the American Medical Association's *Guides to the Evaluation of Permanent Impairment, 6th Edition*, a disability is defined as "an alteration of an individual's capacity to meet personal, social, or occupational demands because of impairment."[9]

It is my professional medical opinion that the disabilities specified herein are attributable to Ms.  relevant impairments, as presented in Section 4.1.

- Decreased ability to perform activities of daily living (ADLs) e. g. bathing, dressing, etc.

- Decreased locomotion e. g. walking, etc.

- Decreased ability to participate in social avocational activities, i.e. participation in activities with others e. g. participation in sports, etc.

- Decreased external mobility e. g. community ambulation, etc.

- Decreased ability to perform household services e. g. inside housework, home and vehicles, etc.

- Decreased ability to participate in personal avocational activities e. g. personal hobbies, pastimes, interests, etc.

*Id*. at 4.2.1.

The plan then proposed "future medical requirements" to address the aforementioned diagnostic conditions and "consequent circumstances."

| Ms. ███ Future Medical Requirements | Nominal Value | Percentage |
|---|---|---|
| Physician Services | $16,412.06 | 4.47% |
| Routine Diagnostics | $16,876.45 | 4.60% |
| Medications | $66,583.86 | 18.15% |
| Laboratory Studies | $8,297.28 | 2.26% |
| Rehabilitation Services | $81,324.18 | 22.17% |
| Equipment & Supplies | $58,587.48 | 15.97% |
| Environmental Modifications & Essential Services | $80,400.00 | 21.92% |
| Acute Care Services | $38,333.96 | 10.45% |
| **Total** | **$366,815.27** | **100%** |

*Id*. at 1.1 (Executive Summary).

As to each category of future medical requirements, PLCP provided a table containing a description of the service, the quantity and frequency of the procedure, and the cost.  For instance, below is the table showing the calculations making up the predicted $16.412.06 in Physician Services:

### 7.4.1  Physician Services Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (Every "x" years) | Duration (Years) | Unit Cost | Total Cost |
|------|------------------|--------------|------------------|----------------------------|------------------|-----------|------------|
| 1 | Plastic Surgeon | 15 | 4 | 1 year | 2 | $167.47 | $1,339.76 |
| 2 | Orthopedic Surgeon | 15 | 12 | 1 year | 1 | $167.47 | $2,009.64 |
| 3 | Orthopedic Surgeon | 16 | 4 | 1 year | 4 | $167.47 | $2,679.52 |
| 4 | Orthopedic Surgeon | 20 | 1 | 1 year | 62 | $167.47 | $10,383.14 |
| **Physician Services Subtotal** | | | | | | | **$16,412.06** |

*Id*. at 7.4.1.

The same analysis is below for Rehabilitation Services, which makes up the largest portion of the future medical requirements:

### 7.4.5  Rehabilitation Services Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (Every "x" years) | Duration (Years) | Unit Cost | Total Cost |
|------|------------------|--------------|------------------|----------------------------|------------------|-----------|------------|
| 1 | Physical Therapy Evaluation (30 min) | 15 | 1 | 1 year | 5 | $176.41 | $882.05 |
| 2 | Physical Therapy Evaluation (30 min) | 20 | 1 | 5 years | 62 | $176.41 | $2,293.33 |
| 3 | Physical Therapy: Periodic (1 hr) | 15 | 15 | 1 year | 5 | $289.44 | $21,708.00 |
| 4 | Physical Therapy: Periodic (1 hr) | 20 | 15 | 5 years | 62 | $289.44 | $56,440.80 |
| **Rehabilitation Services Subtotal** | | | | | | | **$81,324.18** |

*Id.* at 7.4.5.

As to Environmental Modifications and Essential Services, the second largest category of future medical requirements, Dr. Cowen estimated a generic cost of $100 per month for 67 years, leading to a total of $80,400.00.

### 7.4.7 Environmental Modifications & Essential Services Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (Every "x" years) | Duration (Years) | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | Essential Services | 20 | 12 | 1 year | 67 | $100.00 | $80,400.00 |
| Environmental Modifications & Essential Services Subtotal | | | | | | | $80,400.00 |

*Id.* at 7.4.7.[8]

The plan estimates that the cost of M.N.'s future medications will be $66,583.86.

### 7.4.3 Medications Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (Every "x" years) | Duration (Years) | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | Analgesic: Norco | 15 | 12 | 1 year | 5 | $68.95 | $4,137.00 |
| 2 | Vitamin/Supplements: Calcium with Vitamin D | 15 | 6 | 1 year | 5 | $9.53 | $285.90 |
| 3 | Analgesic: Tylenol | 15 | 12 | 1 year | 5 | $11.28 | $676.80 |
| 4 | Analgesic: Tylenol | 20 | 4 | 1 year | 62 | $11.28 | $2,797.44 |
| 5 | NSAID: Mobic | 20 | 4 | 1 year | 62 | $236.64 | $58,686.72 |
| Medications Subtotal | | | | | | | $66,583.86 |

*Id.* at 7.4.3.

---

[8] This calculation contains an error, because Dr. Cowen estimates M.N.'s life expectancy to be 82 years, and the table states that the "Essential Services" will begin at age 20, which would mean that the services should continue for only 62 years.

- 10 -

### 3.  PLCP's  (and Dr. Cowen's) "Methodology"

#### (a)  "Methodology" is Not Peer Reviewed

The methodology followed by Dr. Cowen in his life care plan is taken from the "tenets, methods, and best practices" of the AAPLCP.  Cowen Depo. at 22:23-23:1; *see also* Life Care Plan at 1.  However, Dr. Cowen agrees that "***the founding members of the PLCP, the business, also founded the AAPLCP, which sets the standards for the life care plans produced by the PLCP***."  *Id*. at 23:4-8.  Thus, the "methodology" followed by PLCP's independent contractor life care planners (and the "methodology" employed by Dr. Cowen in this case) is one created by PLCP, for use in selling their products.  Dr. Cowen is ***unaware of anyone outside PLCP*** who cites the AAPLCP guidelines in life care planning and could not identify any published literature (other than AAPLCP published literature) where those guidelines were discussed.  *See id.* at 23:11-24:2.

#### (b) Only Some Medical Records are Reviewed, and the Summaries (used in the Life Care Plan) are by PLCP Staff

To create the proprietary life care plan product, once contacted by the plaintiff's counsel, PLCP assigns a physician life care planner (here, Dr. Cowen) to the plaintiff's case and requests medical records from counsel.  *Id.* at  53:5-15; 56:23-57:2.  PLCP sets deadlines for records collection, and if the plaintiff's attorney provides records past the deadline for use in the life care plan, PLCP "typically" will not accept the new records.  *Id.* at 57:25-58:17.  In the instant case, although Dr. Cowen's life care plan is dated November 17, 2017, the latest medical record included in the document is from September 2017.  Moreover, while Dr. Cowen purported to find various disabilities from which M.N. suffered, those opinions are based on records that all pre-date the removal of her external fixator in November 2017 and her subsequent release for all

activities in late 2017 and early 2018.  For instance, in his deposition in April 2018, Dr. Cowen was unaware that M.N.'s external fixator had been removed.  *Id*. at 158:12-14.[9]

Not only does PLCP essentially control the records reviewed by the life care planner, ***PLCP staff*** drafts the summaries of those records that go into the life care plan.  *Id*. at 73:14-19. *See also id*. at 74:23-75:11 (in this case, the PLCP staff drafted the initial summaries appearing at pages six to thirty-one of the subject life care plan and Cowen cannot remember making edits). As to who reviewed M.N.'s records in this case and drafted the summaries appearing in the life care plan, Dr. Cowen does not know.  *Id*. at 73:17-23.  The PLCP staff are "trained in-house" at PCLP and ***do not necessarily have a medical background***.  *Id*. at 74:4-8.  Nonetheless, these summaries appearing in the life care plan (drafted by PCLP staff, trained "in-house" by PLCP) are intended to provide "***the important parts that translate the message of what happened***" regarding M.N.'s care for purposes of the life care plan.  *Id*. at 77:1-3.  As to the preparation of the life care plan in this case, Dr. Cowen "scroll[ed]" through M.N.'s medical records, but cannot recall if he revised any of the PLCP staff's records summaries that appear in the life care plan. *Id*. at 74:13-75:11.  He cannot recall whether he pulled out or added any medical record summaries in preparation of the life care plan.  *Id*. at 75:23-76:17.  He has no notes from his own record review.  *Id*. at 77:25-78:4.

---

[9]  *See also e.g*., 163:7-164:16 ("Q.  I'm going to mark as Exhibit 18 another of [M.N.'s] medical records.  It's from Texas Children's Hospital.  And it looks like it's dated from November 2017.  Is that correct?  A.  Yes.  Q.  This record is not summarized in your life care plan?  A.  That is correct.  Q.  So under impressions -- well, first of all, this record indicates that Dr. Epps removed the halo; correct?  A.  Yes.  Q.  Under impression it states, healed osteotomy?  A.  Yes.  Q.  Could that mean that the lengthening was successful?  A.  This is where I probably shouldn't answer just because I think it might be a question better answered by the orthopedist as to what the healing status is.  I'm not trying to be difficult, but just the healing status of that would probably need to come from him.  Q. So you're not currently able to say the healing status on the osteotomy, is that what you're saying?  A.  Yes; correct. Q.  Page 4597 of this record, does it state that [M.N.] is ***without restrictions on her physical activity***?  A.  It does.  Q. And that's not something that you included in your life care plan?  A.  Yes.  ***I don't think I have that record***, correct.")

### (c) Cowen Performs a Short Examination/Interview, but Does Not Review Testimony or Communicate with Treating Physicians

In addition to his "scroll" through the medical records, Dr. Cowen based his diagnoses and opinions about future medical care based on a personal examination and interview with the patient.  *Id*. 62:7-9 ("I see the person, exam, history, review the medical records.  From there, formulate opinions about what diagnoses are involved.").[10]  Dr. Cowen examined and interviewed M.N. on June 5, 2017, for his opinions in this case.  *Id*. at 105:8-12.  The interview (which included Plaintiff as well as M.N.)  lasted about 45 minutes, and the examination lasted about 15 minutes.  *Id*. at 108:20-109:4.

However, the history provided by M.N. and her mother during the interview is inconsistent with information from other sources.  For example, while Dr. Cowen's notes show that he was told at that interview that M.N. had a ***three inch*** leg length discrepancy, the medical records demonstrate that at its worst, the discrepancy was estimated to be (approximately) ***2.5 centimeters*** (something less than 1").  *Id*. at 110:9-17.  Additionally, at the interview, M.N. and/or her mother told him that M.N. had difficulties performing activities of daily living and was unable to participate in her prior extracurricular activities, being limited to cheerleading from a chair and concert band.  *Id*. at 112:5-23.  Although Dr. Cowen ***did not review*** M.N.'s deposition testimony, she testified there, *inter alia*, that she marched on the field with the band at football games, that she needed no assistance with things around the house like general hygiene, bathing, doing her hair, fixing her own meals, and that she did these things without any special equipment.  M.N. Depo. at 13:9-13; 14:20-15:1; 102:14-104:2.[11]

---

[10] *See also*, *e.g.*, *id*. at 177:21-25 (Cowen's opinion that M.N. will be on the pain medication, Norco, through age 20 was "based on my evaluation of her").

[11] Excerpts attached as Ex. H.

Dr. Cowen's examination/interview of M.N. differed in a couple of ways from an examination conducted in his own practice.  First, M.N. was charged twice as much for her examination compared to a patient seen in Cowen's practice.  Cowen Depo. at 43:22-44:25 (his charge for the life care plan interview and examination was $750, but had M.N. been his patient, he would have charged $250 or $350 for the evaluation); 47:20-48:2.  Second, while he intends to rely on the ***June 2017*** interview and examination to testify regarding M.N.'s purported disabilities and future medical requirements at trial (occurring sometime in 2018), ***he would not prescribe future care based on a year old exam in his regular practice***.  *Id*. at 106:19-24 ("Q. So in your clinical practice, if you had a patient that you had last seen over a year ago, would you prescribe care for their future medical requirements based on a one year old exam?  A. No, I wouldn't prescribe to a person care as a treater on a one year old exam, no.").[12]

During the formulation of his opinions on diagnoses and future care, Dr. Cowen ***did not reach out to any of M.N.'s doctors***.  *Id*. at 80:6-9.  For example, although the biggest source of his projected future costs is physical therapy, he did not reach out to Dr. Epps, who has provided M.N.'s physical therapy referrals or to Jennifer Arnold, M.N.'s long time physical therapist.  *Id*. at 80:14-81:3.

Dr. Antekeier, M.N.'s treating physician through March 2015, reviewed Dr. Cowen's life care plan to form opinions regarding this litigation, and testified that he "concurs" with Dr. Cowen's evaluation.  Antekeier Depo. at 76:15-18.  However, he also testified that he could not

---

[12] Dr. Cowen likewise does not prescribe treatment for a patient for years in advance, because the need for treatment is determined at the time of the latest visit.  *Id*. at 129:4-15.

say to a reasonable degree of medical certainty that the plan represents the amount of care that will be required by M.N.  *Id*. at 96:4-98:3.[13]

### (d) PLCP Methodology Uses "Charges" Not "Costs" Paid or Incurred

Based upon his records "review" and interview/examination, Dr. Cowen formulated his opinions about diagnoses, disabilities, and future medical requirements, and sent that information back to the PLCP staff.  Cowen Depo  at 62:8-12.  When the PLCP staff received Dr. Cowen's opinions regarding future medical requirements, they then followed PLCP prescribed procedure to source costs for the prescribed future medical requirements with CPT codes and charges from the Context4Health, Inc. database.  *Id*. at 63:19-64:25.  They use that source, because it was "decided upon as a group" and that's the "methodology" "used on all of the plans."  *Id*. at 63:19-64:3.  Furthermore, they use Context4Healthcare's database to determine a UCR 80 rate[14] (also inputting M.N.'s geographic location) for that health care, which is used to project future costs.[15]  And what's more, that "rate" is based on ***charged rate***, ***not the rate the health care provider would actually be paid***.  *Id*. at 116:19-21 ("Q.  So the UCR data is created using the charges rather than the actual costs incurred?  A.  Yes, the charges, correct.").[16]

This "charged rate" results in overstatements of estimated future costs that are 40% to 70% higher than the rates that would actually be paid on incurred for that care, using M.N.'s own

---

[13] Antekeier Depo. excerpts attached as Ex. I.

[14] Using the UCR 80 rate (or the usual customary rate at the 80th percentile) means that only 20 percent of charges for the prescribed service in the database would be higher than the cost for the service included in the life care plan. *Id*. at 115:25-116:10.

[15] *See id*. at 115:14-21 ("Q.  Is it correct that the way costs are sourced regarding the future medical requirements is that you sent this information to PLCP and they plugged in CPT codes where you had them along with the geographic region where [M.N.] is located, and came back with what you have called … UCR 80?  A.  Yes.").

[16] In his own practice, "less than half, for sure," pay the out-of-pocket "charge" amount for their care.  *Id*. at 117:6-13.  Cowen agrees that "in the United States the majority of patients do not pay the amount charged on a bill for medical procedures." *Id*. at 118:9-15.

medical bills.[17]  According to Dr. Cowen, his life care plan assumes M.N. will never have any third party payor coverage (through insurance or government benefits), because it's "not appropriate to use anything other than charges in a life care plan."  *Id*. at 147:23-149:6.  The PLCP/AAPLCP and Cowen's methodology precludes the use of "costs" rather than "charges," because he does not know if M.N. will have insurance and he does not know if she will not.  *Id*. at 143:15-19.

Dr. Cowen, following the PLCP/AAPLCP methodology, argued that it was improper to make any consideration regarding the availability of third party payors, but literature regarding life care plans (discussing life care plans drafted for use outside the context of litigation) indicates such payors should be considered.  *See* Bond, Nancy J. and Lynne P. Trautwein, "The Role of the Pediatric Care Manager in Life Care Planning," appearing in Riddick-Grisham, Susan and Laura M. Deming, *Pediatric Life Care Planning and Case Management* (2d. ed 2011),  at 37 (in developing the pediatric care plan, "[t]he care manager should be aware of

---

[17] Comparing the actual costs incurred by or on behalf of M.N. for services appearing in Dr. Cowen's life care plan shows a significant difference between his projections using "charges" rather than costs actually incurred.  For instance, regarding Dr. Cowen's projection of the value of future physician services, his report uses a CPT code of 99213 for that service, which has a UCR 80 rate of $167.47 using the Context4Healthcare database, and multiplying that $167.47 times the number of visits he anticipates will be necessary, he arrives at his projected cost of Dr. $16,412.06.  *See* Life Care Plan at 7.4.1.  However, looking at the costs actually incurred for a physician visit by M.N., with the same 99213 CPT code, based upon M.N.'s billing records from Dr. Cowen's file, in 2015 M.N. incurred a cost of $104.55 for physician visits, because she had insurance through Aetna.  *See* Cowen Depo. at 129:16-131:15; Cowen Depo. Ex. 17 (attached as Ex. J).  Thus, using the PLCP preferred UCR 80 value, based on "charges" rather than the costs incurred as shown in the April 2015 billing record, may lead to an overestimation of forty percent.  Cowen Depo. at 142:4-24 (the costs estimated in Cowen's plan for orthopedic visits through age 62 (at line 4 of his physician services costs table at 7.4.1) is approximately forty percent higher than what she would incur at the current rate that she incurs for the same visit).  At a later date, when M.N. had both Aetna coverage as well as coverage through the Texas Children's Health Plan, the cost incurred by M.N. or on her behalf for that same physician service (still under the CPT code 99213) was $52.71.  *See id*. at 143:20-145:12.  Using $52.71 as the cost of the physician visit in Dr. Cowen's calculation shows that his "cost" predicted is more than seventy percent higher than if he used the amount incurred for the service reflected in M.N.'s billing records.  *See id*. at 147:6-147:21 (comparing costs projected in line 4 of physician services table at 7.4.1 to incurred costs).

public entitlements, access to public and private support services, and timelines for applications to other services").[18]

Davenport, PLCP's President and drafter of the Present Value Assessment, relies on the accuracy of Dr. Cowen's predictions regarding future medical requirements and nominal value to create his damages assessment.  *See* Davenport Depo. at 8:9-25 (if Cowen's formulation of care or nominal value calculation was erroneous or needed to be changed, his work would also need to be updated).

## ISSUES TO BE RULED UPON AND STANDARD OF REVIEW

Kawasaki respectfully asks the Court to rule upon the admissibility of testimony by Plaintiff's experts under Rule 702 of the Federal Rules of Evidence, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) and progeny, regarding these experts' life care plan/damages valuation, which sets forth M.N.'s purported future medical requirements and expenses.

## ARGUMENT

Under Rule 702, this Court acts as a "gatekeeper" in determining the admissibility of expert witness testimony and opinions:  "The trial judge must ensure that any and all scientific testimony or evidence admitted is not only ***relevant***, but ***reliable***." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) (emphasis added).  According to the United States Court of Appeals for the Fifth Circuit, "the expert's testimony must be reliable at ***each and every step*** or else it is inadmissible.  The reliability analysis applies to all aspects of an expert's testimony:  the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion."  *Knight v. Kirby Inland Marine, Inc*., 482 F.3d 347, 355 (5th Cir. 2007) (internal

---

[18] Attached as Ex. K.  Cowen cites material from Riddick-Graham's book at p. 3, n. 6 of the Life Care Plan.

quotation marks and citation omitted).  *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("***Any step*** that renders the analysis unreliable … renders the expert's testimony inadmissible.  This is true whether the step changes a reliable methodology or merely misapplies the methodology.") (emphasis added).

"The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony."  *Sims v. Kia Motors of America, Inc.*, 839 F.3d 393, 400 (5th Cir. 2016); *see also Samuel v. Toyota Motor Corp.*, 2015 WL 10960956, *2 (W.D. Tex. Feb. 27, 2015) ("The party proposing the expert's testimony has the burden to prove the testimony is admissible by a preponderance of the evidence.") (citing *Bourjally v. United States*, 483 U.S. 171 (1987)).

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court held that the reliability requirements for the admissibility of scientific testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) also apply to other specialized knowledge.  The factors considered in a reliability analysis may include whether a "theory or technique … can be (and has been) tested," whether it "has been subjected to peer review and publication," the known or potential rate of error, and whether the theory or technique is generally accepted by a scientific community.  *Id.* at 149-50 (citing *Daubert*, *supra* at 592-94).  Moreover, the Court in *Kumho Tire* held that this list of factors was not definitive, but that the trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Id.* at 152.  Additionally, the Fifth Circuit has made clear that admissible expert testimony must "adhere to the same standards of intellectual rigor that are demanded in their professional work."  *Watkins v. Telesmith, Inc.*, 121 F.3d 984, 990 (5th Cir. 1997).

I.     **The Unreliability of Plaintiff's Life Care Plan Makes it Inadmissible under Rule 702**

Plaintiff's life care plan, prepared by Dr. Cowen using the "methodology" propounded by AAPLCP (founded by the same persons who founded PLCP to sell "products" to plaintiffs' attorneys), fails to meet the above discussed requirements for reliability, and lacks indicia of reliability required in federal case law applying Rule 702 and *Daubert* to life care planning.

Just like any expert opinion testimony, testimony regarding life care plans, which include opinions regarding future medical requirements and the calculation of costs for that care, is inadmissible unless Plaintiff demonstrates that it meets the requirements of Rule 702 and *Daubert*. Courts determining the reliability of expert life care plan testimony have considered a number of factors. As discussed below, these factors include: (1) whether the expert's methodology is peer-reviewed; (2) whether the expert's opinions fall within or are incident to their area of medical specialty; (3) whether the expert communicated with the plaintiff's treating physicians; (4) whether the expert drafted the life care plan himself or relied on others; and (5) whether the plan includes treatment not prescribed or indicated by the medical records. *See, e.g., Carreon v. King*, No. 3:15-CV-2089-K-BK, 2016 WL 9525670 (N.D. Tex. June 13, 2016); *Queen v. W.I.C., Inc.*, 14-CV-519-DRH-SCW, 2017 WL 3872180 (S.D. Ill. Sept. 5, 2017).

In *Queen v. W.I.C., Inc.*, the district court excluded the testimony of a physician (a certified life care planner and licensed physiatrist with 27 years of experience in private practice), because the methodology and reasoning behind his life care plan were nothing more than "subjective belief and unsupported speculation." *Queen*, 2017 WL 3872180 at *4. Reaching that determination, the court noted, *inter alia*, that the methodology of the expert had not been subject to peer review, that he could not say that he prepared the plan himself (and the contributing author, a nurse practitioner, was not qualified as an expert), that he did not discuss

the life care plan with the plaintiff's treating physicians, and that his background in physical medicine and rehabilitation and his testimony failed to demonstrate that he was able to offer opinions regarding the plaintiff's surgical and orthopedic needs, other than those recommended by the treating physicians. *Id.* at *4-*5. In light of these facts, the court held that the expert's opinions lacked foundation and were "neither relevant within the meaning of Rules 401 and 402 nor helpful to the trier of fact within the meaning of Rule 702." *Id.* at *5 (internal citations omitted).

Other district courts have applied similar criteria to find life planning opinions inadmissible. In *Carreon v. King*, No. 3:15-CV-2089-K-BK, 2016 WL 9525670 (N.D. Tex. June 13, 2016) a magistrate judge excluded opinions regarding medications that the plaintiff would purportedly require through her life expectancy, offered by a nurse life care planner with 30 years of experience in the life care planning industry. The opinions were excluded, because the life care planner "had not spoken to any of Plaintiff's health care providers about the medications" and none of those providers had "indicated that Plaintiff would need those four medications for the rest of her life." *Id*. at *2-3.[19] Accordingly, the court held that the expert's testimony regarding the medications was not "scientifically valid," where the expert had "no basis for concluding that Plaintiff must take several prescription medications from the current date until her normal life expectancy." *Id*. at *3. *See also Rinker v. Carnival Corp.*, 2012 WL 37381, *2 (S.D. Fla Jan. 6, 2012) (excluding life care planner where, among other things, his plan included "various doctors' appointments, various therapies, and an attendant/driver for 16

---

[19] The life care planner in that case had projected that the plaintiff would take the medications from the current date until the end of her projected life expectancy, which was 46.3 more years. *Id.* Dr. Cowen's life care plan projects M.N.'s medication usage for the next 67 years, for a total cost of $66,583.86. Life Care Plan (Ex. B) at 7.4.3.

hours per day for the rest of Plaintiff's life expectancy," but the expert "admitted that he did not speak with Plaintiff's doctors or Plaintiff").

In *Trinidad v. Moore*, 2:15-CV-323-WHA, 2016 WL 5341777 (M.D. Ala. Sept. 23, 2016), the district court excluded a physician life care planner's opinion regarding the need for future surgery, where life care planner was not an orthopedist and there was no evidence in the medical records that the surgery had been recommended. *Id*. at *7-8. Accordingly, the court held that the opinions regarding future surgeries were "based on speculation." *Id*. at *8.

In *Watkins v. New Palace Casino, LLC,* No. 1:13CV224-HSO-RHW, 2014 WL 10100196 (S.D. Miss. Nov. 6, 2014), the court excluded two "scenarios" from the expert's life care plan, one involving a morphine pump and the other involving a spinal cord stimulator, where there was no record or testimony by a physician that either treatment was recommended. *Id*. at *6. Similarly, the court excluded the projected cost of home health care (described as assistance with "meal preparation, washing clothes, helping him when he's in the shower, [and] driving him to his medical appointments") from the life care plan, where the plaintiff's physician had not put limits or restrictions on the plaintiff's activities and had not recommended that the plaintiff would require a home health care aide, finding the opinion unreliable, "*ipse dixit*." *Id*. at *10-11.

These authorities, as well as the Fifth Circuit's requirements than an expert employ the same level of rigor in the courtroom as in their professional work and that their opinions suffer no analytical gaps, require the exclusion of Dr. Cowen's life care plan. First, the "methodology" employed by Dr. Cowen is based on the "tenets, methods and best practices" of the AAPLCP, which was founded by the same people involved in the business of selling life care plan "products," PLCP. There is no indication that the methodology is peer-reviewed. Cowen is

unsure whether it is even used outside the confines of PLCP.  Cowen Depo. at 23:11-14.  Lack of

a peer-reviewed methodology certainly weighs in favor of exclusion under *Daubert*, *Kumho*, and

cases applying a Rule 702 test to life care planning, like *Queen*.

Not only did Dr. Cowen follow PLCP's "methodology" to draft the life care plan, as in

*Queen*, he relied on unqualified persons in its drafting.  According to PLCP procedure, he relied

on **unknown PLCP staff** to review and summarize M.N.'s medical records.  *See id*. at 73:17-23.

While he "scrolled" through the records, he recalls making no revisions to the staff summaries,

which are intended to provide "***the important parts that translate the message of what***

***happened***." *Id*. at 74:13-75:11; 77:1-3.  This factor also weighs in favor of exclusion.

Dr. Cowen's Life Care Plan is also inadmissible for the additional reason that he, himself,

lacks the expertise to offer opinions regarding orthopedic needs, a factor weighing against

admissibility in *Queen* and *Trinidad*.  As admitted by Dr. Cowen regarding medical records

showing the healing of M.N.'s osteotomy, he is not qualified to discuss the status of M.N.'s

healing based on those records and would have to defer to an orthopedist.  *See* Cowen Depo. at

162:7-164:16.

Furthermore, Dr. Cowen's opinions fail to consider important, available information, a

*Daubert* factor requiring exclusion.  His opinions are formed from an incomplete set of medical

records; the latest medical record in his life care plan is from September 2017.[20]  Moreover, he

failed to discuss her records or his life care planning opinions with M.N.'s treating physicians

---

[20] As discussed earlier, at his April 2018 deposition, Dr. Cowen was unaware that M.N.'s external fixator had been removed.  *Id*. at 158:12-14.  Since that time, M.N. has reported that she has been "pain free" and reported "no difficulty" performing activities including usual housework, work and school activities, light and heavy activities around the home, and walking a mile, and has been discharged from physical therapy.  *See* Norris 032196-97, 199 (April 2018 physical therapy record); Norris 32259 (May 2018 physical therapy record).

(*id.* at 80:6-9; 80:14-81:3), a factor weighing in favor of exclusion in *Queen*, *Carreon*, and *Rinker*.

Because his plan did not consider her medical records post-September 2017, and he has not consulted with her health care providers (nor talked with M.N. or Plaintiff since mid-2017), his plan includes **future medical requirements that are not indicated in the current records**, which was grounds for exclusion in *Carreon*, *Trinidad*, and *Watkins*. For instance, Dr. Cowen's plan includes periodic, one hour, physical therapy visits approximately every three weeks (15 times per year) for M.N. from age 15-20. Life Care Plan at 7.4.5. Dr. Cowen estimates the total cost of those visits from ages 15-20 at $21,708.00. *Id.* However, we know from M.N.'s medical records, that she was discharged from physical therapy, due to meeting "all long term goals" in May 2018 (Norris 032259). Similarly, M.N. has recently reported being "pain free," in her physical therapy records (Norris 032199), yet Dr. Cowen's plan projects that M.N. will fill a prescription for Norco every month until age 20, resulting in a cost of $4,137.00. Life Care Plan at 7.4.3.[21]

Dr. Cowen's opinions regarding essential services likewise lack support in the record. Dr. Cowen estimates that M.N. will require $80,400.00 in "Environmental Modifications & Essential Services" based on an assumption that she will need $100 per month in unspecified "essential services" from age 20 to age 82. Life Care Plan at 7.4.7. At his deposition, he testified that the basis for this number was his opinion that "when [he] saw her," she would not have been able to do things like "house cleaning, mowing, weeding." *See* Cowen Depo. at

---

[21] His opinions regarding this medication were based on his approximately 45 minute interview and 15 minute examination of M.N., conducted in June 2017. Cowen Depo. at 177:21-25. He also opines that, beyond age 20, she will regularly require Tylenol and NSAID:Mobic, resulting in $2,797.44 and $58,686.72, respectively. Life Care Plan at 7.4.3.

167:9-168:7.  However, he had not reviewed M.N.'s deposition testimony, wherein she stated that she was able to take care of herself and do things such as fix her own meals without assistance.  *See* M.N. Depo. at 102:14-104:2.  And his examination of M.N. is stale.  Dr. Cowen last "saw her," in June 2017 and, at that time, she was still wearing the external fixator.  Since then, the fixator has been removed, and as seen in the previously discussed physical therapy records from April and May of this year, she reports "no difficulty" with activities including usual housework and light and heavy activity around the home.  Accordingly, Dr. Cowen's opinion that M.N. will require $80,400.00 in essential services, based on a year old examination of M.N. prior to the removal of her external fixator, and without any indication in her medical records that she requires such services, is nothing more than sheer speculation.  Like the opinion regarding home health services in *Watkins v. New Palace Casino*, Dr. Cowen's opinions regarding essential services should be excluded, here.

Given all of the above, the lack of peer reviewed methodology, role of unqualified persons in the drafting of the plan, his inability to opine on records regarding her orthopedic status (such as the healed osteotomy), his failure to consider important available information, including his failure to discuss his opinions or plan with M.N.'s treating physicians, and the inclusion of services not supported by the record, Dr. Cowen's plan is unreliable and inadmissible at trial.

## II.    The Inadmissiblity of the Life Care Plan Makes the Present Value Assessment Inadmissible

As explained above, Davenport's Present Value Assessment simply applies inflation and a discount rate to the nominal value of the required medical care set forth in Dr. Cowen's Life Care Plan.  As Davenport admitted at his deposition, should Dr. Cowen have made an error in drafting

the Life Care Plan, his Present Value Assessment would have to be likewise amended.  *See* Davenport Depo. at 8:11-25.

Because Dr. Cowen's Life Care Plan is unreliable and inadmissible, it necessarily follows that Davenport's Present Value Assessment is inadmissible, as well.  *See Queen*, *supra*, at 2017 WL 3872180, *5 (finding that where the opinions on future medical treatment were unreliable, "it follows that [the] cost valuation opinion based on those recommended treatments" lacks a "proper foundation").  Accordingly, Davenport's Present Value Assessment must be excluded from trial, as well.

<u>**CONCLUSION**</u>

In light of all of the foregoing, Kawasaki asks that the Court enter an Order excluding the opinion testimony of Plaintiff's life care planning experts, Dr. Todd Cowen and William Davenport.

Respectfully submitted,

By */s/Richard A. Mueller*
THOMPSON COBURN LLP
Richard A. Mueller (*pro hac vice* and attorney-in-charge)
Heather F. Counts (*pro hac vice*)
505 N. 7th St., One US Bank Plaza,
St. Louis, MO 63101
T: (314) 552-60
F: (314) 552-7000
rmueller@thompsoncoburn.com
hcounts@thompsoncoburn.com

Jeffrey S. Hawkins
GERMER, BEAMAN & BROWN, PLLC
State Bar No. 09249100
301 Congress Avenue, Suite 1700
Austin, Texas 78701
T: (512) 472-0288
F: (512) 482-3520
Jhawkins@germer-austin.com

*Attorneys for Defendants*

## CERTIFICATE OF CONFERENCE

Defense counsel has conferred with Plaintiff's counsel, Scott West, concerning the

instant Motion, and the parties were unable to reach agreement.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded on this

17th day of August, 2018, via email to:

| | |
|---|---|
| S. Scott West | Richard P. Hogan, Jr. |
| The West Law Firm | Hogan & Hogan |
| 1600 Highway Six, Suite 450 | 711 Louisiana, Suite 500 |
| Sugar Land, Texas 77478 | Houston, TX 77002 |
| scott@westfirm.com | rhogan@hoganfirm.com |

*Attorneys for Plaintiff*

*/s/ Richard A. Mueller*