1          **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE SOUTHERN DISTRICT OF TEXAS**
2                  **HOUSTON DIVISION**

3  DORIS DENISE NORRIS,           )        NO. 4:16-CV-2424
   INDIVIDUALLY AND AS NEXT       )
4  FRIEND OF M.N., AN INJURED     )
   MINOR                          )         Houston, Texas
5                                 )      1:29 p.m. - 4:54 p.m.
                                  )
6  VS.                            )        OCTOBER 5, 2018
                                  )
7                                 )
   KAWASAKI MOTORS CORP., USA,    )
8  ET AL                          )

9

10  ************************************************************

11                     **JURY TRIAL**

12                      **(DAY 5)**

13  **BEFORE THE HONORABLE CHIEF JUDGE LEE H. ROSENTHAL**

14           **UNITED STATES DISTRICT JUDGE**

15          **TRIAL TESTIMONY OF KEVIN BREEN**

16  ************************************************************

17  APPEARANCES:

18  FOR THE PLAINTIFFS:

19       Mr. S. Scott West
         The West Law Firm
20       1600 Highway Six, Suite 450
         Sugar Land, Texas  77478
21       Tel:  281-277-1500
         Email:  scott@westfirm.com
22
         Mr. Richard P. Hogan
23       Hogan & Hogan
         711 Louisiana, Suite 500
24       Houston, Texas  77002
         Tel: 713-222-8800
25       Email:  Rhogan@hoganfirm.com

2

```
 1 | FOR THE DEFENDANT:

 2 |      Mr. Richard A. Mueller
   |      Ms. Heather F. Counts
 3 |      Thompson Coburn LLP
   |      505 N. 7th Street
 4 |      One US Bank Plaza
   |      St. Louis, Missouri  63101
 5 |      Tel:  314-552-6000
   |      Email:  rmueller@thompsoncoburn.com
 6 |              hcounts@thompsoncoburn.com

 7 |      Mr. Jeffrey S. Hawkins
   |      Germer, Beaman & Brown, PLLC
 8 |      301 Congress Avenue, Suite 1700
   |      Austin, Texas  78701
 9 |      Tel:  512-472-0288
   |      Email:  Jhawkins@germer-austin.com
10 |

11 | COURT REPORTER:

12 |      Ms. Kathleen K. Miller, CSR, RMR, CRR
   |      515 Rusk, Room 8004
13 |      Houston, Texas  77002
   |      Tel:  713-250-5087
14 |
   | Proceedings recorded by mechanical stenography.
15 | Transcript produced by computer-assisted transcription.

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |
```

3

1                                    **INDEX**

2  **KEVIN BREEN**

3          Direct by Mr. Mueller                        4
           Voir Dire by Mr. West                       40
4          Direct by Mr. Mueller                       42
           Voir Dire by Mr. West                       60
5          Direct by Mr. Mueller                       61
           Cross by Mr. West                           99

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*KEVIN BREEN – DIRECT BY MR. MUELLER*

1  **(Jury in.)**

2          THE COURT:  Please be seated, ladies and

3  gentlemen.  The plaintiff having rested, it is now

4  Kawasaki's opportunity to present witnesses, in addition to

01:29:30  5  cross-examining the plaintiffs' witnesses, which it has

6  done.

7          MR. MUELLER:  Thank you, Your Honor.  At this

8  time the defendants would like to call Mr. Kevin Breen to

9  the stand.

01:29:37  10          THE COURT:  All right.  Is he here?

11              Come on up, please, sir.  You can pause

12  there and raise your right hand to be sworn.

13              (Witness sworn.)

14          THE WITNESS:  Yes, I do.

01:30:03  15          THE COURT:  If you could take the witness

16  stand.  And as you testify, lean forward and pull that mic

17  towards you.  You have to speak closely into it.  It does

18  not pick up well from a distance.

19                      **KEVIN BREEN,**

01:30:20  20  duly sworn, testified as follows:

21                  **DIRECT EXAMINATION**

22  BY MR. MUELLER:

23  **Q.**   Good afternoon, Mr. Breen.

24  **A.**   Good afternoon.

01:30:24  25  **Q.**   First of all, please state your name for the record.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   **A.**   My name is Kevin Breen.

2   **Q.**   And just as an introduction, can you -- where do you

3   work?  Can you tell me a little bit about yourself?

4   **A.**   I work for a company called Engineering Systems, or

01:30:37   5   ESI.

6   **Q.**   And what is -- what is ESI?

7   **A.**   We are a consulting and engineering firm of about 250

8   people that do a variety of work and do standards

9   development, testing, research.  We also get involved in

01:30:55   10   loss investigation of various types:  Explosions, fires,

11   crashes, airplane events, things like that.

12   **Q.**   How many -- how many engineers work at ESI?

13   **A.**   I think there is about 120, or something like that.

14   **Q.**   Do you have a number of different offices?

01:31:17   15   **A.**   Yes.

16   **Q.**   How many different offices do you have?

17   **A.**   I think there is about 15.

18   **Q.**   Okay.  And can we pull up Exhibit 119, please?

19             Of the offices that you have, do you have

01:31:39   20   any offices in Texas?

21   **A.**   Yes, as a matter of fact, we have got an office in

22   Conroe, and the vehicle that I understand the jury looked

23   at earlier this week was actually stored there and brought

24   down by one of the guys from there.

01:31:52   25   **Q.**   Okay.  And so, at 119, is this a copy of your CV?

6

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   **A.**   Yes, it is.

2   **Q.**   Okay.  Now, I am looking here, if we look at the top

3   part, it refers to you, you're a managing principal and

4   director of marine and automotive research engineering at

01:32:13   5   ESI.  Tell me, what is the automotive and marine -- marine

6   and automotive research for ESI?

7   **A.**   Well, it's one of the practice groups within the

8   company, and by the title it's focused in -- basically on

9   vehicle-type things or marine-type things.  I generally

01:32:31   10   refer to it as "things with engines and/or wheels."  So it

11   would be a broad range of automotive and/or marine

12   applications.

13   **Q.**   Okay.  And how long have you been working at ESI?

14   **A.**   Since 2001.

01:32:45   15   **Q.**   Okay.  Where did you work before that?

16   **A.**   I had my own company.

17   **Q.**   Okay.  And what was that called?

18   **A.**   It was called Breen Associates.

19   **Q.**   All right.  And could you give the jury some sense of

01:32:55   20   your educational background?

21   **A.**   Sure.  I first received a Bachelor of Science in

22   Engineering from the University of Illinois.  It was from

23   the Department of Materials Engineering.  It dealt with

24   design use of materials, design how materials bend, break,

01:33:13   25   and deform when loads are applied to them, and to some

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   extent to help with basic mechanical engineering

2   principles as well.

3                    I then continued my education and received

4   a Master's in Industrial Engineering at a school called

01:33:25    5   Midwest College of Engineering, with the focus in the area

6   of human factors.

7   **Q.**   Okay.  And do you -- are you -- are you a licensed

8   engineer?

9   **A.**   Yes, I am.

01:33:34   10   **Q.**   And explain to the jury what that means to be a

11   licensed engineer.

12   **A.**   Well, it's a process that you go through that has

13   certain steps to it, and the first one is having an

14   accredited engineering degree.  The next step is having

01:33:52   15   some number of years of documented experience, and then

16   you're required to take a test on engineering principles,

17   and then take a test on application to engineering, and

18   then there is also a test related to -- sort of the

19   practice of engineering in terms of what engineers are

01:34:08   20   supposed to do from a legal standpoint due to stamping

21   drawings, and things of that nature.  And then at least in

22   most states, a requirement to have an ongoing continuing

23   education for the rest of your career.

24   **Q.**   Now, you -- it says -- I am looking here under

01:34:24   25   education.  You have engineering degrees both from the

KEVIN BREEN - DIRECT BY MR. MUELLER

1   University of Illinois and the Midwest College of

2   Engineering; is that right?

3   **A.**   Yes, sir.

4   **Q.**   Okay.  Now, if we go over to the next page, under

01:34:35   5   your professional affiliations and honors, I would like to

6   talk to you -- the very first thing you have listed up

7   there is the Society of Automotive Engineers.  Can you --

8   can you tell the jury a little bit about what the Society

9   of Automotive -- or what you refer to here as also SAE,

01:34:57   10   what that is?

11   **A.**   Sure.  SAE is a group of technical people worldwide

12   that deal with a wide range of automotive applications,

13   maybe automotive applications in cars, in airplanes, in

14   construction equipment, agricultural equipment, marine

01:35:16   15   equipment, and, you know, they -- they develop standards

16   and technical information regarding these products.

17             And, for example, I am going to say that

18   there is probably hundreds of SAE standards that relate to

19   the cars we drive every day.  And so for each of those

01:35:31   20   standards there was a committee on SAE that got together,

21   technical people that were knowledgeable about that

22   particular aspect of the vehicle, and developed those

23   standards, and then update those standards on a regular

24   basis.

01:35:43   25             So, for example, if you go to Jiffy Lube

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    this weekend to get the oil changed in your car, and the

2    guy, you know, at this place says, Okay, I am going to

3    change your oil.  What kind of oil do you want?  And you

4    say, Well, I will take -- he says, Okay, do you want

01:35:56   5    SAE -- 10W30, and that is one of the choices you would

6    have.  There is an SAE committee that determined what it

7    means to have 10W30 oil as opposed to 40-weight oil, or

8    something like that.

9                But pretty much every part of the car,

01:36:09   10   every part of an automotive product, has some sort of an

11   SAE committee that has developed standards or test

12   criteria with that part or product.

13   Q.   And do -- and do many of these standards relate to

14   the safety aspects of the products?

01:36:25   15   A.   Sure.  A lot of them do.  Obviously, oil, you're more

16   concerned about the car engine not seizing.  There are

17   standards for seatbelts.  There are standards for

18   headlights, brakes, vehicle handling, how to test vehicle

19   handling, pretty much, you know, everything you can think

01:36:41   20   of.

21   Q.   Now, looking down under this column here for SAE, it

22   looks like you have a list of, looks like, five committees

23   there.  Are these committees that you have served on?

24   A.   Yes.  There is actually four.  One of them I have had

01:36:59   25   two different roles on, but there is four committees

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    there.

2    **Q.**    Oh, I see.  Okay.  So that first one, the Special

3    Purpose Vehicle Committee, I guess, you have been a member

4    since 1988, it says, and then -- but you also were the

01:37:12    5    chairman of that committee from 1988 to 2003.  Is that --

6    do I understand that correctly?

7    **A.**    Yes.  That's correct.

8    **Q.**    Okay.  Now, can you tell the jury, what is the --

9    that's a little -- what is the special purpose vehicle?  I

01:37:26    10    mean, what is a special purple vehicle?

11    **A.**    Well, as the term would describe, it is a vehicle

12    with a special purpose, unlike say a motorcycle or a

13    passenger car or a light truck or something like that.

14    The Special Purpose Vehicle Committee was created to

01:37:41    15    evaluate and provide standards and technical information

16    for vehicles that have a special purpose, utility vehicles

17    or closed community vehicles or all-terrain vehicles or

18    things like that.

19    **Q.**    Well, we have had some -- heard some evidence in this

01:37:56    20    case about a standard called SAE J2258.  Now, are you

21    familiar with J2258?

22    **A.**    Yes, I am.

23    **Q.**    Do you know, approximately, what the first year was

24    of the 2258 standard?

01:38:10    25    **A.**    I believe it was published in the mid '90s. I want to

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    say about 1996.  The work began on it, I believe, in about

2    1994, but somewhere in that time frame.

3    **Q.**   Okay.  Now, would -- do I -- in relationship to the

4    Special Purpose Vehicle Committee, what is its

01:38:29    5    relationship with J2258?

6    **A.**   That's the committee that actually developed that

7    standard.  So, there was a group put together within the

8    Special Purpose Vehicle Committee that did the research,

9    did the work, and developed that standard.

01:38:42    10   **Q.**   So if I'm trying to put the pieces of the puzzle

11   together here, would I understand at the time that

12   standard was initially passed in the '90s, that you were

13   actually the chairman of the committee that adopted that

14   standard?

01:38:57    15   **A.**   That's correct.

16   **Q.**   Okay.  Now, let me -- let me just pause you right

17   there.  I think the jury has heard some testimony to the

18   effect that these SAE committee meetings are secret

19   somehow, that nobody is allowed to go but inner circle

01:39:15    20   people or things of that kind.  Can you explain to the

21   jury when these committee meetings are held what the

22   process is and how that all works?

23   **A.**   Well, it's changed over the years as the Internet has

24   become more prevalent, but basically the -- there are

01:39:29    25   announcements that are sent around, or posted on the

KEVIN BREEN - DIRECT BY MR. MUELLER

1    Internet now, for committee meetings and they are open to

2    the public.  There are people that are members of the

3    committee that actually do the work, do the research, and

4    ultimately vote up or down on whether to approve a

01:39:46   5    standard or recommended practice.  But anybody can attend

6    a meeting, anybody can participate, submit data, submit a

7    view on something.

8                    There has been times in some of the

9    committee meetings when there is an equal number of people

01:40:00  10    in the room that are actually on the committee or people

11    that are there just to participate because it's a

12    technical area that they know something about and they

13    want to make sure that their input is considered by the

14    committee.

01:40:10  15    Q.   And do these committees, and particularly the special

16    purpose committee, do they actually send out public

17    notices so that if you weren't a member, you would know

18    where to show up and, you know, get -- how to get there?

19    A.   Sure.  There is also an opportunity to do a call-in,

01:40:25  20    or a Webex, or something like that.  It is a pretty

21    transparent way.  You just have to know to ask, I guess.

22    Q.   Okay.  And then for the Special Purpose Vehicle

23    Committee, have there been occasions in which people from

24    the public at large have come in and to observe how -- the

01:40:41  25    committee discussions and so forth?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

KEVIN BREEN - DIRECT BY MR. MUELLER

1    A.    Oh, I'd say more than observe them.  We have had

2    people at the committee on a number of occasions that made

3    presentations, that made demonstrations, things of that

4    nature.

01:40:53    5    Q.    All right.  And now the -- the one that is applicable

6    here that the jury has seen is the 2010 edition of J2258.

7    In and around 2010, were there any government agencies

8    that were -- that were members of the Special Purpose

9    Vehicle Committee?

01:41:16   10    A.    There were individuals who were employees of

11    governmental agencies that were both members and

12    participated in that, the committee at large, so to speak.

13    Q.    And when I -- are we talking about just one

14    government agency or more than one?

01:41:30   15    A.    No.  There was -- back in that time frame I think

16    there was -- there was someone from the Forest Service

17    that they used special purpose vehicles a lot for forest

18    issues, especially in firefighting, things like that.  So

19    they had an interest in how these vehicles were developed,

01:41:44   20    and there was a pretty active participant from that group.

21                    As I recall, there may have been someone

22    there at that point in time from the Park Service.  There

23    was a representative there from Transport Canada --

24    they're equivalent to the Department of Transportation in

01:41:58   25    Canada -- that was interested in how those standards were

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   developed for applications in Canada.  And there were from

2   time to time people with CPSC that were involved in

3   reviewing that committee's work.

4   **Q.**   Okay.  Now, I want to go through the -- these other

01:42:12   5   committees, but I -- well, I guess I will, just briefly.

6   The other committee you work on is the Special Vehicle and

7   Equipment Division; is that right?

8   **A.**   Yes.

9   **Q.**   Now, what is the Special Vehicle and Equipment

01:42:26   10   Division of SAE?

11   **A.**   Well, from a structure standpoint, SAE is set up like

12   a big company.  It is -- it's got hundreds of thousands of

13   members, and so the Special Vehicle Equipment Division is

14   a division that handles a number of specialty type of

01:42:40   15   things.

16                     For example, motorcycles fall under that

17   division, personal water craft, marine technology.  The

18   special purpose vehicles fell -- fall within that

19   committee.  And so there was both an executive committee

01:42:53   20   who kind of oversaw the operation of the individual

21   committees and then the individual committees.

22   **Q.**   All right.  And so you were on the executive

23   committee of those division -- I guess, what you're saying

24   is the division kind of oversees all these other

01:43:08   25   committees?

15

1    **A.**    Right.  It's a grass-roots organization where things

2    basically come up to the members, or from outside in to

3    the membership.  The committee works up standards,

4    recommended practices, technical information, whatever;

01:43:20    5    but at some level, it is just like with any large

6    organization, somebody has to oversee to make sure that it

7    is relevant to be done, that it is following, you know,

8    accepted practices, that it is being run through the

9    proper channels, and everybody that wants to have a say in

01:43:33    10    what that standard or whatever ought to be has the

11    opportunity to be hired.

12    **Q.**    All right.  Now, I won't go through the rest of the

13    committee, but would -- tell me this.  Is the -- is the

14    SAE, is that -- is this like a -- kind of an organization

01:43:48    15    of people, volunteers?

16    **A.**    There are a large number of volunteers, but there is

17    also professional staff.

18    **Q.**    Oh, I'm sorry.  I saw the problem with my question.

19    I mean, how about you, for example?  Do you get

01:44:01    20    compensated for the time and effort you spend working at

21    all these safety standards?

22    **A.**    No, I do not.

23    **Q.**    All right.  Now, moving on, under the affiliations

24    and honors, it mentions here that you're a part of the

01:44:15    25    Human Factors and Ergonomic Society.  First of all, can

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    you tell the jury, when we're talking about either human

2    factors or ergonomics, what is that area of endeavor?

3    **A.**    That is the scientific discipline of how people

4    interact with equipment in various environments.  For

01:44:35   5    example, human factors looks at reaction time, you know,

6    if I am driving a car, how long does it take me to process

7    information if the light changes from green, yellow, red.

8                It deals with how much force and effort I

9    can put into doing certain tasks like shifting a car or

01:44:51   10   pushing on a brake pedal.  So it deals with certainly the

11   human element, so to speak.  But it also deals with how

12   people process information in terms of there are --

13   information communicated to people, how they understand

14   it, in terms of using that information as a part of doing

01:45:07   15   things or operating equipment.

16   **Q.**   Is this an area -- well, first of all, can you tell

17   the jury how many years you have been a member of the

18   Human Factors and Ergonomic Society?

19   **A.**    It's been a long time.  I joined when I was in grad

01:45:22   20   school while working on my research project with health

21   and human factors, so that's probably been at least --

22   **Q.**   A long time?

23   **A.**    -- 45 years ago, yeah.

24   **Q.**   All right.  But is this a -- is this an area of

01:45:35   25   endeavor and study in which you -- you have expertise?

1  **A.**   Yes, it is.

2  **Q.**   Okay.  And you have been -- you're here today

3  testifying, right?

4  **A.**   Yes, sir.

01:45:46  5  **Q.**   I guess you were retained in this case by

6  Mr. Hawkins?

7  **A.**   Yes.

8  **Q.**   I guess you're billing Mr. Hawkins for your time and

9  work here?

01:45:55  10  **A.**   My firm is, yes.

11  **Q.**   Okay.  Did -- let me ask you this.  What's -- the

12  next organization that you have achieved a membership in

13  is the Association for the Advancement of Automotive

14  Medicine.  Can you tell the jury what that area of

01:46:13  15  endeavor is?

16  **A.**   Yes.  That's a group of medical people, engineers,

17  and scientists that look at what happens in car crashes,

18  motorcycle crashes, pedestrian crashes, whatever, in terms

19  of the human injury end of things, in terms of looks at

01:46:35  20  things like seatbelts, car seats, helmets.

21             It also looks at state laws and federal

22  laws, you know, the -- the AAA was one of the biggest

23  proponents of seatbelt laws in this country.  They also

24  look at DUI issues and things like that to try to look at

01:46:52  25  sort of the whole picture of preventing injuries to people

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    that are using motorized vehicles.

2    **Q.**   All right.  Well, let's see if we can -- I am going

3    to -- Oh, I want to cover this last one.  You are -- well,

4    the one down here, you say Society of Accident

5    Reconstructionists.  Now, tell the jury what the area of

6    accident reconstruction is.

7    **A.**   Well, accident reconstruction is the technical

8    discipline of looking at how an accident happened.  And,

9    you know, typically a crash occurs in just a relatively

10   short time, you know, a couple of seconds or so.  There

11   may have been some things that led up to that where, you

12   know, say it's an intersection collision where somebody is

13   approaching a red light, another guy is approaching a

14   green light, and they make decisions, but, ultimately,

15   boom, something happens, you know, in a very short period

16   of time.

17              And what accident reconstruction is, is

18   it's in some ways a lot like -- like they do in a TV thing

19   with a football game, you know, a football play goes in a

20   few seconds.  Then they go back and look at it and show,

21   you know, each viewpoint from the, you know, defensive

22   line viewpoint, looking down the line to see where a block

23   maybe got missed, or whether a guy, you know, was holding,

24   or something like that that allowed that play to either

25   not go the way it was supposed to or go the way it did.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   And that is what accident reconstruction is, going through

2   and looking at incrementally each of the little steps

3   along the way that had to happen in order for an accident

4   to occur.

01:48:16   5          If I was looking at what people recall in

6   terms of their -- their observations about an accident,

7   involves looking at the physical evidence, looks at

8   applying the laws of science to it, and also sometimes

9   involves testing and research.

01:48:32   10  Q.   I am going to try and skip through the rest of this

11  quickly.

12          Go on to the next page.  For the top

13  there, you have had an opportunity, you have been asked to

14  teach certain classes in materials failure analysis and

01:48:47   15  accident reconstruction?

16  A.   Yes.

17  Q.   Below that you have listed a number of areas in which

18  you have issued technical reports.

19  A.   Yes.

01:48:57   20  Q.   You have taken a number of continuing education

21  courses.  And I -- if you go on to the next page, you list

22  them all there, and I certainly won't go through them all,

23  but you have -- it seems like you spent a good deal of

24  your time continuing to keep yourself abreast of your

01:49:18   25  areas of endeavor?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    **A.**    Sure.

2    **Q.**    All right.  And then if we go back over to the final

3    page, it looks like a page and a half.  Can you go through

4    those pages?  Two pages?

01:49:33    5    **A.**    Yes, something like that.

6                    THE COURT REPORTER:  When you turn away, I

7    cannot hear you.

8    BY MR. MUELLER:

9    **Q.**    We will start there.  In any event, so you have

01:49:57   10    several pages of paper that you have written in a variety

11    of fields?

12    **A.**    Correct, generally dealing with accident

13    investigation, accident reconstruction, and vehicle stuff.

14    **Q.**    And would it be fair for me to assume that this is

01:50:11   15    probably not the first time someone has asked you to come

16    into a court of law to express your opinions on a case?

17    **A.**    It is not.

18    **Q.**    Okay.  And have you been qualified in other courts

19    before in the areas of accident reconstruction, design

01:50:26   20    analysis, and human factors?

21    **A.**    Yes, I have.

22    **Q.**    Okay.  And are those the three principal areas in

23    which you have devoted as far as your analysis in this

24    case?

01:50:35   25    **A.**    Yes.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

 1   **Q.**   Okay.  Now, I would like to -- Oh, I just want to
 2   cover one thing quickly.
 3          MR. MUELLER:  If we can pull up Exhibit 20.
 4   That's good.
01:50:54  5   BY MR. MUELLER:
 6   **Q.**   What is Exhibit 20?
 7   **A.**   It's a copy of the 2010 version of SAE J2258.
 8   **Q.**   Is that the standard that governs the -- let me --
 9   start with the predicate.
01:51:15  10          This case involves a 4010 KAF 620 Kawasaki
11   MULE; is that right?
12   **A.**   Yes.
13   **Q.**   Okay.  Is this the standard that applies to the 2013
14   Kawasaki 4010 MULE?
01:51:28  15   **A.**   Yes, it is.
16   **Q.**   Okay.  Now, we have -- I think the jury has heard
17   some confusing evidence about the difference between
18   standards and recommended practices.  Let me ask you
19   something about this.  Does the SAE --
01:51:42  20          MR. WEST:  Excuse me, Your Honor.  I object to
21   the sidebar about whether it was confusing.
22          THE COURT:  All right.  Rephrase.
23          MR. MUELLER:  Yes, Your Honor.
24   BY MR. MUELLER:
01:51:50  25   **Q.**   Does the SAE issue publications that are actually

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   entitled "Recommended Practices"?

2   **A.**   Yes, we do.

3   **Q.**   Okay.  And do they issue something like what we're

4   looking at right here where it says in the title, "Surface

01:52:07  5   Vehicle Standards"?

6   **A.**   Yes, they do.

7   **Q.**   Okay.  So is the J2208 in the SAE terminology, is

8   this a standard or is it a recommended practice?

9   **A.**   This document is a standard.

01:52:24  10  **Q.**   Okay.  And does the 2258, does it have criteria in

11  it, or requirements in it, that would relate to occupant

12  retention?

13  **A.**   Yes, it does.

14  **Q.**   Okay.  And can you explain a little bit of that to

01:52:40  15  the jury?  What about 2258 deals with issues of occupant

16  retention?

17  **A.**   There's a couple of aspects of this standard that

18  deals specifically with that.  One is there's a provision

19  for seatbelts, depending on certain criteria that the

01:52:56  20  vehicle may -- may or may not fall under.  There is also

21  criteria for handholds and hip restraints that also are a

22  part of the occupant retention system.

23  **Q.**   I missed the last part of all that.

24  **A.**   Hip restraints.

01:53:12  25  **Q.**   And --

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    **A.**    And the part about the occupant retaining system.

2    **Q.**    Okay.  And as far as the occupant retention

3    requirements or specifications in 2258, did you as a part

4    of the work that you were doing for Mr. Hawkins, evaluate

01:53:29    5    whether this Kawasaki MULE complies in all those respects

6    with the SAE standard?

7    **A.**    Yes, I did.

8    **Q.**    And can you tell the jury what your conclusions were?

9    **A.**    That the -- the vehicle involved in this -- this

01:53:41    10    matter of Kawasaki MULE 4010 does, in fact, comply with

11    all of the occupant-retention requirements within this

12    standard.

13    **Q.**    All right.  Now, I want to briefly skip -- we are

14    going to come back to this later.  I want to briefly skip

01:53:54    15    over.

16         MR. MUELLER:  Can you put up Exhibit 155?

17    BY MR. MUELLER:

18    **Q.**    Tell the jury what Exhibit 155 is.

19    **A.**    This is SAE J2358, the 2010 edition, which is a

01:54:18    20    standard that relates to low-speed vehicles.

21    **Q.**    Does J2358 apply to the Kawasaki 4010 MULE?

22    **A.**    It does not.

23    **Q.**    And can -- is there -- as far as you know, since

24    you've held a number of pretty high positions at SAE, does

01:54:35    25    anybody at SAE think that the 2358, that you know of, that

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   the 2358 applies to the Kawasaki MULE?

2              MR. WEST:  Objection, Your Honor.  It calls for

3   speculation as to what other people know.

4              THE COURT:  Rephrase it.

01:54:49  5   BY MR. MUELLER:

6   Q.   All right.  Have you -- I take it doing all the

7   volunteer work you do at SAE that -- let me go back.

8                     2358, that we have here, which committee

9   is the committee that adopted 2358?

01:55:05  10   A.   It would be the Special Purpose Vehicle Committee

11   that I was chairman of.

12   Q.   So at the time this -- this is the same committee

13   that you were the chairman of up until 2003?

14   A.   Correct.

01:55:15  15   Q.   And the same committee that you were a member of in

16   2010?

17   A.   Correct.

18   Q.   Okay.  And has the committee, the Special Purpose

19   Vehicle Committee, ever issued any statements that say

01:55:27  20   that this standard would -- would apply to the MULE?

21   A.   No.

22   Q.   Okay.  And can you tell the jury why it doesn't?

23   A.   This standard was actually developed in response to

24   what -- what I felt personally was an inadequate standard

01:55:43  25   that was developed by the Federal Motor Vehicle Safety

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN – DIRECT BY MR. MUELLER*

1    Standard for small vehicles that are golf-cart based

2    sometimes or little bubble vehicles that are driven on the

3    road in communities and things like that.

4                    And there was a standard developed by the

01:55:57    5    federal government for that vehicle that, for example,

6    didn't include any provisions for brakes, didn't include a

7    lot of things that I felt and SAE felt should have been on

8    that standard.  So we developed this standard to provide a

9    more robust standard for those type of vehicles to be

01:56:13   10    tested to and evaluated by.

11                    This is strictly for vehicles that are

12    used in an on-road setting all the time.  They are not

13    off-road part of the time, on-road part of the time.  They

14    are an on-road vehicle in certain communities, for

01:56:25   15    example, retirement communities, and things like that, or

16    golf course communities that were -- where the community

17    permits use there and allows the vehicle.  There are

18    provisions for turn signals and things like that that

19    would be relevant to being an on-road vehicle.

01:56:40   20    Q.   Now, going back to the -- your work experiences, have

21    you -- do you get that -- hired to get involved -- do work

22    that is not related to litigation?

23    A.   Yes.

24    Q.   Okay.  Can you tell the jury, give the jury some

01:56:58   25    examples of that?

1    **A.**    Sure.  I know from time to time I am asked by

2    companies to evaluate new products that are developed.

3    For example, there was a time when John Deere was

4    taking -- John Deere is an agricultural company,

01:57:14  5    obviously.  They make a vehicle conceptually similar to

6    the MULE, and it's called the Gator.  And they were in the

7    process of taking that vehicle and moving it into a

8    more -- more sporty-type of application, and so I spent

9    some time with them looking at vehicle handling, the

01:57:35  10    occupant retention systems, the seatbelts, and that type

11    of thing in terms of them developing that product that was

12    a little more sporty, for lack of a better term, than the

13    standard Gator.

14               I have done work for people like Yamaha

01:57:49  15    with side-by-side vehicles in terms of looking at human

16    factors, drivers' consideration, developing on-product

17    labeling.  Also done work for governmental agencies around

18    the world, largely related to special purpose vehicles.

19               For example, I did some work with the

01:58:03  20    Australian Farm Safety Group to look at the use of ATV s

21    versus MULE type of vehicles in an agricultural setting in

22    Australia.  Did something similar to that for the Canadian

23    Forest Industry Council.  There has been other situations

24    like that.

01:58:21  25    **Q.**   Have you had occasions to perform research projects

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   at the request of the CPSC?

2   **A.**   Yes, I have.

3   **Q.**   Okay.  On more than one occasion?

4   **A.**   Yes.

01:58:31   5   **Q.**   All right.  Now, let me see here.  Oh, I wanted to

6   talk to you about your -- your experiences with the

7   Kawasaki MULE.  Before Mr. Hawkins hired you in this case,

8   had you had experiences either with using or studying the

9   Kawasaki MULE?

01:58:52   10   **A.**   Yes, I have.

11   **Q.**   Can you tell the jury a little bit about that?

12   **A.**   It, I guess, first started when the MULE came out

13   that we -- volume of material, looked at the vehicle and

14   it was involved as a part of the candidate of vehicles we

01:59:08   15   looked as a part of that first SAE J2258 standard

16   development.  So that was a vehicle that the committee

17   looked at, operated, you know, kicked the tires on, so to

18   speak.  I have operated them a number of times personally.

19   I have worked on other projects that involved MULES.

01:59:25   20   **Q.**   Okay.  Now, I want to talk to you about your

21   background a little bit as far as -- let me preface that.

22   As far as the work that you did for Mr. Hawkins in this

23   case, did you perform any testing?

24   **A.**   Yes, I did.

01:59:40   25   **Q.**   Okay.  Can you -- can you tell us, the jury,

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    something about your background as it relates to either

2    doing testing or experiments of the type that you did for

3    Mr. Hawkins?

4    **A.**    The work that I have done has largely been, from an

01:59:54    5    engineering standpoint, hands on type of stuff.  I am not

6    an engineer that sits at the drawing board or the computer

7    and does stuff.  I am -- I have a test lab and test --

8    test areas in my facility in Florida, and we have off-road

9    driving areas.  We have some on-road driving areas.  And

02:00:12    10    so a good part of the work that I do involves testing.

11    And it may involve full vehicle testing, but it might --

12    also may involve component testing, or human factors

13    testing, or durability testing, or things like that.

14    **Q.**    Now, just so I want to make sure we can kind of get

02:00:29    15    our terminology squared away, you just referred to

16    four-wheelers.  What's another name for four-wheelers?

17    **A.**    Well, there's -- obviously, four-wheelers is kind of

18    a term that we apply to a lot of vehicles.  My pickup

19    truck has four wheels.

02:00:41    20    **Q.**    Yeah.

21    **A.**    An ATV has four wheels, and it is, I think, referred

22    to by a lot of people as a four-wheeler.

23    **Q.**    So when you just were talking about doing testing on

24    four-wheelers that was like ATV testing?

02:00:52    25    **A.**    ATV, side-by-sides, you know, vehicles of that type.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  **Q.**  So, go back to the answer you gave me before.  And

2  when the Special Purpose Vehicle Committee was first

3  working on standards for these UTVs, if you will, did --

4  was a part of that work involved in an evaluation and

02:01:10  5  study of the MULE and its characteristics?

6  **A.**  It was one of the vehicles that was on the market at

7  that point in time, so it was one of the vehicles that we

8  looked at.

9  **Q.**  Okay.  So you looked at it and some competitive

02:01:19  10  models, I guess?

11  **A.**  Correct.

12  **Q.**  Okay.  Now, we talked about accident reconstruction.

13  Can you tell the jury, as far as accident reconstruction,

14  approximately how many accidents -- whether it involved

02:01:34  15  you testifying or not, approximately how many accidents

16  you have been asked to evaluate in the past?

17  **A.**  You know, I have been doing this for over 35 years.

18  I would -- I am sure I have investigated thousands of

19  vehicle accidents of various types.

02:01:50  20  **Q.**  Okay.  And, now, let me ask you this.  Can you tell

21  me what you did when -- after you got retained by -- can

22  you kind of give me an overview after you were retained by

23  Mr. Hawkins of what work you did as far as this case is

24  concerned?

02:02:09  25  **A.**  Sure.  One of the early things that I did in this

KEVIN BREEN - DIRECT BY MR. MUELLER

1   project was to coordinate having another engineer on my

2   team go out and examine the vehicle at the scene that was

3   involved in this accident.  I reviewed a number of

4   documents that I had been provided:  Accident report,

02:02:28   5   photos, depositions, owners manuals.

6               I have -- I have obtained a similar make

7   and model MULE, and I have done some testing on it that

8   includes driving-type testing.  It includes testing of the

9   occupant retention system, looking at how people use the

02:02:47  10   vehicle from a functionality standpoint, looking at the

11   strength of certain parts of the vehicle that we noted to

12   be deformed on the subject vehicle that involved the --

13   doing some calculations, and that type of thing.

14               MR. MUELLER:  Okay.  Can we pull up Exhibit

02:03:16  15   126.008.

16   BY MR. MUELLER:

17   Q.   Can you identify 126.008 for me, Mr. Breen?

18   A.   Yes.  This is a chart out of SAE J2258, I believe, in

19   the standard such -- designated as Figure 2.

02:03:47  20   Q.   I missed that last part.

21   A.   It is the standard section designated as Figure 2.

22   Q.   Okay.  So this is a document that actually comes out

23   of the SAE standard?

24   A.   Correct.

02:03:56  25   Q.   Can you explain -- because it looks like you have got

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   three regions there.  Can you explain to the jury as far

2   as the SAE J2258 standard is concerned, what these three

3   regions mean?

4   **A.**   Sure.  What we were interested in doing fairly early

02:04:15   5   on is looking at whether or not a vehicle of this type

6   needed a roll cage of some type and/or if it needed

7   seatbelts, and our thinking was that it depended on a

8   couple of things.  It depended on how stable the vehicle

9   was and how fast the vehicle could be driven.

02:04:32   10          And so we looked at a number of issues

11   related to that, number of vehicle-use patterns and things

12   like that, and determined that if the vehicle was very

13   stable that there probably was not actually a need for a

14   roll cage and seatbelt, and the seatbelt and roll cage did

02:04:49   15   go hand-in-hand.  And if, on the other hand, the vehicle

16   was not very stable, maybe they shouldn't be using it at

17   all.  Maybe it should be redesigned to be made more

18   stable.

19          And so what this chart is, is kind of

02:05:04   20   looking at this type of evaluation.  What we did was say,

21   okay, let's look at the lateral stability.  Lateral

22   stability is how a vehicle might overturn sideways, and if

23   when tested on a tilt table, you -- it is not stable to at

24   least 20 degrees, that vehicle shouldn't be -- shouldn't

02:05:22   25   be made.  Somebody should do something different with that

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    vehicle to make it more stable.

2                    If, on the other hand, it's -- it's stable

3    beyond 20 degrees but doesn't go very fast, let's say it

4    goes 10, 15 mile an hour, then in that area that vehicle

02:05:38    5    is very stable, goes pretty slow, and so at that point the

6    discretion is left to the designer as to whether or not a

7    roll cage and seatbelt are necessary.

8                    If, on the other hand, the vehicle is

9    above the 20-degree level, so it is pretty stable, but it

02:05:57    10    goes faster, let's say in the, you know, 20 to 25 speed

11    range, then, in that area, it -- though it is pretty

12    stable, it's -- it goes fast enough that the view was the

13    vehicle ought to have a roll cage and seatbelts on it.

14                    And so that is the process that we went

02:06:16    15    through to decide -- to give guidance to the people making

16    these vehicles as to where to start as a minimum for

17    stability, and then where to make a decision as to whether

18    to have seatbelts and roll cage or not.

19    **Q.**    All right.  And can you explain to the jury -- well,

02:06:33    20    let me ask you this first.  As part of the work that you

21    either did for the committee or you did in this case, did

22    you -- did you evaluate the stability of the Kawasaki 4010

23    MULE that is involved in this lawsuit?

24    **A.**    Yes, I did.

02:06:48    25    **Q.**    Okay.  And so, we will talk about that in a minute,

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   but can you tell the jury as far as, say, Exhibit 126.008,

2   where the MULE is involved in this case, where it falls on

3   this chart?

4   **A.**   Well, first of all, we measured the speed of the

5   vehicle, and the vehicle in low gear does about 14 mile an

6   hour and in high gear does about 22 mile an hour.  Then

7   measured the stability of the vehicle per the standard,

8   and the standard requires it to be loaded up pretty heavy

9   as though there were four big people in the vehicle.

10             We found that it was just above 30

11   degrees.  And so that would put it into the green area

12   here so that it is in the area, you know, whether it's in

13   low gear or high gear, that is an area where it is stable

14   enough, it doesn't go so fast that they would require that

15   there would be a roll cage and seatbelt associated with

16   the vehicle.

17   **Q.**   But the -- from the photograph that the jury is

18   seeing that Kawasaki MULE in this case does have seatbelts

19   and a roll bar; is that right?

20   **A.**   That's correct.

21   **Q.**   And so was that a decision that was apparently

22   voluntary made by Kawasaki?

23   **A.**   Correct.  For example, there are some vehicles by

24   other manufacturers that fall into this green region that

25   do not have a roll cage and a seatbelt.  It is a decision

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  Kawasaki made to include that, that they would not have

2  had to comply with the standard.

3  **Q.**   Okay.  And as far as the SAE -- the SAE 2258, it does

4  have minimum stability requirements, does it?

02:08:22  5  **A.**   Yes.

6  **Q.**   Okay.  Can you tell the jury as far as the Kawasaki

7  MULE involved in this case, how its stability compares

8  with the minimum stability requirements of 2258?

9  **A.**   Its stability characteristics are about 150 percent

02:08:40  10  better than the minimum requirements, so it's a very

11  stable vehicle.

12  **Q.**   So, when you say that means -- let's say J2258

13  requires X, and this Kawasaki MULE is how much greater

14  than X?

02:08:51  15  **A.**   It's 150 percent of X.

16  **Q.**   All right.  Now, as a part of the work that you were

17  doing -- I really did want to cover this.

18          I am going to --

19          MR. MUELLER:  These are new exhibit numbers,

02:09:09  20  Your Honor, but they're going to be 356 and 357 but for

21  demonstrative purposes only.

22          THE COURT:  All right.  So you are not offering

23  them into evidence?

24          MR. MUELLER:  I am not, Your Honor.

02:09:44  25  BY MR. MUELLER:

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   **Q.**   Now, Mr. Breen, I am walking up here with Exhibits

2   356 and 357.  Can you -- well, take this one here, which

3   is -- this is 357.  And if you could, tell the jury

4   what -- can you tell the jury what that is?

02:10:12   5   **A.**   This is the A-pillar from the right side of the

6   vehicle, kind of this point of reference.  This is my

7   little model of the vehicle here.  This is the pillar

8   right here that goes right next where the front passenger

9   would be sitting, right in front of where they would be,

02:10:33   10   so this is the A-pillar.

11   **Q.**   If you look at this picture right here -- maybe I can

12   move it over here for -- in front of the jury.  We're

13   referring to this one where I am pointing at right here.

14   **A.**   Yes.

02:10:50   15   **Q.**   All right.  And the other exhibit, 356, what is this

16   one?

17   **A.**   This is --

18   **Q.**   I'll hold it here.

19   **A.**   This is the opposite side.  Essentially what I did

02:11:02   20   was get the front roll structure and cut it in half to get

21   it in here easily today.  So this is the A-pillar that

22   would be directly in front of the driver.

23   **Q.**   Okay.  And so that would -- if we are looking at this

24   picture here, that is this other one that is on the other

02:11:16   25   side?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    **A.**   Correct.

2    **Q.**   Now, if I hold these two down, is one of them as

3    straight as the other?

4    **A.**   No.

02:11:27   5    **Q.**   Can you explain to the jury -- did you play any role

6    in the fact that one of them is not as straight as the

7    other?

8    **A.**   Yes.

9    **Q.**   All right.  Can you tell the jury -- explain to the

02:11:37   10   jury what you did.

11   **A.**   Well, one of the things we noted in the examination

12   of the vehicle involved in this crash is that the A-pillar

13   on the passenger side was bent, and we made some

14   measurements and documented that.  And I then went back to

02:11:54   15   our lab and wanted to measure how much force does it take

16   to bend that piece of steel up -- out of column, so to

17   speak, so it is no longer straight but rather has a buckle

18   in it part way down.  And so we put it in a test fixture

19   and applied a load to it, measured that load and resulted

02:12:15   20   in the bend you will see in this B-pillar here in the

21   courtroom.

22   **Q.**   Okay.  And is that the bend, more or less -- I am

23   sure it is not exact -- roughly the same area as the bend

24   you observed, or you saw, from the Carter MULE?

02:12:34   25   **A.**   Yes, it is.

KEVIN BREEN - DIRECT BY MR. MUELLER

1    **Q.**   Or Crawford, I should say.  Crawford MULE, right?

2    **A.**   Yeah.  That's correct.

3    **Q.**   Okay.  Now, I have one more demonstrative here which

4    I am going to mark as 358, if it will stick.  Is this

02:12:59   5    another section of the -- what we're referring to as the

6    ROPS off of a Kawasaki 4010 MULE?

7    **A.**   Right.  That's another section off the front section.

8    The way it's built is there's a U shape that extends back

9    in the front and there is another one in the rear, and

02:13:20  10    they're connected together.  That's another section off of

11    the front, the front tube.

12               MR. HAWKINS:  Your Honor, if I might, I would

13    like to -- this is a small one so I won't have to handle

14    it.  I would like to pass this around to the jury.

02:13:33  15               THE COURT:  That is fine.

16    BY MR. MUELLER:

17    **Q.**   Is the -- kind of the width, dimension, and thickness

18    of the ROPS structure in a Kawasaki MULE, at least until

19    you get to the attachment points, is it -- is it pretty

02:13:53  20    much the same?

21    **A.**   Yes, it is.

22    **Q.**   Okay.  Now, what about this question:  When you have

23    a section of this ROPS that is -- that is initially

24    supported -- what is this thing that I am tracing my

02:14:13  25    finger around?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   **A.**   That is the handhold for the right front passenger,

2   so you reach up and grab that little bar and hold onto it

3   while you're driving.

4   **Q.**   From a material science standpoint, when you attach

02:14:23   5   kind of a structure like this to a piece of pipe, does it

6   affect its strength characteristics?

7   **A.**   It affects the structural integrity.  Sure.

8   **Q.**   And it affects it up or down?

9   **A.**   It makes it stiffer in that area.

02:14:38   10   **Q.**   Okay.  So, the fact that this was bent right in an

11   area where it had a support structure means that if I just

12   took a flat piece and bent it, it would take more force to

13   bend it there?

14   **A.**   Correct.  The fact that there is that strut there, it

02:14:50   15   is going to take more energy to displace it.

16   **Q.**   All right.  Now, you were telling the -- the jury

17   your role as far as the -- inducing this bend into the

18   ROPS structure.  Can you explain to them what -- what it

19   was you did and then we will go to what conclusions you

02:15:09   20   reached.

21   **A.**   Well, as I said before, I noted that there was a bend

22   in the vehicle involved in the accident, and the

23   information was that the bend was not there before the day

24   of the accident.  And so it apparently must have occurred

02:15:22   25   in the crash itself.

39

1          And I looked at where it is and understand

2    how that structure works and determined it -- I knew how

3    that load was generated, but what I wanted to look at is

4    how much force did it take to generate that level of

02:15:36    5    bending on that piece of tube and recognizing that there

6    is other parts of the roll cage that are bent as well.  We

7    tested the front part of the structure, but there would be

8    other parts that were noted to be bent as well, just a

9    part to try to understand better what type of forces were

02:15:54   10    involved in this crash event.

11    **Q.**    Yours -- what you have there might be a little small

12    for the jury to see.  Can we -- is it okay to use this

13    one?

14    **A.**    That's fine.

02:16:06   15    **Q.**    All right.  Now, I realize that this is not a

16    Kawasaki MULE but just for demonstrative purposes.

17          So how did you -- how did you induce --

18    for as far as your experiment was concerned, how did you

19    induce those loads?

02:16:24   20    **A.**    Basically, I applied a load at the area where the

21    bend occurred to generate a bending load in the tube

22    itself.

23    **Q.**    Okay.  And -- and the result of your experiment -- as

24    a result of your experiment, we have the bend that the

02:16:42   25    jury can see here?

*KEVIN BREEN - VOIR DIRE BY MR. WEST*

1   **A.**   Correct.

2   **Q.**   And can you tell the jury, did you come to any

3   conclusions as to the minimum possible forces that were

4   necessary to create a bend like that?

02:16:57   5   **A.**   Yes.  It -- this bend --

6             MR. WEST:  I would like to take him on voir

7   dire about this before he expresses his opinion.

8             THE COURT:  You may.

9             MR. WEST:  Thank you, Your Honor.

02:17:08   10                  **VOIR DIRE EXAMINATION**

11  BY MR. WEST:

12  **Q.**   Mr. Breen, you issued your report in January of 2018,

13  correct?

14  **A.**   I believe that's correct.

02:17:15   15  **Q.**   And that report was done months before you did this

16  testing; is that correct?

17  **A.**   Yes.

18  **Q.**   You've never seen the actual MULE, have you?

19  **A.**   I have not.  I had one of the engineers that works

02:17:27   20  for me inspect it.

21  **Q.**   And when your report was issued, you only had seven

22  hours in the entire case when the report that was --

23             MR. MUELLER:  Your Honor --

24             THE COURT:  Excuse me.

02:17:38   25             MR. MUELLER:  -- I'll object to this.  This is

*KEVIN BREEN - VOIR DIRE BY MR. WEST*

1  not proper voir dire.

2           THE COURT:  This goes beyond voir dire.

3  BY MR. WEST:

4  **Q.**   When your report was issued months -- when did you do

02:17:45  5  this bending test?

6  **A.**   Done on April 11th, 2018.

7  **Q.**   Months after your report?

8  **A.**   Yes.

9           MR. MUELLER:  Your Honor, this is not proper

02:17:56 10  voir dire.

11           THE COURT:  This is cross-examination.

12           MR. MUELLER:  This is cross-examination.

13           MR. WEST:  I am going to the point of the

14  force.

02:18:00 15           THE COURT:  Go ahead and get there.  Thank you.

16  BY MR. WEST:

17  **Q.**   You don't have an impulse time for this collision, do

18  you, sir?

19  **A.**   I do not.

02:18:09 20  **Q.**   And the force that you have, you're doing a little

21  bit of physics, force equals mass times acceleration?

22  **A.**   Correct.

23  **Q.**   And acceleration is expressed in terms of speed over

24  time squared, right?

02:18:24 25  **A.**   Correct.  Or Gs.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  **Q.**   Okay.  And you determined here that the -- that's a

2  function of gravity, right?

3  **A.**   Correct.

4  **Q.**   And you cannot equate force to speed, can you?

5  **A.**   Cannot.

6          MR. WEST:  All right.  That is all I have.

7          **DIRECT EXAMINATION (Continued)**

8  BY MR. MUELLER:

9  **Q.**   All right.  So, as far as the -- the amount of force

10  or energy it took to bend this thing, what conclusion did

11  you come to?

12         MR. WEST:  Objection.  It is irrelevant, the

13  force and energy, Your Honor.  It can't be equated to

14  speed.

15         THE COURT:  Overruled at this time.  I am going

16  to give him a little leeway.

17  **A.**   What we measured was something just a little under

18  2,000 pounds.

19  BY MR. MUELLER:

20  **Q.**   Okay.  What is the weight of this vehicle?

21  **A.**   About 1600 pounds.

22  **Q.**   So the load that you -- that it required to bend

23  it -- now, when you bent it, was it all in the frame on

24  the vehicle?

25  **A.**   No.  It was just this component part, just the front

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  A structure.

2  **Q.**   Okay.  But whatever it is at that -- the amount of

3  that load exceeded the entire weight of this vehicle?

4  **A.**   Correct.  That's kind of what was tied into this

5  equation we were talking about there on Mr. West's

6  questions. ▮

*KEVIN BREEN - DIRECT BY MR. MUELLER*



02:20:51

02:21:01

11   Q.   All right.   Now, in the -- did you compare, when we

12   looked at -- maybe you need to come down here for a

13   second, Mr. Breen.

14         MR. MUELLER:   Is that all right, Your Honor?

02:21:13   15         THE COURT:   It's fine.

16 BY MR. MUELLER:

17   Q.   And let me hand you what we marked as 357, and hold

18   that up.   And did you try to compare the degree of bend

19   from your test with -- with the -- with either the

02:21:34   20   testimony of Mr. Carter about how much the frame was bent?

21   A.   Yes, we did.

22   Q.   Okay.   What did Mr. Carter say?

23   A.   He said that it was bent, and then he tried to bend

24   it back, or hammer it back.   And then, after that is when

02:21:46   25   we looked at it and measured it.   And so you knew it was

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    something more than -- more than what it was when we

2    actually looked at it.

3    **Q.**   Okay.  And so, as far as this bend here, do you

4    have -- do you have a perspective as to how it would have

02:22:00   5    compared to the bend immediately following the accident?

6    **A.**   Well, this bend is very close to the bend at the time

7    we looked at it.  So, the bend involved in the accident

8    would be something greater than that to some extent.

9    **Q.**   And would that mean it would be something that would

02:22:16   10   require a greater amount of force to get a greater bend?

11   **A.**   Yes.  That's correct.

12   **Q.**   All right.  Thank you.

13                   Now, as part of the work in this case, did

14   you evaluate or examine the MULE as far as its occupant

02:22:40   15   retention characteristics?

16   **A.**   Yes, I did.

17                   MR. HAWKINS:  All right.  Can we pull up

18   Exhibit 126.014?  Oh, we have got it.  Sorry.

19   BY MR. MUELLER:

02:23:09   20   **Q.**   Can you explain -- well, first of all, can you

21   identify this?

22   **A.**   This is a photograph that I took of the exemplar MULE

23   that's one of the vehicles I used for the testing I did in

24   this project.

02:23:21   25   **Q.**   And who is the guy sitting in the seat there?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    **A.**    That's -- he -- he has two roles in my life.  He is

2    another engineer that works for me but he is also my son.

3    **Q.**    Ah.  So your son is sitting in the seat.  But now

4    explain to the jury, as a part of your evaluation of the

02:23:38  5    occupant retention characteristics of the MULE, explain

6    what you're attempting to show with this photograph.

7    **A.**    Well, what I did there was to go through the features

8    in the SAE J2258 to see that this vehicle had those

9    occupant retention features and then also looked to see if

02:23:57  10   there were other features as well.  So, for example,

11   there's a seatbelt.  That's clearly an occupant retention

12   feature.  You have a seatbelt on, it does a lot to retain

13   you in your seat.

14                    Secondly, there is a designated hand grip

02:24:11  15   at the passenger position.  There is also hand grips for

16   the front riders as well.  You can see he is holding on to

17   it.  There is a bar that is affixed to the front seat.

18                    Then there is a hip restraint which is

19   this bar that I am pointing to right here that does two

02:24:26  20   things:  One is it provides structural stiffness to the

21   roll cage, but that bar could have been made shorter and

22   done a lot of different ways.  Could have actually gone

23   back this way to accomplish the same structure.  But by

24   orienting it this way, it accomplished another useful tool

02:24:43  25   and that basically is the hip restraint.  In other words,

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  your hip runs right up against that and it stops you from

2  going laterally out of the vehicle.

3            Then lastly -- not lastly, but there is

4  also two other features that are not a part of the

02:24:55  5  standard that I found in looking at the -- this vehicle.

6  And one is the way the -- the foot area is designed for

7  this vehicle, there is an area where your foot is

8  encapsulated by the B-pillar and the lower support bracket

9  for the front seat so that your foot basically is provided

02:25:14 10  some -- some restraint in the footrest area.

11            And then lastly, the surface that the --

12  that the floor of the vehicle is a diamond plate kind of

13  floor so that it is intended to provide some resistance to

14  slip, as opposed to being perfectly flat type of surface.

02:25:33 15  **Q.**   Two follow-up questions on that.  Number one, from

16  the standpoint of the SAE standard, J2258, does this -- do

17  these occupant retention characteristics of these vehicles

18  meet or exceed the requirements of the standard?

19  **A.**   It exceeds the requirements.

02:25:52 20  **Q.**   Okay.  And, secondly, from the standpoint of a design

21  engineer, do you have a point -- an opinion as to whether

22  these occupant -- occupant retention design features of

23  the Kawasaki MULE are suitable and proper, reasonably

24  safe?

02:26:07 25  **A.**   Sure.  In my view, this is a very appropriate way to

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   configure an occupant retention system.  It's at several

2   stages.  Several body parts are addressed.  It is

3   consistent with the way other vehicles within this

4   industry are configured.  Obviously, each vehicle has got

02:26:25  5   its own little nuances of where things are positioned, but

6   it has -- it checks all the blocks.  It has a few extra

7   blocks on its own.  And from an ergonomic standpoint it

8   is -- it is very well laid out in terms of, you know, the

9   handhold is literally right in front of you.  It's where

02:26:41  10  you can reach at a comfortable level.  The -- the hip

11  restraint is there, that you don't have to do anything.

12  It's just there to assist you in the event of lateral

13  motion.  The seatbelt is a pretty standard seatbelt that

14  we use every day in our car, so it is something that

02:26:56  15  people would be familiar with, easy to use, not have to

16  figure out continually about it.

17  **Q.**   Go ahead.

18  **A.**   And then the last thing is that the -- that the

19  footrest area there, it's a pretty -- it is located in a

02:27:12  20  very natural position in terms of how you would sit in a

21  vehicle like this.

22  **Q.**   Now, I want to talk about the -- the bar there next

23  to your son, this one right here.  So if I sit in this

24  seat, I know it's -- I know this is a bar from the front,

02:27:34  25  and it's not a bent one, but it's coming down in an area

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    kind of like this?

2    **A.**    Something like that.

3    **Q.**    And is it the case that the bar that is -- that we're

4    looking at here next to your son is made of the same --

02:27:50    5    same dimensions, same thickness, same strength as this

6    one?

7    **A.**    Yes, it is.

8    **Q.**    Okay.  Now, you said something about it's configured

9    similar to other vehicles in its class.

02:28:11    10           MR. MUELLER:  Can we pull up Exhibit 126.16?

11    Oh, before we do that, let's pull up 126.001.

12    BY MR. MUELLER:

13    **Q.**    What are we looking at here, Mr. Breen?

14    **A.**    This is a photograph of the Kawasaki MULE 4010 where

02:28:35    15    I have shown where the damage on the subject vehicle is in

16    terms of the bend on the A-pillar part of the bolt of the

17    structure.

18    **Q.**    Okay.  So if we look at that, it's in the same

19    vicinity as we see here, right?

02:28:51    20    **A.**    Yes.

21           MR. MUELLER:  Okay.  Now -- now, if we can pull

22    up Exhibit 126.016.

23    BY MR. MUELLER:

24    **Q.**    What are we looking at here, Mr. Breen?

02:29:12    25    **A.**    Well, as I said a few minutes ago, one of the things

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    I looked at is whether or not the occupant retention
2    system on this vehicle is consistent with the way other
3    vehicles of this class are configured, and the short
4    answer is, by and large it is.
02:29:26    5              But what I did was to survey a number of
6    other J2258 vehicles that are made by people like John
7    Deere, Kubota, Husqvarna, New Holland, Bobcat, people like
8    that, that make competitive vehicles for this application,
9    to see what their occupant retention systems were and to
02:29:52    10   look to see if any of them had, in this case, doors or
11   nets.
12   **Q.**   Doors and shoulder bolsters, right?
13   **A.**   Right.
14   **Q.**   Okay.  Now --
02:30:04    15              MR. WEST:  Excuse me, Your Honor.  I think his
16   answer was doors and nets.
17              MR. MUELLER:  I am moving to strike that.
18              THE COURT:  I'll sustain the objection.
19              MR. WEST:  Objection, leading, then.  It
02:30:13    20   misstates his testimony.
21              THE COURT:  All right.  I'll sustain as to
22   leading.  Rephrase the question.
23   BY MR. MUELLER:
24   **Q.**   All right.  As far as doors are concerned, do some of
02:30:23    25   these manufacturers sell accessories that would -- and I

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   am -- if I use the word "enclosed cab," do you know what I

2   am referring to?

3   **A.**   Yes.

4   **Q.**   Okay.  And by "enclosed cab," can you come down here

02:30:43   5   to the jury and show them what -- what you would mean when

6   you were using the term "enclosed cab"?

7   **A.**   What -- there are some accessories that are available

8   from various manufacturers, but also the special purpose

9   model that you can purchase that literally turn this open

02:31:04  10   structure into a totally enclosed vehicle like our cars

11   are.  So it would be a full-coverage door here, a

12   full-coverage door here, full-coverage back windshield,

13   full-coverage front windshield, so that the whole thing is

14   like our cars.  It is closed up.

02:31:19  15              And that's typically done for people who

16   are using these kinds of vehicles in -- let's say in the

17   wintertime up north, to fight snow and things like that.

18   They want to put a little heater in there to try to keep

19   it warm.  Or hot places put air conditioning in there to

02:31:35  20   try to keep it cool.  Or if it is a dirty or dusty kind of

21   environment, just from getting it covered with dirt and

22   grime when you're out there at the job site every day.

23   **Q.**   Okay.  So tell me -- explain to me, you were saying

24   you did as a part of your work, you -- you did a survey of

02:31:51  25   the people that -- kind of in this class of vehicles.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    Explain to them how you did that survey.

2    **A.**    Well, it involved looking at sort of the big-name

3    manufacturers in this -- this class of vehicles and

4    looking at either physical samples of their vehicles,

02:32:06    5    brochures, searching online at their vehicles to see how

6    each of them were configured.  And we had to create sort

7    of a chart to go through and check off on a systematic

8    basis, does it have seatbelts?  Does it have a roll cage?

9    How is the seat configured?  Does it have a door?  And

02:32:23    10    those type of things.

11    **Q.**    Okay.  And so when you say 95 percent --

12         MR. MUELLER:  Can you take this exhibit down?

13    BY MR. MUELLER:

14    **Q.**    When you say 95 percent of them don't have doors,

02:32:42    15    what about the other 5 percent?

16    **A.**    Those were essentially vehicles that are sold,

17    brand-new-stock vehicles with full-cab enclosures, like

18    with air conditioning, with the heater, or something like

19    that.  So there are -- you know, for example, Kubota has a

02:33:00    20    line of these kind of vehicles, and one of them within

21    their line is a full closed -- it is actually a hard-shell

22    cab, and it comes with air conditioning.  It comes with a

23    heater.  And it's a -- it is a complete sealing around all

24    of the doors and openings so it is just like being in your

02:33:16    25    pickup truck.

KEVIN BREEN - DIRECT BY MR. MUELLER

1          Husqvarna has a similar model they sell

2    with full coverage like that.  Essentially, it's an

3    environmental protection type of thing.

4    **Q.**   When you did that survey -- and I have got next to

02:33:33   5    me -- well, if I had my glasses, I could read it.  Here

6    they are.  It is hard getting old.

7          But it's Demonstrative Exhibit 002.  In

8    some of photographs in the reports you have seen in this

9    case, have you seen pictures of something like this?

02:33:58  10    **A.**   Yes.

11    **Q.**   Okay.  I think it's probably fair to refer to this as

12    the Newbold door, something -- you saw it in his report?

13    **A.**   Correct.

14    **Q.**   Did you see in any of those vehicles that had a

02:34:14  15    Newbold door on it of, you know, essentially this kind of

16    height and configuration?

17    **A.**   No.

18    **Q.**   Okay.  So as far as the survey you did on the

19    vehicles in this class, was there even one company that --

02:34:37  20    for the models going up to 2013 -- and I want to be clear

21    we are not talking about anything past the model year of

22    this vehicle -- were there any vehicles in this class that

23    had a door like the Newbold door?

24    **A.**   Not within this class, no.

02:34:48  25    **Q.**   Okay.  And so when you earlier were referring to --

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    amongst the other design features that is consistent with

2    the practices of the people that are in this class of

3    vehicles, was this this survey that you were referring to?

4    **A.**   Yes.

02:35:08    5    **Q.**   Okay.  Now, as a part of your evaluation in this

6    case, did -- did you also engage in some ride testing?

7    **A.**   Yes.  I described that earlier as functionality

8    testing.

9            MR. MUELLER:  Okay.  And can we pull up Exhibit

02:35:33   10   164-A?

11   BY MR. MUELLER:

12   **Q.**   All right.  First of all, before we get rolling here,

13   can you tell us -- start up and kind of give the jury sort

14   of a preview of what we are going to be looking at?

02:35:59   15   **A.**   Sure.  This is a MULE 4010.  It's a similar vehicle,

16   similar to the one involved in this accident.  This is

17   a -- kind of a small farming area in North Fort Myers,

18   Florida.  This is a gentleman by the name of Rick Oxton,

19   who worked with us on this project, and he is going to

02:36:19   20   demonstrate some of the features of the -- the vehicle.

21   **Q.**   All right.  And maybe as we're going along, you can

22   kind of tell me what it is that he's demonstrating.

23   **A.**   Well, the first one there is just showing, as I said

24   before, how easy it is to use just the regular seatbelts,

02:36:35   25   similar to like we have in our cars.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1      He is also demonstrating there one of the

2  things is getting in and out of this vehicle as a work

3  vehicle, that is something that you need to be attending

4  to because you may be in and out of it a hundred times in

02:36:48    5  a day.  Again, there is a rear seat, seatbelt.  There is

6  our foot restraints as well on that.

7  **Q.**   And who is the other guy?

8  **A.**   That's my son again.  They get in there, they are

9  showing -- getting in, putting the seatbelt on, as though

02:37:07   10  you have got two guys on a work site.  And then showing

11  the handhold for the front person.  There is a gearshift,

12  accelerator pedal.

13      Now, here they're going to demonstrate the

14  conversion of the vehicle from a four seater with a

02:37:30   15  smaller bed to a two seater with a bigger bed.

16  **Q.**   And this is a feature -- also a feature of the MULE

17  that Susan Crawford purchased, is it?

18  **A.**   Yes.  So, now, you basically have a bigger bed but

19  only one seat or one bench seat.  Then here is the dump

02:37:58   20  function on the bed.

21  **Q.**   All right.  Now, in addition to demonstrating the

22  features of the model, did you do some other riding

23  evaluations?

24  **A.**   Yes, we did.

02:38:16   25      MR. MUELLER:  All right.  Can we pull 164-B, I

KEVIN BREEN - DIRECT BY MR. MUELLER

1  am hoping?  Yes.

2  BY MR. MUELLER:

3  **Q.**   Before we start this, can you -- again, can you give

4  the jury a sense of what it was you were trying to either

5  demonstrate or show with respect to these shots?

6  **A.**   Sure.  Again, keeping in mind that this is a utility

7  vehicle that was purchased a lot of times for farms,

8  ranches, construction, things like that, where you're

9  looking for a vehicle that can provide a couple of -- you

10  know, one or two workers maybe, maybe more than that,

11  maybe four workers transportation, to do something useful,

12  work type of things, with the ability to carry some cargo,

13  a cargo bed.  But it is also a vehicle that is

14  intentionally designed to be used on an off-road setting

15  that may be soft surfaces, inclined surfaces, things like

16  that.  And it may be a vehicle where you're trying to

17  drive it into fairly tight areas so that you can negotiate

18  around, you know, brush, or run close to a fence line,

19  things like that.  So what this video is, is a short clip

20  just showing you sort of how this vehicle is used, just

21  sort of routine type of applications for utility purposes.

22            In one of these you can see here is that

23  it's got a fairly tight vehicle so it can negotiate sort

24  of around tight trails and stuff like that that you might

25  find in an unimproved area.  This is kind of a scrub brush

02:38:37
02:38:54
02:39:12
02:39:32
02:39:58

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   area in Florida.

2                    Again, it's got the dump bed, that we have

3   seen a couple of times now, to be able to carry cargo.

4   It's a vehicle that you can get in and out of very easily.

02:40:17   5   If you're doing work on a ranch or a farm, you may be

6   literally in and out of that vehicle 100 times in a day.

7   This is an example, sort of, of why would you get out of

8   the vehicle 100 times a day?  Well, you have to open and

9   close fences, and get out to open a fence, get back in

02:40:48   10   after you close the fence to go on -- on to the next spot

11   on your farm.

12                    And, again, you list -- the vehicle is a

13   fairly low-speed vehicle so that you can use it around

14   animals without frightening them.  And it's pretty

02:41:21   15   maneuverable so that you don't have to worry about, you

16   know, being able to turn tight circles and things like

17   that, especially at slow speed, you know.  If you are

18   checking on a fence line or something like that, you can

19   get up close to the fence and be able to access, you know,

02:41:33   20   again, the fence without having any encumbrances to

21   reaching over and checking the fence line or, you know,

22   that type of thing that you might be doing.

23   Q.   Did you see in Mr. Carter's testimony where he

24   described doing -- using it for just those kinds of

02:41:49   25   functions?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    **A.**    Yes.

2    **Q.**    Okay.

3    **A.**    And now we configured the vehicle back to the

4    four-seat type of setup.  And we have got a fourth -- a

02:42:29    5    third guy in here again showing, you know, the typical get

6    in and out, picking up stuff, tending to -- tending to

7    property.

8    **Q.**    I neglected to --

9              MR. MUELLER:  Can you pull up Exhibit 126.10.

02:42:44    10    BY MR. MUELLER:

11    **Q.**    Tell me what -- tell me what we're looking at here.

12    **A.**    This is a -- a chart that shows the testing that we

13    talked about a few minutes ago of bending the front

14    A-pillar.  This is sort of the plot of the force versus

02:43:15    15    deflection, but then also here are some photographs that

16    show how similar the bend that we tested to is to the bend

17    involved in the accident itself.

18    **Q.**    I am going to hand you what I have marked as Exhibit

19    359.  And I am going to see if I can get the ELMO to work.

02:44:00    20              MR. WEST:  Excuse me, Your Honor.  I don't

21    think Exhibit 126 is in evidence.

22              MR. MUELLER:  What is 126?

23              MR. WEST:  What you have been using.

24              MR. MUELLER:  Oh, no.  I said 359.

02:44:10    25              MR. WEST:  No.  The 126.

1      MR. MUELLER:  This one is 359.  I'm sorry.  All

2   right.  Let me go change 126.

3      MR. WEST:  10 and 11 are not.

4      MR. MUELLER:  You want me to set up some

02:44:54  5   foundation for it?  All right.  Sorry.

6   BY MR. MUELLER:

7   **Q.**   I'm going to hand you this Exhibit 126.10.  First of

8   all, can -- I am trying to lay some foundation for this so

9   that we can get it into evidence.

02:45:10  10      Can you describe for the -- in more detail

11   how the test was performed that we were discussing

12   earlier?

13   **A.**   Sure.  We -- we took the -- the steel structure that

14   we have seen here the last few minutes, put it in a test

02:45:25  15   fixture, and basically applied a load to deform the

16   A-pillar inward right by where the hand grip is, and then

17   we measured the load involved with that test.

18   **Q.**   Okay.  And I am going to come over and look at that

19   copy over your shoulder a little bit.  As far as the --

02:45:43  20   the graph with -- that has the numbers on it there, can

21   you tell the jury how -- what process was used to generate

22   that draft?

23   **A.**   We conducted some instrumentation to measure the

24   force that was applied and then how much deflection or how

02:46:02  25   much motion the force would have applied over that period

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    of time.

2    **Q.**   And those are recorded in some kind of a computer

3    device?

4    **A.**   Yes.

02:46:10   5    **Q.**   Okay.  And then it -- you can print out a graph of a

6    computer device that is measuring those loads?

7    **A.**   Right.

8    **Q.**   All right.

9            MR. MUELLER:  I am offering 126.10.

02:46:19  10            MR. WEST:  Foundation on voir dire real

11   quickly?

12            THE COURT:  Briefly.

13                    **VOIR DIRE EXAMINATION**

14   BY MR. WEST:

02:46:23  15   **Q.**   Did you apply the force in -- the same principal

16   direction of force as this collision?

17   **A.**   I did not.  I applied it in the same direction that

18   the bend was in.

19   **Q.**   Did you apply this force in the same principal

02:46:34  20   direction of force as the SAE ROPS testing requires?

21   **A.**   No.  Because that would have given us a different

22   bend.

23   **Q.**   So this bend here was neither the force direction as

24   the collision, nor of J1194; is that right?

02:46:49  25   **A.**   It is not 1194.  It is bent in the same configuration

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

61

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    as was in the accident, but force was applied differently

2    than it was at the crash.

3                MR. WEST:  Objection, relevance.

4                THE COURT:  Overruled.  What is the exhibit

02:47:02   5  number again, please?

6                MR. MUELLER:  It is 126.010.

7                THE COURT:  Thank you.

8                **DIRECT EXAMINATION (CONTINUED)**

9    BY MR. MUELLER:

02:47:08   10  **Q.**   All right.  Now, as to Exhibit 359 --

11               MR. MUELLER:  First of all, may I talk to

12   Mr. West for just one second, Your Honor?

13                    (Counsel confer off the record.)

14   BY MR. MUELLER:

02:47:37   15  **Q.**   All right.  Can you -- well, first of all, let me

16   just get some preliminary questions.  Recently did I

17   provide you with some electronic files that came from

18   Mr. Newbold's data logger?

19   **A.**   Yes.

02:47:56   20  **Q.**   Okay.  From the -- from the runs that he did when he

21   was out at the Carter property riding around in the 4010

22   MULE?

23   **A.**   That's my understanding, yes.

24   **Q.**   Okay.  And did you endeavor to analyze that

02:48:11   25  information that we recently got from Mr. Newbold?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    **A.**    Yes.

2    **Q.**    Okay.  And are these files here a portion?  I know

3    that there is -- he had, looked like, hundreds of pages.

4    Is this a portion of the data that came on those thumb

02:48:25    5    drives that I provided to you?

6    **A.**    This is all of the data from the thumb drives.

7    **Q.**    Okay.  And so, if I can put this up here, now, what

8    are we -- and, oh, hold on.  Tell me what we're looking

9    at.  And I am going to flip to the next page, but tell me

02:48:51    10    what we're looking at here with all these little, for lack

11    of a better word, squiggly lines?

12    **A.**    So what these are is the data that was collected from

13    the driving that was done, and across the bottom of the

14    page is time.  And so it's from zero to 1500 seconds.  And

02:49:11    15    then the top -- there are the three graphs of data.  The

16    top one is speed.  This one is in mile per hour.  So you

17    can see here, here's 15 mile an hour.

18    **Q.**    Uh-huh.

19    **A.**    That line right there.  You can see most of the runs

02:49:26    20    were done at just below 15 mile an hour.

21    **Q.**    Uh-huh.

22    **A.**    And then the middle chart is the lateral acceleration

23    in Gs.  And then the bottom chart is the longitudinal

24    acceleration, again in Gs.

02:49:39    25    **Q.**    All right.  And we are going to come back to that.

1    Now, let's look at the next page here.  What is the next

2    page of Exhibit 359?

3    **A.**   That would be the actual path that he drove for that

4    particular ride.  So this is like the GPS coordinates, or

02:49:58    5    if you were to just plot out on a map where he drove

6    around during the course of that 1500 seconds or so.

7    **Q.**   Okay.  So, from -- if I am looking down at the Carter

8    property from a satellite view, and he had a little piece

9    of chalk driving behind him, we would see these trace

02:50:15    10   markings?

11   **A.**   Correct.

12   **Q.**   And so if I look at, for example, an area like right

13   here, or right here, does it appear from the GPS data that

14   he was making some pretty tight turns?

02:50:28    15   **A.**   Right.  From looking at the data, it appears those

16   are full lock turns.

17   **Q.**   Okay.  And so did you -- in looking at Mr. Newbold's

18   data from his actual riding the subject MULE on the Carter

19   property, and when he was making these tight turns, can

02:50:46    20   you tell me approximately what was the top -- at the --

21   this is for the 14-mile-an-hour runs, you know, or so.

22   What was the top lateral Gs that he measured?

23   **A.**   It looks like in the testing he did where he is

24   driving 14 mile an hour at just under 15, that the top was

02:51:10    25   .5, .6 Gs.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  **Q.**   Okay.  Now, you did -- and with that -- if we move on

2  to -- I guess you have got several of these, right?

3  **A.**   Yes.

4  **Q.**   Okay.  Then we can look at -- see here that, again,

02:51:18  5  he is making a lot of tight turns and so forth, right?

6  **A.**   Yes.

7  **Q.**   And then if we go on back, you can see in this one he

8  was making a lot of really tight turns here, right?

9  **A.**   Right.

02:51:31  10  **Q.**   Okay.  And throughout that data, would it be -- was

11  it looking at all these tight turn runs but only for the

12  14 mile an hour, you know, speeds, was the -- was the top

13  tier, as you said .5 or .6?

14  **A.**   Yes.  I didn't find any above that for the

02:51:52  15  14-mile-an-hour runs.

16           MR. MUELLER:  Okay.  I'd offer into evidence

17  Exhibit 359, Your Honor.

18           MR. WEST:  No objection.

19           THE COURT:  It is admitted.  Thank you.

02:51:59  20  BY MR. MUELLER:

21  **Q.**   Now, did you -- did you, as a part of your analysis,

22  perform any tilt table testing to evaluate the lateral

23  stability of the Kawasaki 4010 MULE?

24  **A.**   Yes, I did.

02:52:24  25  **Q.**   Okay.  And that -- was that tilt table testing done

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   consistent with the SAE standards?

2   **A.**   It was done both consistent with the SAE standards

3   but also using the same methodology but with the weights

4   in the vehicle like were in this accident, as opposed to

02:52:39   5   the test weights that were required in the SAE 2258.

6   **Q.**   Okay.  Let's talk about that a little bit.  So you

7   not only evaluated as SAE required, but you also evaluated

8   the lateral stability weighting the various occupant seats

9   according to the weights of the individuals that were

02:52:55   10   riding that day?

11   **A.**   What we understood their weights to be, yes.

12   **Q.**   And in terms of the lateral Gs that from your tilt

13   table test for the weights that were actually weighted

14   that day, what number did you come up with?

02:53:10   15   **A.**   It was like 34-point-something degrees.  Just a hair

16   under 35 degrees.

17   **Q.**   Okay.  So that means that if the vehicle got tilted

18   all the way up to such a -- you know, something greater

19   than a third of 90, that it was still stable at that?

02:53:31   20   **A.**   Correct.

21   **Q.**   And the way -- I -- we must have a picture of it some

22   place, but -- so what you do, and maybe I can just see if

23   I can demonstrate this, if I can grab the -- if I can grab

24   the toy, is if you put it on like this and you tilt the

02:54:07   25   table up, and up, and up, it stays on all four wheels at

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    what degrees?

2    **A.**    It was set up in the accident configuration at 34.6

3    degrees.  You go just a little bit more and the top -- and

4    the top of the wheels just start to leave the ground.

02:54:24   5    **Q.**    And that is how you ended up with a conclusion that

6    weighted as it was on the date of the accident, that the

7    lateral -- this vehicle was stable, four wheels on the

8    ground, all the way up to .7 Gs?

9    **A.**    Correct.

02:54:40  10    **Q.**    Okay.  Now, so what is the -- what is the

11    significance of the fact that when Mr. Newbold rode the

12    subject vehicle on the Carter property making all those

13    tight turns at 14 miles an hour, what is the significance

14    of the fact that he only got numbers that were in the .5

02:55:00  15    or .6 range?

16    **A.**    Well, .5 or .6, you said only in the .5 or .6 range,

17    is pretty high.  That is not something you do in normal

18    driving around at all.  Typical driving for -- you know,

19    of an off-road vehicle, you know, is in the .3, .4 at the

02:55:18  20    most.

21    **Q.**    So he was riding pretty aggressively?

22    **A.**    He was pushing the limit.  And, you know, for utility

23    work, you know, like on a ranch or a farm, you know, it's

24    rarely above two-tenths of a G.  And just to kind of

02:55:32  25    correlate that a little bit, when you drive your car, the

1   same thing goes on.  You get lateral Gs.  And like 99

2   percent of all driving is less than three-tenths of a G in

3   terms of lateral acceleration.

4                MR. WEST:  Objection, Your Honor.  Foundation.

02:55:48   5                THE COURT:  Response.

6                MR. MUELLER:  It seems like --

7                THE COURT:  Do you want to lay a more detailed

8   predicate?

9                MR. MUELLER:  All right.

02:55:55   10  BY MR. MUELLER:

11  **Q.**   Can -- how many years -- how many years have you been

12  doing research, testing, and evaluating four-wheeled

13  vehicles?

14  **A.**   I guess almost 40.

02:56:08   15  **Q.**   And in all those 5,000 accident cases that you

16  evaluated, have you had an opportunity to measure the

17  lateral Gs in a whole variety of vehicles?

18  **A.**   Yes.

19  **Q.**   And have some of those evaluations been done just in

02:56:28   20  the course of doing, as you described it, normal riding?

21  **A.**   Yes.

22  **Q.**   And is it that work background and experience the

23  basis for the number that you just told the jury?

24                MR. WEST:  Objection, leading, Your Honor.

02:56:39   25                THE COURT:  Rephrase it so as not to lead.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1        MR. MUELLER:  I'm sorry.  I couldn't hear.

2        THE COURT:  Rephrase so as not to lead.

3        MR. MUELLER:  Sorry.

4        THE COURT:  Thank you.

02:56:47  5  BY MR. MUELLER:

6   **Q.**   Can you explain to the jury the basis for the number

7   that you just gave them?

8   **A.**   It would be both personal testing I have done, and

9   there's a lot of technical literature that has been

02:56:59  10  developed that I have reviewed over the years in this

11  area.

12        MR. MUELLER:  Is that sufficient, Your Honor?

13        THE COURT:  Sorry?

14        MR. MUELLER:  Is that sufficient, Your Honor?

02:57:05  15        Do you have any more objection?

16        THE COURT:  Yes.

17        MR. WEST:  Go ahead and ask him the question.

18        THE COURT:  Thank you.

19        MR. MUELLER:  Fair enough.

02:57:14  20  BY MR. MUELLER:

21  **Q.**   But so, going back to the relationship between

22  Mr. Newbold's very aggressive riding out on that Carter

23  property and the .7 number, what's the significance of

24  that here?

02:57:32  25  **A.**   Well, I think a couple of things.  In order to get

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    the vehicle to just start to have the wheels come off the

2    ground, you know, just a little bit, as you're making

3    whatever maneuver, it takes .7 Gs.

4              Mr. Newbold was out driving around there

02:57:47    5    pretty aggressively.  .6 is probably that -- is the

6    highest I saw of any of his data.  So he wasn't -- he

7    wasn't at that level where he would -- just even a little

8    bit of wheel lift in the driving that he did.  And even

9    that, like I said before, that's pretty aggressive

02:58:03   10    driving.

11    **Q.**    And I guess you saw his testimony that -- that

12    regardless of how aggressively he rode it, he never rolled

13    it over when he was out there, did he?

14    **A.**    That's what he said, yes.

02:58:12   15    **Q.**    All right.  So, now is -- from your standpoint

16    looking at -- let me -- let me go back.  In the riding

17    that you did, did you also perform some riding where you

18    weighted the vehicles consistent with the weights of the

19    people that were out there?

02:58:36   20    **A.**    Yes.

21    **Q.**    And did you, in fact, as a part of that riding to try

22    and evaluate the influence of this what sounded like

23    referred to as a depression, what I have been referring to

24    as kind of a pothole out there -- did you try and do any

02:58:52   25    evaluations to look at that?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  **A.**   Yes, we did.

2  **Q.**   Okay.  And tell the jury what you did.

3  **A.**   What we did was went to a relatively flat, grassy

4  field, laid out a course similar to that with the fence

02:59:05  5  line at the accident scene, and then we dug a hole that

6  was similar in size to the hole that was measured out at

7  the accident scene, a pothole, or depression, whatever you

8  want to call it, and then did a number of driving

9  maneuvers making turns in the vicinity of the hole,

02:59:23  10  sometimes hitting the hole, sometimes not hitting the

11  hole, at speeds -- at max speed, 14 mile an hour, in low

12  gear with different levels of steering input.

13  **Q.**   And did you shoot or record some video of this -- of

14  this testing?

02:59:37  15  **A.**   Yes.

16  **Q.**   All right.  Can we pull up --

17              Before we do that, let's -- can we look --

18         (Confers with counsel off the record.)

19              MR. MUELLER:  All right.  Can you pull up

02:59:59  20  126.12?

21              MR. WEST:  Those are in.

22              MR. MUELLER:  Huh?

23              MR. WEST:  Those are already in.  They're in

24  evidence.

03:00:06  25              MR. MUELLER:  Oh, all right.  Thank you.

71

1  BY MR. MUELLER:

2  **Q.**   Now, what are we looking at here, Mr. Breen?

3  **A.**   This is our test area.  Again, it's a fairly flat,

4  grassy area, and I have placed some cones -- kind of hard

03:00:22  5  to see the lighting in here -- but there is a series of

6  cones right along the left-hand side of the photograph

7  that represent the fence line.  And then it's kind of even

8  harder to see here, but we dug a hole out there that was

9  16 feet from the fence line.

03:00:40  10  **Q.**   I have got another picture.  I am going to show that.

11  But I wanted to just say, first of all, what are these --

12  what are these things here?

13  **A.**   Those are water dummies.  So what they are, are big

14  plastic, essentially, huge water jugs, and we can fill

03:00:55  15  them up with water at different levels and weigh them so

16  that we can put, you know, 100 pounds in the seat or 150

17  pounds in a seat or whatever weight we want to.

18        MR. MUELLER:  All right.  If we can put up

19  126.013.

03:01:10  20  BY MR. MUELLER:

21  **Q.**   All right.  So what are we -- you were talking about

22  some hole.  First of all, is that what I am pointing at

23  right there?

24  **A.**   Yes.  It's a hole we dug.

03:01:25  25  **Q.**   All right.  Now, when the inspection was done at the

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  scene, did somebody take measurements of the hole that was

2  out on the Carter property?

3  **A.**   Yes.

4  **Q.**   Okay.  And how does that -- the shape -- I mean, the

03:01:38  5  size, the width, and the depth of this hole compare with

6  the measurements that were made on the Carter property?

7  **A.**   It's similar.

8  **Q.**   Okay.  And so, then, now you can explain to the jury,

9  what did you do with regard to this hole?  I take it these

03:01:55  10  tests were conducted in Florida some place?

11  **A.**   Yes.

12  **Q.**   Okay.  What did you do in regard to this hole?

13  **A.**   Well, we -- as I said before, we did some driving

14  tests where you approach the fence line that we put

03:02:06  15  through there with the cones and made a left hand turn at

16  various amounts of steering input, sometimes interacting

17  with the hole and sometimes not.

18  **Q.**   Okay.  And can we --

19          MR. MUELLER:  Well, do you know what video that

03:02:26  20  is?

21          TECHNICIAN:  065.

22          MR. MUELLER:  Say again.

23          TECHNICIAN:  165.

24          MR. MUELLER:  Can you show video 165, please?

03:02:33  25  BY MR. MUELLER:

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  **Q.**   As we're going through this, before you run it, how

2  many test runs are we going to look -- did you perform?

3  **A.**   That involve this step maneuver, 16.

4  **Q.**   Okay.  And the 16 were recorded on this video that we

03:02:50  5  are about to look at?

6  **A.**   Yes.

7  **Q.**   Okay.  And so, as we go through this, perhaps you can

8  describe for the jury what we're -- what we're see seeing

9  there.

03:02:59  10  **A.**   Sure.  This is sort of getting started.  It's the

11  first run, obviously.  And here is -- I am driving the

12  vehicle.  We have got the two water dummies.  We have also

13  got a camera that's looking at what is going on with the

14  steering input, and there is also instrumentation

03:03:16  15  recording speed and steering input as well as the track of

16  the vehicle.

17           (Video of Run 1 played.)

18  BY MR. MUELLER:

19  **Q.**   There, I guess, are the cones you were talking about,

03:04:33  20  right?

21  **A.**   Right.  And if you saw that molded -- the hole with

22  the right --

23           (Video of Run 2 played.)

24  BY MR. MUELLER:

03:05:33  25  **Q.**   The hole is back there some place?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  **A.**   Yes.

2  **Q.**   And these are -- these runs all being done basically

3  at, you know, 14 miles an hour, something like that?

4  **A.**   Yes.  14, 15 mile an hour.

03:05:48   5          (Video of Run 3 played.)

6  BY MR. MUELLER:

7  **Q.**   Have they managed to hit the hole every time?

8  **A.**   No.  I -- part of the test was to drive -- to just

9  steer without contacting the hole to see what happened

03:06:05   10  there.  Sometimes was trying to hit the hole, and

11  sometimes we tried to hit the hole and missed it.

12          (Video of Run 4 played.)

13  BY MR. MUELLER:

14  **Q.**   The hole is right there, isn't it?

03:07:18   15  **A.**   Yes.

16          (Video of Run 5 played.)

17  BY MR. MUELLER:

18  **Q.**   Now, the two water barrels, or whatever you call

19  them, they're loaded up with water to simulate the weight

03:07:39   20  of the other two passengers; is that --

21  **A.**   Correct.

22  **Q.**   All right.

23          MR. WEST:  Your Honor, this is cumulative.  He

24  keeps straddling the hole.  It's cumulative.

03:08:05   25          THE COURT:  I am waiting for his response.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1      Response?

2            MR. MUELLER:  If we have had enough, I am

3  willing -- we can stop.

4            THE COURT:  All right.  Let's get through this

03:08:12    5  last one, and then we are done.

6  BY MR. MUELLER:

7  **Q.**    The rest of the runs that you -- would they be --

8  when they hit the hole, they hit the hole.  When they

9  didn't, they didn't.  But the turns and the runs, would it

03:08:23    10  be reflecting essentially substantially the same thing

11  that we just saw?

12  **A.**    Conceptually similar other than for some of the runs,

13  I then sat in the right rear position to kind of

14  experience what it would be like to be in the right rear

03:08:36    15  position and somebody else drove.

16  **Q.**    Now, in terms of the -- of rate of turn here, I know

17  there had been some discussion of some of the people about

18  a full locked turn.  Are these -- in these runs, were

19  these guys doing full locked turns or just kind of really

03:08:55    20  aggressive ones?  Or how would you describe that?

21  **A.**    Well, it ranged.  That's one of the things that we

22  were trying to experiment with a little bit.  Some of the

23  runs were right at or a little bit above a full lock

24  steer, and some of them were less than a full lock steer.

03:09:09    25  **Q.**    Okay.  But in even the ones that were right at or

*KEVIN BREEN - DIRECT BY MR. MUELLER*

 1   very near a full lock steer, did you --

 2   **A.**   May I should -- full rotation, not a full lock.  Let

 3   me correct what I said there.

 4   **Q.**   Full?

03:09:20   5   **A.**   We did one full rotation but not all the way to the

 6   lock.

 7   **Q.**   Okay.  So if I -- if I had a steering wheel here, I

 8   went all the way around like that once, that's what you're

 9   saying that they were doing there?

03:09:30   10   **A.**   That's what we did on some of the runs, yes.

11   **Q.**   Okay.  And now explain to the jury, to do a -- so we

12   have got a terminology right, for a full lock turn, what

13   are we talking about in terms of this?

14   **A.**   One-and-a-half times.  All the way around once and

03:09:49   15   then almost halfway around again.

16   **Q.**   Okay.  So to get down to, I think, what Mr. Newbold

17   described as his 15-foot radius turn, that would have

18   to -- would that have to assume that -- that the young

19   Carter lady did a one -- let's see, if I start off here, I

03:10:06   20   am going to go one and then all the way over to here when

21   she made that turn?

22   **A.**   No.

23   **Q.**   What did I do wrong?

24   **A.**   Keep going.  There you go.

03:10:14   25   **Q.**   Ah.  Okay.  So -- and so to -- but to get to a 15

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    radius turn, it is that one-and-a-half turns, you would

2    have to assume that she is making that in order to achieve

3    a 15-foot radius turn?

4    **A.**    That is correct.

03:10:28   5    **Q.**    Okay.  In any of these runs that you did here -- by

6    the way, in -- in Mr. Newbold's data logger, did he record

7    the degrees of turn of his steering wheel?

8    **A.**    No.

9    **Q.**    So the only way you can tell how aggressive it is,

03:10:47   10   by looking at those small little circles, he is doing a

11   complete 180?

12   **A.**    Correct.  Or a complete 360.

13   **Q.**    Okay.  Now -- but in any of the 16 runs that you did

14   here, whether you were hitting the hole or missing the

03:11:01   15   hole, with this complete 180 degree -- or 360 degree,

16   there -- I am going to get -- math apparently is not my

17   strong suit.  With the complete 360-degree turn, you

18   were -- you never -- well, first of all, you never rolled

19   any of these over, did you?

03:11:21   20   **A.**    Oh, no.  Of course not.

21   **Q.**    All right.  And so we would also assume that you

22   never achieved lateral accelerations that would exceed

23   7 G -- .7 Gs?

24   **A.**    Correct.  We did not.  We actually did not have a lot

03:11:34   25   of accelerations where the vehicle started to slide

1  either, so these maneuvers were less than what is

2  necessary to cause the vehicle to slide.

3  **Q.**   Now, let me ask you this.

4          MR. MUELLER:  Can we pull up 126.005?

03:11:48  5  BY MR. MUELLER:

6  **Q.**   This is what I was actually looking for before but

7  couldn't find.  Can you identify this for me, sir?

8  **A.**   Yes.  This is the tilt table test we did with the

9  MULE configured with the weights we understood to be

03:12:16  10  weights of the people that were in the unit at the time of

11  the accident.

12  **Q.**   Okay.  And so this was a test that you performed; is

13  that right?

14  **A.**   Yes.

03:12:24  15  **Q.**   And if I am looking down here at the lower left-hand

16  corner, that vehicle still is sitting on all four wheels.

17  If you can -- that point right over there.  Yeah.

18                  34.8 degrees, right?

19  **A.**   Correct.

03:12:41  20  **Q.**   Now, in the SAE test -- explain this to me for a

21  minute.  In the SAE test -- and I am going to steal my toy

22  here for a minute.  In the SAE test when you do the tilt

23  table test and you put it up on that table and you lift it

24  up like this, when are you supposed to stop the test?

03:13:04  25  **A.**   When the uphill tires just come off the ground.

KEVIN BREEN - DIRECT BY MR. MUELLER

1    **Q.**   So even if it just comes off a quarter of an inch,

2    the test is over?

3    **A.**   It has got to be visibly off the ground, but yes.

4    **Q.**   Okay.  But does that mean that at .7 Gs, if it -- if

03:13:17    5    it just comes off the table a quarter of an inch, does

6    that mean that the vehicle then is going to tip over?

7    **A.**   No.

8    **Q.**   So in order for the vehicle to tip over, while in the

9    SAE test it's stable, all four wheels on the ground at

03:13:33    10   34.8 degrees, it is also, if you go a little bit further,

11   the wheel is going to get off the ground, it is not

12   rolling over at that level?

13   **A.**   That's correct.

14   **Q.**   Okay.  So in order to get the vehicle to roll over,

03:13:46    15   it would have to be some number greater than 35 degrees,

16   right?

17               MR. WEST:  I'm sorry.  Your Honor, objection.

18   He is leading.

19               MR. MUELLER:  I'll withdraw it.

03:13:58    20               THE COURT:  Rephrase it.

21   BY MR. MUELLER:

22   **Q.**   Can you tell the jury whether or not the -- the

23   actual lateral Gs the vehicle would have to experience in

24   order to roll over, as opposed to just having the wheel

03:14:13    25   come up a little bit, what lateral Gs would it have to

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    experience?

2    **A.**   It would have to be something greater than what --

3    what the limit test would be showing here.  So something

4    greater than 34.8 degrees.

03:14:23    5    **Q.**   All right.  But do we know -- well, how about this,

6    did you do that test where you kept on tilting it up and

7    tilting it up until finally in this tilt table test where

8    it did roll over?

9    **A.**   It did not.

03:14:34    10    **Q.**   Okay.

11    **A.**   I did that mathematically, but I did not do it -- I

12    didn't want to damage the vehicle, but I did it

13    mathematically.

14    **Q.**   Okay.  All right.  But so -- let me see if I can --

03:14:55    15    now, in your -- well, first of all, from the analysis and

16    studies that you have done of this vehicle, have you come

17    -- considering its stability characteristics and its

18    occupant-retention features, have you come to an opinion

19    as to whether or not the design of this vehicle is

03:15:15    20    reasonably safe?

21    **A.**   Yes, I have.

22    **Q.**   Okay.  And what is that opinion?

23    **A.**   I --

24          MR. WEST:  Objection, foundation.  He hasn't

03:15:21    25    been given the proper foundation.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1              THE COURT:  Do you want to rephrase?

2  BY MR. MUELLER:

3     **Q.**   Well, I am -- can you tell me what -- before you give

4     me the opinion, can you tell me the bases for your

03:15:34    5     opinion?

6     **A.**   Well, I guess the basis we have talked about here,

7     but in summary --

8              MR. WEST:  Excuse me, Your Honor, I am not

9  asking the basis.  It is the ultimate question foundation.

03:15:43   10  I'm sorry if I wasn't clear.

11              MR. MUELLER:  I don't know what foundation he

12  is talking about then.

13              THE COURT:  Rephrase the question.

14              MR. MUELLER:  One second, Your Honor.

03:16:01   15         (Counsel confer off the record.)

16  BY MR. MUELLER:

17     **Q.**   Based upon a reasonable degree of engineering

18     certainty, do you have an opinion as to whether or not

19     this vehicle is reasonably safe?

03:16:20   20              MR. WEST:  Objection, foundation still.  It is

21  not the proper --

22              THE COURT:  Overruled.  You may answer.

23     **A.**   Yes, I do.

24  BY MR. MUELLER:

03:16:27   25     **Q.**   Okay.  And can you tell me what that opinion is?

82

1    **A.**    I believe that this vehicle as designed is reasonably

2    safe for its intended purpose from a stability, handling,

3    and occupant protection standpoint.

4    **Q.**    All right.  And can you describe for me the basis --

03:16:44    5    other than what we have been talking about here and the

6    testing analyses done, can you describe for me -- well,

7    maybe I shouldn't ask it that way.

8                    Let's talk about the stability of the

9    vehicle.  Would you -- how would you from an engineering

03:17:03    10   standpoint characterize the stability of the Kawasaki

11   MULE?

12   **A.**    This vehicle has a very good stability, especially

13   for its intended purpose as a utility, relatively

14   low-speed vehicle.

03:17:16    15   **Q.**    Okay.  And from the standpoint of the SAE standards

16   that apply to this vehicle, how would you characterize the

17   occupant-retention characteristics of the vehicle?

18   **A.**    The occupant-retention characteristics exceed the

19   requirements of the SAE standard and are reasonable design

03:17:36    20   configuration for its intended purpose.

21   **Q.**    Okay.  Now, as a part of this design analysis that

22   you did, I take it you're aware of the fact that

23   Mr. Newbold has been asserting that this vehicle should

24   have doors like this, four of them, I guess, and shoulder

03:18:00    25   bolsters?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  **A.**   Yes, I am aware of that.

2  **Q.**   Okay.  And just restricting it to doors and shoulder

3  bolsters, did you do any work in this case to evaluate the

4  Newbold suggestions?

03:18:17  5  **A.**   Yes, I did.

6  **Q.**   Okay.  Can you describe for the jury what work you

7  did to look at the potential, the pros and cons, to the

8  Newbold -- I don't know if I -- let me -- before I go

9  there, because I don't know if I asked you this question.

03:18:35  10          Do any of these SAE J2258 vehicles have

11  these kind of half doors and shoulder bolsters that

12  Mr. Newbold is talking about?

13  **A.**   No.  They do not.

14  **Q.**   Okay.  All right.  Tell me what the -- what you did

03:19:15  15  to evaluate the pros and cons of the Newbold door.

16  **A.**   Well --

17  **Q.**   Excuse me, the Newbold door and shoulder bolster.  I

18  want to get those both in there.

19  **A.**   What I did was two things.  One is I took our

03:19:31  20  exemplar vehicle and I put panels on there similar to the

21  one that's here in the courtroom and did the functional

22  evaluation of those devices on a vehicle using an exemplar

23  person getting in and out of the vehicle, looking at how

24  they're positioned, how it affected their ability to -- to

03:19:52  25  basically use the vehicle for its intended purpose.  It is

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

KEVIN BREEN - DIRECT BY MR. MUELLER

1    going to involve getting in and out of it.  Did it create

2    some hazards?  Did it have some benefits?

3              And then the second thing I wanted to look

4    at is what would happen if a rear-seat occupant were to be

5    involved in a lateral rollover unbelted with the Newbold

6    half door and shoulder bolster in place, to see what would

7    happen with an occupant in that situation.

8    Q.   Okay.  Let me -- maybe I can -- skipped ahead a

9    little bit.  As a part of your -- because we haven't

10   gotten to the accident reconstruction part yet so -- but

11   if I could just skip ahead a little bit, then we can come

12   back to that.

13             As a part of your work on the accident

14   reconstruction, did you come to a conclusion as far as the

15   vehicle dynamics in this accident?

16   A.   Yes, I did.

17   Q.   Okay.  And I know we are going to come back to it

18   about how you got there, but demonstrating either one of

19   those devices, can you -- can you tell the jury what you

20   think as far as the vehicle dynamics in this accident,

21   what they were?

22   A.   Well, sort of in summary, the vehicle was in a -- a

23   turn, a turn to the left, starts to slide, and starts to,

24   as a result of being in what is called a yaw, it starts to

25   then do a pitch roll coming into contact on the corner of

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

KEVIN BREEN - DIRECT BY MR. MUELLER

1    the A-pillar causing the damage that we see, and then

2    coming down to rest on the ground.

3    Q.    In the information you received in the depositions,

4    and I know we have talked about the A-pillar already, I

03:21:32   5    guess you learned that the -- and from the inspection

6    materials, you learned that the A-pillar was bent?

7    A.    Right.

8    Q.    Okay.  And in the demonstration that you just did for

9    the jury, just so we're clear, that A-pillar that we are

03:21:47   10   talking about, I realize they are only little one-row

11   seats here, but the A-pillar we are talking about is this

12   one here?

13   A.    Yes.

14   Q.    Now, did you also receive information as to any

03:22:00   15   consequences as far as the front hood is concerned?

16   A.    Yes.

17   Q.    Okay.  And just so I can -- when we are talking about

18   the front hood, we are talking about this piece just like

19   the front hood of your car, right?

03:22:12   20   A.    Correct.

21   Q.    Okay.  And what information did you receive about the

22   front hood?

23   A.    That it opened up.

24   Q.    Okay.  Now, do you know anything about the latching

03:22:22   25   mechanism on the front hood?

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    **A.**    Yes.

2    **Q.**    Tell the jury about the latching mechanism on the

3    front hood?

4    **A.**    Essentially, it is like we have in our cars in that

03:22:32    5    there is a little release knob in the occupant area, but

6    what it has are two hooks that are under the hood that are

7    called slam latches that are spring loaded that are steel

8    hooks that basically engage a bar that when you push it

9    down and slam on it, it latches these hooks in place.

03:22:47    10   **Q.**    Well, so if I were to go out to your average Chevy or

11   Pontiac, how many of these spring locks that you are

12   talking about would that car have?

13   **A.**    It has one as a primary and one as a secondary.

14   **Q.**    Okay.  And this vehicle has two?

03:23:04    15   **A.**    Has two primary.

16   **Q.**    Do you have a view as to -- in terms of popping that

17   hood open, do you have a view or perspective as to the

18   degree of force it would take to pop the hood open?

19              MR. WEST:  Excuse me, Judge.  There has been no

03:23:21    20   disclosure of any such opinion.

21              THE COURT:  The question is, does he have a

22   view?  Then he can explain the basis for it.

23              MR. WEST:  It is irrelevant.  It has not been

24   disclosed, any such view.

03:23:30    25              THE COURT:  All right.  We will take it up at

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  the break.

2  BY MR. MUELLER:

3  **Q.**   All right.  Well, so, anyway, as you have described

4  the vehicle dynamic, then, let's go back to -- as you were

03:23:40   5  describing part of the evaluation that you did of the

6  Newbold proposed door and shoulder bolster, and tell me

7  what that second part was that you were referring to.

8                Well, all right.  I knew that was going to

9  be a bad question.

03:23:56   10                Why don't you tell me -- I asked you if

11  you had evaluated the Newbold door and shoulder bolster.

12  Tell me what -- give the jury a feeling for what you did.

13  **A.**   Well, as I said before, I did two things.  One is

14  statically to use it with a rider, but then to look at

03:24:14   15  what happens in the event of a pitch roll overturn to an

16  unbelted occupant in the right rear seat.

17  **Q.**   Okay.  And as far as what would happen in a pitch

18  roll of the type you describe, with the Newbold door, what

19  work did you do in that area?

03:24:33   20  **A.**   What I did was to take the vehicle and put it on the

21  tilt board up to an angle.  I put the Newbold door and hip

22  bolster at the backseat position, and I put 100 --

23  **Q.**   Hip bolster or shoulder bolster?

24  **A.**   Shoulder bolster.

03:24:50   25  **Q.**   All right.  So just so we are clear, and so the jury

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

KEVIN BREEN - DIRECT BY MR. MUELLER

1   is clear about the distinction, the hip bolster that he

2   had would be like something like this.  The size is not

3   exact.  But the shoulder bolster is more higher up, right?

4   **A.**   Correct.

03:25:08  5   **Q.**   So going to go back again.  So you had the door and

6   the --

7   **A.**   Shoulder bolster.

8   **Q.**   There we go.  Okay.  Now, go ahead.

9   **A.**   And I put a dummy in the backseat that weighed 105

03:25:20  10   pounds or so, fifth percentile female dummy unbelted, and

11   then took the vehicle and positioned it on a tilt table

12   such that I could add -- when you really start the test,

13   release the vehicle so that it would roll, and then catch

14   as though it tripped, like occurred in this accident, and

03:25:39  15   then monitored what happened to the -- to the occupant.

16   **Q.**   And tell the jury what did happen.

17   **A.**   Well, what happened was the occupant was ejected over

18   the door and around the shoulder bolster.

19   **Q.**   So that if I was sitting in a seat like this, and

03:25:58  20   someone picked up the back corner of my chair, so it was

21   kind of tilted kind of down and forward like this, they

22   would fall out like this?

23   **A.**   Something like that.

24   **Q.**   Okay.  Now, have you -- and you did that on a 4010

03:26:17  25   MULE with a Newbold door and a Newbold shoulder bolster?

1   **A.**   Correct.

2   **Q.**   Now, in this case, did you receive information that

3   the young Carter lady was the driver?

4   **A.**   Yes.

03:26:34   5   **Q.**   Okay.  And then there was a young Tiller lady, who

6   was in this passenger seat?

7   **A.**   Yes.

8   **Q.**   Okay.  Now, did you receive any information as to how

9   the young Carter lady -- what her path of trajectory was

03:26:52   10   out of the vehicle?

11   **A.**   That she went through the front windshield opening,

12   up and over the hood area of the -- of the sort of dash

13   panel area.

14   **Q.**   Now, the hood area there that you pointed to in the

03:27:11   15   front, is it higher or lower than Mr. Newbold's door?

16   **A.**   It's higher than.

17   **Q.**   Okay.  So that her trajectory --

18            MR. WEST:  Excuse me, Your Honor.  He is not

19   addressing occupant dynamics.  It is outside the scope of

03:27:26   20   his testimony.  They have not --

21            THE COURT:  Who is "his"?

22            MR. WEST:  Mr. Breen.  Whose is it?

23            THE COURT:  Excuse me.  Response.

24            MR. MUELLER:  He's addressing the door.

03:27:35   25            THE COURT:  All right.  I'll allow it.

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1        MR. WEST:  Oh, okay.

2  BY MR. MUELLER:

3  **Q.**   So that -- is the information about the path of

4  travel of the young Carter lady consistent or inconsistent

03:27:48   5  with the test you did with Newbold's door and a dummy?

6  **A.**   It's consistent with that.

7  **Q.**   All right.  And now the young Tiller lady, she was

8  sitting in the passenger seat; is that right?

9  **A.**   Yes.

03:28:03   10  **Q.**   Okay.  Now, the passenger seat here, as we can see,

11  has got a hip bolster, doesn't it?

12  **A.**   Yes.  A hip restraint.

13  **Q.**   And did you receive any information as to whether the

14  young Tiller lady, now that -- can we pull up -- I think

03:28:26   15  it's 151.  It's the picture of Newbold's door.

16        THE COURT:  Is this a good time for a break

17  while you get organized?

18        MR. MUELLER:  It is.

19        THE COURT:  All right.  Ladies and gentlemen,

03:29:15   20  we will take our afternoon break at this time.  Let's break

21  for 15 minutes.  Thank you.

22  **(Jury Out.)**

23        THE COURT:  You may step down, sir.  If you

24  don't mind waiting outside.  Sir, if you don't mind waiting

03:29:47   25  right outside the courtroom.  Thank you.

KEVIN BREEN - DIRECT BY MR. MUELLER

1            All right.  We need to take up the one

2 issue of whether that topic you objected to is in the

3 report or not.

4            MR. WEST:  Yes, Your Honor.

03:29:58  5            THE COURT:  Do you have a copy of the report

6 handy?

7            MR. WEST:  I have his report.

8            THE COURT:  All right.  Do you want to confer

9 on that and then I'll come in five minutes -- in ten

03:30:06 10 minutes and we can talk about it?

11            MR. WEST:  A couple of things.  Number one, the

12 occupant dynamics of the front driver coming over the hood

13 has nothing to do with the door, so that is outside of his.

14            And what was the other one that we said we

03:30:21 15 would come back to.

16            MR. MUELLER:  The hood.

17            MR. WEST:  The hood latch.  There is no hood

18 latch.

19            THE COURT:  Why would we want to talk about a

03:30:29 20 hood latch?

21            MR. MUELLER:  I can pass on it.

22            THE COURT:  All right.  So what about the issue

23 of the front driver?

24            MR. MUELLER:  The front driver has a height

03:30:37 25 that is almost exactly as Newbold's door, so it's the same

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1    thing.  Two people going over things --

2              THE COURT:  Go ahead.

3              MR. WEST:  Occupant dynamics are Dr. Carhart's

4    testimony, not this guy's, and so I would move to strike it

03:30:52   5    and an instruction for the jury to disregard this guy

6    talking about motion of occupants because that is not his

7    area.  He is a driver, tester, design guy.

8              THE COURT:  But that is -- to some extent deals

9    with the movement of the occupants.

03:31:08   10             MR. WEST:  But, Your Honor, he is not

11   designated anything to do with any of the other occupants

12   or even Mxxx Nxxxxxxx occupant dynamics.

13             THE COURT:  Did he testify to the same thing

14   that he testified -- did he cover the same things he is

03:31:19   15   testifying about now, including the occupant movement

16   characteristics under certain conditions, in his report?

17             MR. WEST:  No, ma'am.  No, Your Honor.

18             MR. MUELLER:  What he did do is he said that

19   Newbold's door, because of its size and configuration, they

03:31:33   20   are going to make no difference here.  And the testimony

21   about what these two other people did --

22             THE COURT:  Show me where in the report you are

23   relying.  Because I gather the objection is that it wasn't

24   in the report.

03:31:44   25             MR. WEST:  It is not anywhere in there.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1          THE COURT:  Is that right?  Show me in the

2   report and I'll be back in about eight minutes and I will

3   look at it.  Thank you.

4          **(Proceedings recessed from 3:31 to 3:48.)**

03:48:12   5          **(Jury Out.)**

6          THE COURT:  All right.  Let's address that

7   issue real quickly.

8          MR. MUELLER:  Yes, Your Honor.  Two things:

9   One, while not agreeing with Mr. West, I have also been

03:48:19  10   told I have been going on too long.  So I'm just going to

11   cover one brief topic and then a couple of roundhouse

12   questions.  I will be done in ten minutes.

13          THE COURT:  Before you say that, I am inclined

14   after looking at the testimony that was pulled on nets,

03:48:35  15   netting, to allow you to ask your -- Mr. Breen about that

16   because I think that there was enough in the direct

17   examination to permit -- well, to make it prudent for you

18   to go ahead and ask your questions about netting, either at

19   this time or on Tuesday.

03:48:56  20          MR. MUELLER:  Let me confer with --

21          THE COURT:  All right.

22          MR. WEST:  And while they're doing that, Your

23   Honor, I would move for an instruction to the jury to

24   disregard the hood interaction as well as the --

03:49:07  25          THE COURT:  I am not going to tell them to

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  disregard it.  I am simply going to welcome the information

2  that no further questions will be asked in that area.

3          MR. MUELLER:  Thank you, Your Honor.

4          MR. WEST:  Then what about the occupant

03:49:19    5  dynamics?  Because that was not disclosed either from this

6  witness.  We are going to have Dr. Carhart.  I just think

7  it's inappropriate.

8          THE COURT:  That is all right.  He didn't go on

9  very long.  He just very briefly described the overlap of

03:49:31   10  it with his work.  I don't think there is a need for an

11  instruction.

12          MR. MUELLER:  Thank you.

13          THE COURT:  All right.  I think we are ready to

14  go.

03:49:36   15          MR. MUELLER:  I will ask a couple of questions

16  about netting while he is here.

17          THE COURT:  That is fine.

18          THE CASE MANAGER:  All rise for the jury.

19          **(Jury in.)**

03:50:04   20          THE COURT:  Please be seated, ladies and

21  gentlemen.

22              If the witness -- please, take the witness

23  stand, sir.  I think we are ready to proceed.

24  BY MR. MUELLER:

03:50:25   25  Q.   Mr. Breen, I would like you to look at what I hope is

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN – DIRECT BY MR. MUELLER*

1  going to show up as Exhibit 70.

2          THE COURT:  Keep your voice up, please.

3          MR. MUELLER:  Sorry, Your Honor.

4  BY MR. MUELLER:

03:50:35  5  **Q.**   Have you seen Exhibit 70 before?

6  **A.**   Yes, I have.

7  **Q.**   All right.  It's a drawing that Mr. Newbold prepared?

8  **A.**   I saw it in the report, yes.

9  **Q.**   And at the bottom this is a depression pothole,

03:50:55  10  whatever we call it, right, that you read about in the

11  testimony?

12  **A.**   Correct.

13  **Q.**   And this Exhibit 70 has a scale on it, does it?

14  **A.**   Yes.

03:51:06  15  **Q.**   And did you scale -- using Mr. Newbold's scale here

16  at the bottom, did you scale the distance of this hole

17  from this fence?

18  **A.**   Yes.

19  **Q.**   And what is that distance?

03:51:17  20  **A.**   It's about 16 feet or so.

21  **Q.**   Okay.  Now, if I am going along at 14 miles an hour,

22  can you tell the jury what is that in feet per second?

23  **A.**   It's about 22 feet per second.

24  **Q.**   Okay.  So that -- would that mean that at the time

03:51:38  25  the vehicle reached the pothole, it was less than a second

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1  away from hitting the fence?

2  **A.**   Yes.

3  **Q.**   Okay.  Another question:  There has been some

4  reference in the case to netting for vehicles of this

03:51:52  5  type.  Do you have, from a design engineer's standpoint --

6  well, first of all, did Mr. Newbold in any of his tests,

7  did he test netting?

8  **A.**   No.

9  **Q.**   Okay.  Do you have an opinion to a reasonable degree

03:52:07  10  of engineering certainty whether netting is advisable or

11  needed on a vehicle like the MULE?

12            MR. WEST:  Objection, foundation.

13            THE COURT:  Overruled.

14  **A.**   I do have an opinion.

03:52:18  15  BY MR. MUELLER:

16  **Q.**   All right.  And tell the jury what that is.

17  **A.**   Well, I think, first of all, that the use of netting

18  on a vehicle like this would significantly hamper the

19  utility of the vehicle in that if you're getting in and

03:52:28  20  out of it frequently, you have to deal with the net every

21  time.

22            The other thing is that it really doesn't

23  provide for a vehicle like this a lot of enhancement to a

24  vehicle from a usability or from a safety standpoint.

03:52:40  25            THE COURT:  Sir, can you lift that mic so it is

1  closer to you and speak closer into it?

2  BY MR. MUELLER:

3  **Q.**   Keep the mic close to you and repeat that answer

4  because I missed half of it.

03:52:50   5            THE COURT:  Thank you.

6  **A.**   From a usability standpoint, netting provides a

7  disadvantage to users, to aid -- reposition the netting

8  every time they get in and out of the vehicle.  Or they're

9  trying to check fence line, they wouldn't be able to get

03:53:04   10  through the netting because the netting would be in the

11  way.

12            From an occupant-retention standpoint,

13  given the overall design of this vehicle, it is not

14  necessary.  There are other features as part of the

03:53:16   15  occupant-retention system, and the overall way this

16  vehicle works that would make it suitable to not have

17  netting on a vehicle like this.

18  **Q.**   So as far as whether that is needed or advisable, is

19  your answer there "yes" or "no"?

03:53:28   20  **A.**   It is not needed, and it is not advisable.

21  **Q.**   Okay.  I would like to ask you a couple of kind of

22  conclusions here.  One, as a result of all the analysis

23  you did in the accident reconstruction here, can you tell

24  the jury with a reasonable degree of engineering certainty

03:53:47   25  you have come to any conclusions whether or not the

*KEVIN BREEN - DIRECT BY MR. MUELLER*

1   Kawasaki MULE was the cause of this rollover?

2   **A.**   Yes, I have come to conclusions.

3   **Q.**   And what is that?

4                   MR. WEST:  Objection, Your Honor.  The cause of

03:53:59   5   the rollover is not the issue.

6                   THE COURT:  I agree.  There is no issue as to

7   any problem that caused the rollover.  We're only looking

8   at the cause of the injuries.

9   BY MR. MUELLER:

03:54:09   10   **Q.**   All right.  Can you -- from the standpoint of the

11   occupant-retention characteristics of the craft -- I mean

12   of the vehicle, have you come to any conclusions as to

13   whether the Kawasaki MULE was the cause of the injuries

14   that Mxxx Nxxxxx received?

03:54:25   15                   MR. WEST:  Your Honor, that is Dr. Carhart's

16   area, and --

17                   THE COURT:  I'll allow his opinion.

18   **A.**   I do have an opinion.

19   BY MR. MUELLER:

03:54:31   20   **Q.**   What is that?

21   **A.**   That it is not the cause of the ejection and

22   injuries.

23   **Q.**   All right.  And also, do you, in evaluating

24   Mr. Newbold's designs, and that is to say the door and the

03:54:44   25   shoulder bolster, from a design standpoint, do you have --

KEVIN BREEN - CROSS BY MR. WEST

1   have you come to a conclusion as to whether Mr. Newbold's

2   designs are either a good idea, needed, or advisable?

3   **A.**    In terms of are they a good idea?  No.  Are they

4   advisable?  No.

03:55:02   5   **Q.**    All right.

6            MR. MUELLER:  I think I'll pass the witness,

7   Your Honor.  Oh, wait, one last.

8   BY MR. MUELLER:

9   **Q.**    Look, these opinions that you just expressed there,

03:55:10   10   are they to a reasonable degree of engineering certainty?

11   **A.**    Yes, they are.

12            MR. MUELLER:  I'll pass the witness.

13            MR. WEST:  May I proceed?

14            THE COURT:  You may.

03:55:16   15                    **CROSS-EXAMINATION**

16   BY MR. WEST:

17   **Q.**    Do you agree that engineers shall hold paramount the

18   rights, safety, and welfare of the public?

19            MR. MUELLER:  Your Honor -- object, Your Honor,

03:55:24   20   relevancy.  This is a code of ethics thing.

21            THE COURT:  We're going to stay away from that.

22   BY MR. WEST:

23   **Q.**    Part of your resume has set forth you're a member of

24   the National Society of Professional Engineers, right?

03:55:32   25   **A.**    Yes, sir.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

KEVIN BREEN - CROSS BY MR. WEST

1   Q.   Do you agree that that's an engineering paramount

2   consideration?

3              THE COURT:   I think I have ruled that we are

4   not -- that is just not relevant.

03:55:41   5   BY MR. WEST:

6   Q.   All right.   You were designated to -- on two things

7   in this case:   how the accident occurred and to evaluate

8   the design and performance of this MULE, right?

9   A.   Yes, sir.

03:55:50   10   Q.   Those two things only?

11   A.   And to evaluate Mr. Newbold's claims about the

12   design.

13   Q.   Okay.   That is not what you told me your deposition,

14   is it?

03:55:57   15   A.   I think I did, sir.

16   Q.   Were you retained by counsel for Kawasaki to look at

17   the facts available, how the accident occurred,

18   accident-reconstruction-type activities, and also to

19   evaluate the design and performance of the Kawasaki MULE

03:56:15   20   at issue in this case?

21              Were those the things you were retained to

22   do?   Page 5 of your deposition, lines 18 through 23.

23   A.   Yes.

24   Q.   Say anything about Newbold's design in that answer?

03:56:38   25   A.   Well, about the design -- about the allegations about

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1  the design.

2  **Q.**   Design and performance of the Kawasaki MULE at issue

3  in this case.  Did you say anything about Newbold's

4  design?

03:56:48  5  **A.**   Not in that statement, no.

6  **Q.**   Now, the last billing I have for you for the

7  lawyers -- I mean, the lawyers are who hired you.  That is

8  who you consider your client is, right?

9  **A.**   Yes, sir.

03:57:01  10  **Q.**   The last billing we have is right under $60,000

11  through the middle of August of this year, right?

12  **A.**   I gave the bills.  I don't know.  That sounds about

13  right, though.

14  **Q.**   Then we took your deposition on September 18th?

03:57:17  15  **A.**   Yes.  That's correct.  16th.

16  **Q.**   16th?  So it was a Sunday in Florida.  I flew out

17  there.  We took your deposition.

18  **A.**   Yes.

19  **Q.**   What, for about three hours, and you had to leave and

03:57:27  20  catch a flight?

21  **A.**   Yes, sir.

22  **Q.**   I still had more questions and I expressed that to

23  you, didn't I?

24  **A.**   We had arranged for three hours and that was what my

03:57:34  25  understanding was.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1   **Q.**   You know that I asked you to stay and I had

2   additional questions?

3                   MR. MUELLER:  Your Honor --

4                   THE COURT:  Excuse me, we won't take up

03:57:40    5   discovery disputes here.  Move on to a different area.

6   BY MR. WEST:

7   **Q.**   All right.  At the time of your report that was

8   issued in January of this year, you had yourself about

9   seven hours in the case, didn't you?

03:57:57   10   **A.**   I don't remember offhand but something like that.

11   **Q.**   I can show them to you if you would like.

12   **A.**   If you want me to look at them, I'll be glad to.

13   **Q.**   Sure.  Pull your -- I have got the billing right

14   here.

03:58:19   15                   And the way you do your billing --

16   actually, let me do it from the ELMO.  You can watch.

17                   MR. WEST:  Would you mind moving it up?

18                   MR. MUELLER:  Sure.  No problem.

19   BY MR. WEST:

03:58:33   20   **Q.**   The way you do your billing, Mr. Breen, you're the

21   principal on this case, right?

22   **A.**   Yes.

23   **Q.**   And no other principals within ESI worked on this

24   case, did they?

03:58:43   25   **A.**   No.

*KEVIN BREEN - CROSS BY MR. WEST*

1   Q.   So this is as detailed as we get, right?

2   A.   Yes.

3   Q.   You have some other billings within your company but

4   you haven't given those to us, right?

03:58:53   5   A.   Right.  I provided invoices.

6   Q.   Right.  This is all we get.  So the principal -- so

7   November 2016 you worked .8 hours, right?

8   A.   Yes.

9   Q.   And then your next bill was September 2017, you had

03:59:11   10   another .8 hours?

11   A.   Okay.

12   Q.   Right?  So we're at 1.6.  Then you got .3 hours?

13   A.   Okay.

14   Q.   And I am going to let you take a look at them and

03:59:27   15   confirm my numbers of about seven hours through the time

16   of the report was your own involvement.  Can you do that

17   for me, please, sir?

18   A.   No.  That is not correct.

19   Q.   All right.  What was your time through the billing of

03:59:57   20   January 2018?

21   A.   The billing through January for my time is, looks

22   like, about 17.2 hours.

23   Q.   All right.  Through the -- oh, you went into the

24   February billing?

04:00:06   25   A.   The bill dated February is for time in January.

KEVIN BREEN - CROSS BY MR. WEST

1   **Q.**   Okay.  So I am asking you the bills through the date

2   of your report.

3   **A.**   About 17 hours.

4   **Q.**   Okay.  No.  No.  Through Jan 11th?

04:00:17   5   **A.**   Yes.

6   **Q.**   All right.  So if we add up the November, 16;

7   September, 17; November -- we add these up through the

8   date of your report, you are telling me it's 17 hours?

9   **A.**   If you include February, yes.

04:00:37   10   **Q.**   Okay.  I am through the date of your report.

11   **A.**   Right.  Through the date of report which would be the

12   invoice in October.

13   **Q.**   What was the date of your report?

14   **A.**   January 10th.

04:00:45   15   **Q.**   And so the invoices through January 11th total about

16   seven hours?

17   **A.**   You're not understanding.  The invoices through

18   January 10th only covered work through December.

19   **Q.**   I got you.

04:00:56   20   **A.**   Invoice goes out in January that has another nine

21   hours in preparation of the report.

22   **Q.**   I got you.  So you have got 17 hours in on the case?

23   **A.**   At that point in time.

24   **Q.**   And you have about 31 hours total; is that right?

04:01:08   25   **A.**   Something like that.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

KEVIN BREEN - CROSS BY MR. WEST

1  Q.   And that was through the billing before your

2  deposition?

3  A.   I mean, you have got them and added them up.  That

4  sounds right.

04:01:19  5  Q.   I know I have them.  That's through your billing of

6  the deposition, right?  Is that about 31 hours total?

7  A.   Something like that.

8  Q.   Now, you have never testified in any case against a

9  side-by-side manufacturer that it was defective or unsafe

04:01:35  10  in any way, have you?

11  A.   That's correct.

12  Q.   You're kind of a -- an all around special vehicles

13  expert for hire, aren't you?

14  A.   I do work and have done for 40 years on special

04:01:47  15  purpose vehicles.

16  Q.   Tell me all the things that you are an expert in,

17  Mr. Breen.

18  A.   Recreational vehicles, special purpose vehicles,

19  accident reconstruction and human factors primarily.

04:01:57  20  Q.   Statistics?

21  A.   I get involved looking at accident data.  Sure.

22  Q.   Helmets?

23  A.   I get -- look at helmets if they're involved in an

24  accident.  Sure.

04:02:07  25  Q.   What other things?  Not just vehicles and helmets,

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1  accident reconstruction, statistics.  Anything else that

2  you're an expert in?

3  **A.**   Recreational type of vehicles and products,

4  accidents, and boats.

04:02:20   5  **Q.**   Such as three-wheelers and four-wheelers, the ATVs?

6  **A.**   Sure.

7  **Q.**   You have always thought the three-wheelers were okay,

8  right?

9  **A.**   Some of them; some of them not.

04:02:28   10  **Q.**   It was up to you they would still -- some of them

11  would still be on the road, wouldn't they?

12  **A.**   Again, because of the standard situation, no.

13  **Q.**   But they could be made, couldn't they?

14  **A.**   They can't be today because there is not a standard

04:02:40   15  for them.

16  **Q.**   Well, the ten years expired.

17           MR. MUELLER:  Relevance, Your Honor.

18  BY MR. WEST:

19  **Q.**   Are we not in agreement?

04:02:45   20           THE COURT:  Excuse me.

21           MR. MUELLER:  We're going to go on a long

22  debate about something that occurred 20 years ago.

23  Relevance.

24           THE COURT:  Move on to a different area.  We

04:02:52   25  will come back to this if we need to.

KEVIN BREEN - CROSS BY MR. WEST

1  BY MR. WEST:

2  **Q.**   You're a go-to guy for the -- this type of vehicle,

3  aren't you, as an expert?

4  **A.**   I am not sure what you mean by "go to."  I have spent

04:03:02   5  my entire career working on special purpose vehicles.  I

6  know a lot about how they're designed and how they work.

7  **Q.**   All right.  Now, let's take a look at Depo Exhibit 5.

8              Do I need to drop this?

9              Yeah, your Depo Exhibit 5 is a listing of

04:03:38  10  materials that you had received through January 11th?

11              MR. MUELLER:  It is not admitted, and -- it's

12  not admitted so he is going --

13              THE COURT:  All right.

14              MR. WEST:  On Depo Exhibit 5 --

04:03:48  15              THE COURT:  Excuse me.  Are you going to offer

16  it?

17              MR. WEST:  Sure.  Yes.

18              THE COURT:  Any objection?

19              MR. WEST:  It's listed in his materials.

04:03:55  20              MR. MUELLER:  Oh, no.  Sorry.  I got the wrong

21  one.

22              THE COURT:  All right.

23              MR. MUELLER:  Let me see it.  Yes.  No.  I'm

24  sorry.  I have the wrong one.  I have the wrong one.  I

04:04:06  25  have no objection to that.

*KEVIN BREEN – CROSS BY MR. WEST*

1          THE COURT:  All right.

2          MR. WEST:  What number will this be?  When

3  you -- well, we have got it up here.  When --

4  BY MR. WEST:

04:04:20   5  **Q.**   The date of that is January 11, 2018, right,

6  Mr. Breen?

7  **A.**   Yes.

8  **Q.**   And that was the listing of materials that you had

9  received, your company had received, as of the date of

04:04:31  10  your report, January 11th or 12th of 2018, right?

11  **A.**   No.

12  **Q.**   That is not a list of the materials you received as

13  of that date?

14  **A.**   No.  This is a list of materials as of September

04:04:44  15  11th, 2018.

16  **Q.**   Oh, okay.  Let me hand you this one, then.  Let's

17  take that one off.  You're right.

18          This one is a previous list.  You had

19  several lists because you have gotten materials as the

04:04:59  20  case has progressed, right?

21  **A.**   Sure.

22  **Q.**   And this is the list of materials that you had given

23  to us when you produced your report in January of 2018,

24  right?

04:05:09  25  **A.**   Yes.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1   **Q.**   You have never been to the site?

2   **A.**   I personally had not, no.

3   **Q.**   You had never seen the actual MULE?

4   **A.**   Not this particular one, no.

04:05:19   5   **Q.**   You sent your son down here?

6   **A.**   Right.

7   **Q.**   And he made some measurements out there at the scene?

8   **A.**   Right.

9   **Q.**   You didn't need to take Mr. Newbold's diagram and use

04:05:27   10   a scale because your son made one of the two measurements,

11   didn't he?

12   **A.**   Right.

13   **Q.**   He pulled the distance off of that east side fence?

14   **A.**   Correct.

04:05:34   15   **Q.**   He failed to pull the other distance, didn't he?

16   **A.**   He does not have that distance recorded, at least

17   photographically.

18   **Q.**   He doesn't have a photograph of the distance, does

19   he?

04:05:44   20   **A.**   No.  He does not. ▆

21   ▆ ▆

22   ▆

23   ▆ ▆

24   ▆

04:06:01   25   ▆ ▆

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

KEVIN BREEN - CROSS BY MR. WEST



*KEVIN BREEN – CROSS BY MR. WEST*



KEVIN BREEN – CROSS BY MR. WEST



*KEVIN BREEN – CROSS BY MR. WEST*



12   **Q.**   Do they put these on the high-speed vehicles, doors

13   and bolsters?

14   **A.**   On some high-speed vehicles they do have doors, yes.

04:10:20   15   **Q.**   All right.  If they comply with ROHVA standards,

16   don't they have to have the doors and the bolsters?

17   **A.**   At some vintage, yes.

18

19

04:10:34   20

21

22   **Q.**   You understand.  You are familiar with this industry.

23   You have seen the vehicles, right?

24   **A.**   Sure.

04:10:46   25   **Q.**   Now, this standard that you talk about, what are the

*KEVIN BREEN - CROSS BY MR. WEST*

1  consequences for not following the standard?

2  **A.**   Well, I think there's a number of consequences.

3  We're talking about item -- J2258, I assume you're talking

4  about.

04:11:00  5  **Q.**   Yes, sir.

6  **A.**   Well, being noncompliant with the standard I think

7  could have an effect on the marketplace in terms of other

8  competitors are going to say, you know, this vehicle

9  doesn't meet blah, blah, blah standards.  But there is

04:11:14  10  also situations such as we're talking about here today.  I

11  am sure if this vehicle didn't pass part of that standard,

12  that would be part of your discussion cross-examining me.

13  And there is also a certain amount of the government's

14  involvement in these standards.  Obviously, they're not

04:11:28  15  laws that people have to follow, but the government tracks

16  what we're doing in SAE standards.

17  **Q.**   And when it gets way out of whack, then the

18  government steps in?

19  **A.**   The government steps in when they feel it is

04:11:42  20  appropriate.  They have got guidelines they use to step in

21  and they do that.

22  **Q.**   And the government has not endorsed SAE J2258, have

23  they?

24  **A.**   They participated in the development of it.

04:11:53  25  **Q.**   You have got individuals who work for the government

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1  that participated?

2  **A.**   Well, people --

3  **Q.**   It is not a law, is it?

4  **A.**   It is not a law.  You're correct.

04:12:03   5  **Q.**   As I looked through your list of materials, I didn't

6  see any investigator notes from the Kawasaki investigator

7  that went and visited with the EMS witness.  Did you get

8  some of those notes?

9  **A.**   I don't know what you're talking about.

04:12:15   10  **Q.**   Did you ever seek to -- to interview any of the

11  emergency personnel out there?

12  **A.**   No.  I was not involved in the medical stuff.  That's

13  not my area.

14  **Q.**   No.  But the medical part, the EMS guys, they went

04:12:27   15  out to the scene.  You got their depositions, didn't you?

16  **A.**   Yes.

17  **Q.**   Mr. Earp, Mr. Northcutt, Mr. Broussard?

18  **A.**   Those names sound familiar.

19  **Q.**   Did you read or watch their depositions?  They were

04:12:40   20  videotaped and transcribed.

21  **A.**   I reviewed them, yes.  I reviewed the paper part.

22  **Q.**   And did you see Mr. Earp, where he said that a

23  Kawasaki investigator had come out and visited with him?

24  **A.**   I may have seen that.  I don't recall that

04:12:55   25  specifically, though.

KEVIN BREEN - CROSS BY MR. WEST

1   **Q.**   Did you ever ask to see them?  I understand that you

2   were dealing with medical issues a minute ago.  But you

3   didn't want to deal with medical issues with me.  Did you

4   seek to talk to those EMS guys that were at the scene?

04:13:08   5   **A.**   Other than through their depositions, no.

6   **Q.**   Now, you now who Dr. Miller is?

7   **A.**   I do not.

8   **Q.**   Did you visit with Dr. Carhart about this case?

9   **A.**   I don't believe I have talked with him about this

04:13:33   10   case.

11   **Q.**   Did you visit with Dr. Carhart's partner,

12   Dr. Miller --

13   **A.**   No.

14   **Q.**   -- about this case?  Have you seen Dr. Carhart's

04:13:45   15   deposition?

16   **A.**   I have.

17   **Q.**   And are we certain, Mr. Breen, that you haven't

18   spoken with anybody at Dr. Carhart's facility, Xponent?

19   **A.**   About this case, I don't have a recollection of that.

04:14:14   20   **Q.**   If you had some detailed billing, would it be on

21   that?

22   **A.**   No.

23   **Q.**   Do you remember when Dr. Carhart was deposed that he

24   had anticipated lateral accelerations on the order of .7

04:14:34   25   Gs?  Did you see that?

1   **A.**   Yes.

2   **Q.**   And that Mr. Breen conveyed lateral accelerations

3   along that level to Dr. Miller, and it is also in

4   Mr. Breen's report?  Did you see that in Dr. Carhart's

04:14:48   5   deposition?

6   **A.**   Sure.  I was -- he was provided a copy of my report.

7   **Q.**   But did you see the first part that Mr. Breen

8   conveyed lateral accelerations along that level to

9   Dr. Miller, but it is also in Mr. Breen's report?  Did you

04:15:00   10   see that?

11   **A.**   Only time is when I wrote the report.

12   **Q.**   You didn't even talk to Dr. Miller?

13   **A.**   I don't know who Mr. Miller is.

14   **Q.**   Dr. Miller.

04:15:09   15   **A.**   Dr. Miller.

16   **Q.**   So Dr. Carhart was agreeing with the .7 G lateral

17   acceleration figure that you put in your report, that's

18   the equilibrium point, right?

19   **A.**   Well, that's the initial point where the wheels start

04:15:23   20   to tip up.

21   **Q.**   In a static situation, right?

22   **A.**   Correct.

23   **Q.**   So in a static loading on a tilt table, .7 Gs is

24   where anything will make it teeter or totter the other

04:15:35   25   way?

*KEVIN BREEN - CROSS BY MR. WEST*

1  **A.**   No.  That's where the time, the first point in time

2  where the uphill wheels cut to leave the platform.

3  **Q.**   That's right.  And that is when the vehicle is still,

4  it's a static tilt table test?

04:15:44  5  **A.**   Sure.

6  **Q.**   And so if the vehicle is moving and has the dynamic

7  input of the shock absorbers depressing and then

8  rebounding, and over a field like the pasture that was

9  being operated in, certainly that would be enough to get

04:15:58  10  it unstable even at .7 Gs?

11  **A.**   No.

12  **Q.**   Okay.  Have you made that analysis, Dr. -- Mr. Breen?

13  **A.**   Yes.

14  **Q.**   So .7 questions -- you're comfortable that is the

04:16:10  15  lateral acceleration in this event?

16  **A.**   Something greater than that.

17  **Q.**   That is not what you said.

18  **A.**   I thought I just said 45 minutes ago something

19  greater than that.

04:16:20  20  **Q.**   All right.  Well, have you corrected Dr. Carhart?

21  Because he still thinks you're at .7 Gs.  Have you ever

22  called him and let him know that he is misunderstanding

23  you?

24  **A.**   Let me see what he says there.  I don't think he is

04:16:30  25  saying that.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN – CROSS BY MR. WEST*

1  Q.  Okay.  He says, "My assumption was based on my
2  experience in UTV evaluations, but it also was my opening
3  assumption, and I learned that it was fairly reasonable,
4  and I would anticipate lateral accelerations on the order
04:16:45  5  of .7 Gs.  Mr. Breen conveyed lateral accelerations along
6  that level to Dr. Miller, but it is also in Mr. Breen's
7  report."
8         Is Dr. Carhart mistaken about your
9  position?
04:16:57  10  A.  Something in excess of .7 Gs, sure.
11  Q.  That is not what he is saying.
12  A.  I think he is saying something pretty close to that.
13  We're mincing words here.
14  Q.  Does he say in excess anywhere in that?
04:17:11  15  A.  On the order of anticipate, any determination of
16  where it is not specifically, where in the accident
17  sequence it's .7.  It's .7 at some point in time.
18  Q.  We know --
19  A.  It gets bigger than that.
04:17:26  20  Q.  We know the vehicle rolled over?
21  A.  Sure.
22  Q.  And you did some calculations.  You think that the
23  turn radius was not as tight as 15 feet, don't you?
24  A.  It could be a little less than that.
04:17:39  25  Q.  It would actually be a little greater than that?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1   **A.**   Right.  I'm sorry, yeah.  Yeah, you're right.

2   **Q.**   Like 19 foot I think is what you --

3   **A.**   It could be as high as like 18 point something.

4   Right.

04:17:49   5   **Q.**   For your calculations you used 19 feet, didn't you?

6   **A.**   That's what it came out to be.

7   **Q.**   And so let's go -- and that's what you think it was

8   more likely to be than 15 feet, right?

9   **A.**   I don't know.

04:18:00   10   **Q.**   You don't have an opinion one way or the other?

11   **A.**   No.

12   **Q.**   Let's go through your 19 and figure out where that --

13   we end up.

14               We did those calculations.  I think

04:18:15   15   they're Exhibit 9 to your deposition, right?

16               Yeah.  Save you some drawing time, sir.

17   Do you see on the screen there?

18   **A.**   Yes.

19   **Q.**   And Mr. Mueller asked you earlier how fast 14 miles

04:18:50   20   an hour was, and you said about 22 feet per second.

21   You're talking about 15 miles an hour.  Fourteen is just a

22   little over 20 feet per second, isn't it?

23   **A.**   Correct.

24   **Q.**   All right.  And so at a 19-foot radius, you did some

04:19:05   25   of those calculations, that arc, that 90-degree arc, would

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN – CROSS BY MR. WEST*

1    be about 30 feet, wouldn't it?

2    **A.**   That's not something I can do in my head.

3    **Q.**   Well, let's do it together.

4              Because it's a less aggressive event at

04:19:33    5    that point, right?  So if you have a 19-foot radius, we

6    good with that?

7    **A.**   Okay.

8    **Q.**   Okay.  And pi ID, right?  What is 19 times 3.14?

9    Times 38.  Nineteen times 2.  Sorry.  About 120.

04:20:17    10   **A.**   Total circumference is 120 feet.

11   **Q.**   And so that arc would be about 30 feet, right?  That

12   90-degree arc?

13   **A.**   Something like that, 29 something.

14   **Q.**   All right.  And if a vehicle is traveling at 20 feet

04:20:34    15   per second, over a 30-foot period, that takes a second and

16   a half, right?

17   **A.**   Yes.

18   **Q.**   And what is a yaw rate?

19   **A.**   It's the rate at which the vehicle goes from going

04:20:52    20   straight to sliding sideways.

21   **Q.**   Okay.  And what do you think that distance was in

22   this event, that distance before it slid sideways?  Or do

23   you have any evidence of that?

24   **A.**   There is no physical evidence to determine that.

04:21:11    25   **Q.**   Did you read in the EMS guys' depositions that they

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1   did not see any gouging, or any furrowing in the -- in the

2   field?  Did you see that?

3   **A.**   Yes.

4   **Q.**   If the vehicle was sliding out in an aggressive

04:21:26   5   manner, would you expect to see furrowing in a field?

6   **A.**   No, not in grass like that.  Furrow is where you're

7   actually digging into the surface, whereas sliding on

8   grass is very different.

9   **Q.**   I got it.  And so if a vehicle is traveling 20 feet

04:21:39   10   per second over a 30-foot arc in a second and a half,

11   what's that yaw rate?  About 60 degrees per second?

12   **A.**   That is not a yaw rate.

13   **Q.**   Okay.  What is that?

14   **A.**   That's a turn rate.

04:21:49   15   **Q.**   All right.  If it's sliding over that entire period,

16   is that 60 degrees per second?

17   **A.**   In terms of yaw rate, no.

18          MR. WEST:  All right.  Pull up exhibit --

19   Defense Exhibit 112.006, please.  You don't have it?

04:22:25   20   That's all right.

21          TECHNICIAN:  Don't have page six.

22          MR. MUELLER:  Foundation, Your Honor.

23          THE COURT:  Establish the predicate.

24          MR. WEST:  Defendant's Exhibit 112.

04:22:44   25          MR. MUELLER:  Put that down because it's not

KEVIN BREEN - CROSS BY MR. WEST

1   in, and foundation.

2               MR. WEST:  It is in evidence.

3               MR. MUELLER:  No.  It is not.

4               THE COURT:  I don't believe so.  Let me check.

04:22:52   5   If it's not --

6               MR. WEST:  It is in his book right here.

7   I'll --

8               MR. MUELLER:  Some are still in there so that

9   you can't --

04:23:01   10              THE COURT:  Why don't you move on to a

11  different area?  We will take this up over the break.

12              MR. WEST:  Let me see if I can lay a foundation

13  with him, Your Honor.  May I?

14              THE COURT:  It is not in evidence.

04:23:09   15              MR. WEST:  Yes.  And I won't display it unless

16  it gets in.

17              THE COURT:  All right.  Thank you.

18              MR. WEST:  Actually, I may have the deposition

19  exhibit.

04:23:30   20  BY MR. WEST:

21   Q.   You provided some documents to me during your

22   deposition, didn't you, sir?

23   A.   I provided you my file.

24   Q.   And one of the things in your file was exhibit -- was

04:23:50   25  Depo Exhibit 6.  I marked that?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1              MR. MUELLER:  No, Your Honor.  That wasn't in

2 his file.  Mr. West brought it.

3              THE COURT:  All right.  Is it in evidence?

4              MR. MUELLER:  No.

04:24:01  5              MR. WEST:  It's marked Defendant's Trial

6 Exhibit 12.

7              THE COURT:  If it has not been admitted, then

8 it is not in evidence.

9              MR. WEST:  I understand, Judge.  I am going to

04:24:09 10 lay a foundation.

11              THE COURT:  All right.

12 BY MR. WEST:

13 **Q.**   Do you see Defendant's Trial Exhibit 112 as noted

14 right here?

04:24:13 15 **A.**   Yes.

16 **Q.**   And did you make any of these entries on this

17 document -- on the document?

18 **A.**   No.

19 **Q.**   This 15-foot radius turn, none of this is your

04:24:23 20 writing?

21 **A.**   No.

22 **Q.**   And do you know where this came from?

23 **A.**   No.

24 **Q.**   Did these lawyers help you draft up drawings?

04:24:30 25 **A.**   No.

125

*KEVIN BREEN - CROSS BY MR. WEST*

1  **Q.**   Huh.  Had you ever seen this before the day of your

2  deposition?

3  **A.**   No.

4  **Q.**   Do you know where it came from?

04:24:38   5  **A.**   No.

6  **Q.**   Do you know why they would produce this document to

7  me?

8  **A.**   I have no idea.

9  **Q.**   Well, you know that the notations here are

04:24:49   10  inaccurate?

11  **A.**   I have not looked at it for that purpose.

12  **Q.**   Okay.  Why did you look at it?

13  **A.**   It is not something I have done or I have relied on.

14  **Q.**   Well, you have -- you have got this -- this part of

04:25:02   15  the drawing in your file, right?

16  **A.**   I have got what Mr. Newbold generated in my file and

17  that is it.

18  **Q.**   And you don't know who made these other entries?

19  **A.**   No.

04:25:11   20  **Q.**   Do your lawyer clients often help you with -- put

21  together exhibits?

22  **A.**   Generally, not.

23  **Q.**   Have you done an analysis of the figures on that

24  diagram to see if they're accurate?

04:25:35   25  **A.**   No.

KEVIN BREEN - CROSS BY MR. WEST

1  Q.   I'm sorry, sir?

2  A.   No.

3  Q.   Let's look at Defendant's Exhibit 126.  Can you

4  look -- refer -- can we look at five?

04:26:05  5        This is some tilt table testing of yours,

6  right?

7  A.   Yes.

8  Q.   All right.  Just so we -- we understand, this --

9  these are both taped tests that you did in this case,

04:26:19 10  right?

11  A.   Correct.

12  Q.   You ever rigged a test?

13  A.   No.

14  Q.   That would not be right?

04:26:22 15  A.   Correct.

16  Q.   It wouldn't be honest?

17  A.   I agree.

18  Q.   So here we have on the left side the operator at

19  100-pounds, right?

04:26:35 20  A.   Correct.

21  Q.   And then the front passenger at 100-pounds?

22  A.   Right.

23  Q.   And then the rear passenger at 130 pounds?

24  A.   Yes.

04:26:42 25  Q.   And over here it's the same except your driver is 180

1   pounds.  The driver is heavier?

2   **A.**   Right.

3   **Q.**   Now, what you're telling us on this left tilt table

4   is the vehicle becomes unstable at 34.8 degrees?

04:27:01   5   **A.**   The tires initially leave the tilt table at 34.8,

6   right.

7   **Q.**   Right.  But when you load up the uphill with eighty

8   pounds more, it becomes unstable at a lower angle.  Do you

9   see that?

04:27:14   10   **A.**   Yes.

11   **Q.**   Now, these water dummies, they're -- they hold what?

12   200 pounds of water each?

13   **A.**   176 pounds plus -- plus you can add some weight to

14   them.

04:27:28   15   **Q.**   All right.  And you did that?

16   **A.**   Right.

17   **Q.**   Let me see -- let me see just this one, please,

18   Mr. McDonald.

19            TECHNICIAN:  I'm sorry, which one?

04:27:40   20            MR. WEST:  The one on the left 126.05.  Thank

21   you.

22   BY MR. WEST:

23   **Q.**   So, you belt in these water dummies, right?

24   **A.**   Right.

04:27:49   25   **Q.**   Then you add some more belts because the seatbelts

128

*KEVIN BREEN - CROSS BY MR. WEST*

1   that came with the Kawasaki MULE aren't enough to hold

2   these in, right?

3   **A.**   Not for a tilt table.  They will slide.

4   **Q.**   I got you.  And these have water in them, don't they?

04:28:00   5   **A.**   Right.

6   **Q.**   And so the water is going to fall toward gravity?

7   **A.**   Sure.

8   **Q.**   And so the water is going to be concentrated lower

9   than the center of gravity of a person, right?  You got

04:28:16   10   water -- all the water is going to be concentrated right

11   here.  There is nothing above that, right?

12   **A.**   Right.

13   **Q.**   Okay.  So the center of gravity will move as it

14   tilts?

04:28:27   15   **A.**   A little, yes.

16   **Q.**   Well, it will move as much as it tilts?

17   **A.**   Well, I mean, if I tilt this, the water moves a

18   little bit and that is why the dummies are designed the

19   way they are.  They don't have legs and arms so we can

04:28:41   20   take all that into account.  Water is pretty stationary

21   their during the course of the test.

22   **Q.**   I got you.  So you got the moving water.  You got

23   these double-strapped water dummies in there, and the one

24   that's loaded heavier in the driver's side is less stable

04:28:57   25   than the one that's lighter on the driver's side,

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1    according to this tilt table test?

2    **A.**    Correct.

3    **Q.**    Let's take a look at Exhibit 126, page 14, please.

4                      All right.   That's your son?

04:29:16  5    **A.**    Yes.

6    **Q.**    And you have got some rear-occupant protection items

7    identified here, right?

8    **A.**    Correct.

9    **Q.**    Here's the hand grip.  He has got gloves on.  He is

04:29:30  10   holding on to the hand grip?

11   **A.**    Right.

12   **Q.**    It goes across the back from B-pillar to B-pillar?

13   **A.**    Right.

14   **Q.**    And it's got the ROPS, the rollover protective

04:29:40  15   structure?

16   **A.**    Right.

17   **Q.**    And there's a specific standard for how that rollover

18   protective structure is tested, right?

19   **A.**    Yes.

04:29:47  20   **Q.**    It's one of the SAE standards?

21   **A.**    There are several SAE standards related to that.

22   **Q.**    This one is tested in accordance with J1194?

23   **A.**    Yes.

24   **Q.**    And also, it's FMVSS 216 compliant, right?

04:30:02  25   **A.**    That's what I am told, yes.

*KEVIN BREEN - CROSS BY MR. WEST*

1  **Q.**   You saw the label on there?

2  **A.**   Yes.

3  **Q.**   You don't have any reason to believe that they're

4  mislabeling this MULE, do you?

04:30:11   5  **A.**   No.

6  **Q.**   Did you ever call anybody or talk with anybody at

7  Kawasaki at all about this case?

8  **A.**   No.

9  **Q.**   So, now, the ROPS system, that is not required by

04:30:23   10  anything other than this SAE standard?

11  **A.**   Well, it's not required.  Kawasaki chose to do it

12  anyway.

13  **Q.**   All right.  And they close to comply with the FMVSS

14  216 with this ROPS, right?

04:30:37   15  **A.**   Apparently so.

16  **Q.**   You saw that?

17  **A.**   Right.

18  **Q.**   Raised an eyebrow to you?

19  **A.**   No.  They didn't have to do it, but they did.

04:30:43   20  **Q.**   All right.  And that's a good thing?

21  **A.**   Sure.

22  **Q.**   And there is nothing in this SAE standard that

23  prevents Kawasaki from putting safer doors and bolsters on

24  the sides, does it?

04:30:53   25  **A.**   No.  They can do that if they felt it was

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    appropriate.

2    **Q.**    And then they have got this footrest.  Is it a

3    footrest or is that -- is that an abbreviation for

4    restraint?  Because we got a hip restraint.  Is that a

04:31:07    5    foot restraint?

6    **A.**    It does both.  It is where your foot rests but also

7    restrains it.

8    **Q.**    Do you believe that that B-pillar is sufficient for

9    foot restraint from a design standpoint?

04:31:16    10    **A.**    If your feet's in there, it is going to stay in

11    there, yes.

12    **Q.**    And you think that is good?

13    **A.**    Sure.

14

04:31:23    15

16

17

18

19

04:31:27    20

21

22

23

24

04:31:32    25

*KEVIN BREEN - CROSS BY MR. WEST*

1

2

3

4

04:31:38   5

6 BY MR. WEST:

7    **Q.**   Have you seen any design drawings anywhere,

8 Mr. Breen, that shows that the B-pillar is intended to be

9 any kind of a restraint for the rear seat, or front seat,

04:31:48  10 or the rear seat passengers?

11   **A.**   I don't recall.  I haven't seen that.

12            MR. WEST:  All right.  May I switch this,

13 please?

14 BY MR. WEST:

04:31:59  15   **Q.**   This is a photograph of a B-pillar in that same area

16 that your son's foot was on a different model.  It is a

17 demo model.  Do you see that?  The seat is off of the

18 front, but there is your B-pillar area.  Do you recognize

19 that?

04:32:11  20   **A.**   I mean, I see what's on the photograph.  I am not

21 sure I know exactly what you're trying to show me, what

22 vehicle it is and that type of thing.

23   **Q.**   All right.  It's a -- it's a 2013 Kawasaki MULE.  Did

24 you -- did you review the B-pillar on the driver's side to

04:32:28  25 see what kind of foot restraint was available over there?

*KEVIN BREEN - CROSS BY MR. WEST*

1    **A.**    I looked at it.  I don't have a recollection.  No.

2    **Q.**    Does that look familiar to you?  That area right

3    there?

4    **A.**    Offhand, it does, in general.

04:32:43    5    **Q.**    Okay.  What is this area right here?

6    **A.**    It's the seatbelt.

7    **Q.**    How about the parking brake?

8    **A.**    Yeah.  That's right.

9    **Q.**    All right.  Do you think that's enough restraint

04:32:57   10    there on the driver's side B-pillar?

11                MR. MUELLER:  Relevance, Your Honor.  Nobody

12    was sitting in that seat.

13                MR. WEST:  We are talking about design, overall

14    design.

04:33:05   15                THE COURT:  All right.  I am going to allow

16    this one question and then we will move on.  Thank you.

17    **A.**    I have not done a thorough evaluation of the driver's

18    side.  It looks to me like it would perform the function.

19    BY MR. WEST:

04:33:15   20    **Q.**    You are okay with that?

21    **A.**    In general, yes, but I haven't done a thorough

22    evaluation.

23    **Q.**    Did you evaluate the foot restraints anywhere else in

24    the vehicle?

04:33:25   25    **A.**    No.  In this case I was focused on the right rear

1    passenger.

2    **Q.**    Did you ever seek to interview anybody at Kawasaki

3    about what they did to evaluate whether doors and bolsters

4    were appropriate?

04:33:49   5    **A.**    No.  I did my analysis independent of them.

6    **Q.**    And everything that you reviewed was on your listing

7    of materials that you gave me at or around the time of

8    your deposition in September?

9    **A.**    Yes.

04:34:02   10   **Q.**    And you had depositions, reports, expert reports,

11   pleadings, discovery matters, correct?

12   **A.**    Right.

13   **Q.**    Did you -- were you missing anything that you felt

14   was necessary for your evaluation?

04:34:15   15   **A.**    No.

16   **Q.**    And do you feel like you needed to go out to the

17   scene or were you okay with going with your son's

18   evaluation?

19   **A.**    Perfectly comfortable with his evaluation.  We have

04:34:25   20   been working together in this business for ten years now.

21          MR. WEST:  Pull up Defendant's Exhibit 16.001.

22   Blow up this top right, please.  I'm sorry, this top right.

23   Yeah.

24   BY MR. WEST:

04:34:55   25   **Q.**    You said something about this being a utility

*KEVIN BREEN – CROSS BY MR. WEST*

1   vehicle, right?

2   **A.**   Yes.

3   **Q.**   Do you know what MULE stands for?

4   **A.**   I think maybe I don't know what it stands for.

04:35:03   5   **Q.**   Multiuse light equipment.

6   **A.**   I never heard that before.

7   **Q.**   All right.  Take a look at this label that's

8   somewhere on the MULE.  "The protective headgear reduces

9   the risk of injury."  Do you recall that?

04:35:20   10   **A.**   Sure.

11   **Q.**   A helmet is recommend when this vehicle is being used

12   for what purpose?

13   **A.**   Recreational purposes or other aggressive driving.

14   **Q.**   All right.  Or any aggressive driving?

04:35:29   15   **A.**   I stand corrected.  Yes, sir.

16   **Q.**   So this vehicle can be used not only for farm use but

17   also for recreational use, by its own labeling?

18   **A.**   Sure.  It can be used for light recreation, like if

19   you wanted to go camping, hunting, that kind of stuff, it

04:35:44   20   works for that.

21   **Q.**   Fishing?

22   **A.**   It works for that.  It is an exploring vehicle.

23   **Q.**   Riding around in a pasture?

24   **A.**   Sure.

04:35:52   25        THE COURT:  All off -- I'm sorry.  Is it all

*KEVIN BREEN - CROSS BY MR. WEST*

1   off-road?

2                   THE WITNESS:  Yes.

3   BY MR. WEST:

4   **Q.**   You don't want to operate these on pavement?

04:35:58   5   **A.**   No.  That is not appropriate.

6   **Q.**   Different coefficients of friction between the tires

7   and the ground on cement and asphalt versus in pastures

8   and off-road?

9   **A.**   Right.  Right.

04:36:07   10   **Q.**   The suspension is not designed to be on-road?

11   **A.**   Well, the suspension is not so much a factor, but the

12   vehicle is not designed, in general, to be on-road.

13   **Q.**   The full tire, suspension, center of gravity, all of

14   that, it is meant to be off-road?

04:36:23   15   **A.**   Correct.

16   **Q.**   And the -- what's the difference between light

17   recreation, and moderate recreation, and recreation?

18   **A.**   Well, I am not sure that is anything published, but

19   in my view of having looked at these vehicles for 20 years

04:36:38   20   or more, that light recreation is kind of when you're just

21   out using the vehicle for exploring, sightseeing, things

22   like that.  I would say sort of mid range is where you

23   might be out in a sand dune or something like that where

24   it is more -- the terrain is more part of the fun in

04:36:52   25   driving.  And that's where the heavy recreation gets into

*KEVIN BREEN - CROSS BY MR. WEST*

1 more of a competitive-type situation where you're really

2 out there to drive it to drive it.

3 Q.   Yeah.  And you have read the manuals and paperwork

4 that came with this MULE, right?

04:37:04   5 A.   I have reviewed the manual, yes, sir.

6 Q.   All right.  And you referred to light recreational in

7 your report a number of times.  Did you see anywhere in

8 the manual where Kawasaki advises, it gives any kind of

9 directions, suggestion as to what light recreation is?

04:37:21  10 A.   No.  That report -- that term of "light" is my term.

11 Q.   You got in your report, you -- you note that

12 Mxxx Nxxxxx was holding onto the handrail in the backseat,

13 immediately before the turn?

14 A.   I -- I reference that at a part in the report, yes.

04:37:42  15 Q.   And you also noted that all the testimony was that

16 when it turned, it kind of tottered for a second, and

17 then -- and then went over.  Do you remember that?

18 A.   There was testimony to that regard, yes.

19 Q.   Do you remember you and I kind of chuckled on what

04:37:58  20 "tottering" meant?

21 A.   We did.

22 Q.   And figured it was the other half of "teeter," right?

23 A.   I guess that's what it is, but that's --

24 Q.   All right.  Have you heard anything from any witness

04:38:09  25 anywhere that has this vehicle up like this?  You had the

*KEVIN BREEN - CROSS BY MR. WEST*

1    tail end up when Mr. Mueller was with you, like this.

2    Like it was diagonal.  Have you seen any testimony from

3    anybody that supports that?

4    **A.**    That's not the way we have it, but that is pretty

04:38:27    5    clear that the vehicle overturned, and it is pretty clear

6    that the vehicle overturned and hit on the upper A-pillar,

7    so at some point in time it was like that.

8    **Q.**    Okay.  Do you believe that --

9    **A.**    But by that point in time the occupants were ejected

04:38:42    10    so they wouldn't know that.

11    **Q.**    The occupants what?

12    **A.**    They would have been ejected well before that point

13    in time.

14    **Q.**    You are not designated on occupant dynamics, are you?

04:38:49    15    **A.**    No.  But that's pretty obviously your question.

16    That's where they would be at that point in time, so they

17    wouldn't know.

18    **Q.**    But how about any testimony from any EMS guys that

19    showed any kind of furrowing or burying of the front end

04:39:05    20    hitting the ground?  Do you see any of that?

21    **A.**    No.

22    **Q.**    Now, you don't always wear your seatbelt when you

23    operate these, do you?

24    **A.**    I do if I am operating for real.  If I move them

04:39:24    25    around a parking lot, or around --

*KEVIN BREEN - CROSS BY MR. WEST*

1  **Q.**   I couldn't understand you.

2  **A.**   I just said, I have moved vehicles around without

3  wearing a seat belt; but if I am out on a real ride, I put

4  my seatbelt on.

04:39:35  5  **Q.**   How about the parking brake?  Do you always use it

6  when you get out of it?

7  **A.**   No.

8          MR. WEST:  Pull up that label again.  Okay.

9  Right above.

04:39:51  10  BY MR. WEST:

11  **Q.**   Do you know that you're violating the warnings when

12  you get out and leave it running and don't apply the

13  parking brake?

14  **A.**   I'm aware of that, yes.

04:40:00  15  **Q.**   Even in some of the testing you produced to us, you

16  got out and you looked at some tree lines.  You left it

17  running.  You didn't put the parking brake on, did you?

18  **A.**   That's correct.

19  **Q.**   And let's talk about SAE standards versus Federal

04:40:23  20  Motor Vehicle Safety Standards.  Okay.  Which of those

21  is an actual federal government standard?

22  **A.**   Federal Motor Vehicle Safety Standards are Federal

23  Motor Vehicle Safety Standards by the government.

24  **Q.**   That's law?

04:40:37  25  **A.**   Yes, sir.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1             MR. WEST:  Can you pull up Defense Exhibit 16,

2  page 8, please?  Blow it up.

3  BY MR. WEST:

4  **Q.**    That's the label we're talking about on the ROPS

04:40:59  5  requirement, and Kawasaki chose to comply with this not

6  only SAE J1194, but also it chose to comply with this one

7  and only Federal Motor Vehicle Safety Standard.  Do you

8  see that?

9  **A.**    Yes.

04:41:14  10  **Q.**    Didn't have to?

11  **A.**    Correct.  Did not have to.

12  **Q.**    Are you familiar with Federal Motor Vehicle Safety

13  Standard 205?

14  **A.**    In general.  I have not memorized what they are, but

04:41:24  15  I am familiar with -- at one point in time in my life, I

16  have reviewed them all, but I can't quote like a Bible

17  verse.

18  **Q.**    I understand.  You know it dealt with occupant

19  containment and requirements for unbelted occupants.  Did

04:41:38  20  you know that?

21  **A.**    I haven't looked at it in a while.

22  **Q.**    Would you take my word on that?

23  **A.**    I haven't looked at it in a while.  I --

24  **Q.**    Do you know why Kawasaki didn't choose to test for

04:41:52  25  unbelted occupants?

*KEVIN BREEN - CROSS BY MR. WEST*

1  **A.**   Well, it is my understanding that their intent was

2  the vehicle should be used with people wearing their --

3  that their -- their seatbelts.  And as a result their

4  testing was done with their occupants belted, the way it

04:42:07  5  was intended to be used.

6  **Q.**   And do you have any indication, other than what

7  Mr. Hisada's testimony was, as to why they didn't test for

8  unbelted occupants?

9  **A.**   Well, that -- I don't other than what he said, but it

04:42:20  10  seems to me that, you know, this is a -- a very stable

11  vehicle.

12  **Q.**   That is all.  I am not asking why Kawasaki --

13  **A.**   I don't know.  I have done my analysis kind of

14  independent of theirs.

04:42:29  15        MR. WEST:  All right.  Pull up Defense Exhibit

16  135, please, page 7.  Blow up this right here.  Yeah.

17  BY MR. WEST:

18  **Q.**   This is from the ROHVA standard.  This is one of the

19  defense exhibits.  Do you see this?  Have you seen that

04:42:58  20  before, Mr. Breen?

21  **A.**   Yes.

22  **Q.**   As the definition of an ROV, right?

23  **A.**   Right.

24  **Q.**   That's -- the ROHVA, that's another industry

04:43:07  25  organization, isn't it?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  **A.**   Yes.

2  **Q.**   And --

3  **A.**   It's another industry.

4  **Q.**   Yes.  I got you.  So let's see how many of these

04:43:16  5  bullet points from the definition of an ROV the 2013

6  Kawasaki MULE met.

7             Does it have a steering wheel for steering

8  control?

9  **A.**   Yes.

04:43:25  10  **Q.**   That's one.  Nonstraddle seating?

11  **A.**   Yes.

12  **Q.**   That's two.  Let's skip over three because I don't

13  think we are going to get that one.

14             We are not going to get three, right?

04:43:37  15  **A.**   No.

16  **Q.**   We got four, gross weight vehicle weight rating no

17  greater than 1700 kilograms.  That's about 3700 pounds?

18  Does this one comply with that?

19  **A.**   I haven't memorized it.  I don't remember offhand.

04:43:53  20  **Q.**   Do you have it in your file somewhere, the

21  specifications?

22  **A.**   The specifications have the gross vehicle weight

23  rating.  They have a maximum vehicle load, but I don't

24  have a GVRW here.

04:44:37  25  **Q.**   You don't have that in your file?

1  **A.**   It's not in the specifications I have here.

2  **Q.**   Okay.  Well, we will pull it up for you.  How about

3  less than eighty inches wide?  This one is a little less

4  than five feet wide, isn't it?

04:44:49  5  **A.**   Right.

6  **Q.**   So we will check on that one also.

7              Engine displacement less than 1,000 CCs,

8  this one?

9  **A.**   This one does, yes.  Correct.

04:44:56  10  **Q.**   I'm sorry, sir?

11  **A.**   Correct.

12  **Q.**   And does it have a 17-character VIN or pin?

13  **A.**   I assume so.  I have never counted them, though.

14  Looks like it.

04:45:06  15  **Q.**   So if we assume, Mr. Breen, that the gross vehicle

16  weight rating is no greater than 3750 pounds, then this

17  2013 Kawasaki MULE meets all the requirements of an ROV

18  under the ROHVA standards except it doesn't go fast

19  enough?

04:45:21  20  **A.**   That's correct.

21  **Q.**   You know vehicles roll over under 30 miles an hour?

22  **A.**   Depends how you operate them.  That can happen.

23  **Q.**   Sure.  Under 25 miles an hour?

24  **A.**   Again, depending how you operate them, it can happen.

04:45:33  25  **Q.**   And we know this one was in low gear?

KEVIN BREEN - CROSS BY MR. WEST

1  **A.**   That's the testimony, yes.

2  **Q.**   You don't have any evidence otherwise, do you?

3  **A.**   One way or the other, I don't have any evidence.

4  **Q.**   You don't have any evidence that it was not in low

04:45:43  5  gear?

6  **A.**   Correct.  There is no evidence other than people's

7  testimony.

8  **Q.**   Let's go to page 34.  So if we look at occupant

9  retention systems, right?  See this up here?  Just give me

04:46:13  10  the first couple paragraphs.

11                      This is in the ROHVA standards, right?

12  **A.**   Correct.

13  **Q.**   They define occupant retention systems, right?  Seat

14  belts?

04:46:23  15  **A.**   Yes.

16  **Q.**   But that's a different type, that's a three-point

17  type instead of the kind that they put in the MULE?

18  **A.**   Right.

19  **Q.**   The ones that come across the shoulder, like he

04:46:37  20  tested in the tilt table with the cross straps?

21  **A.**   That's different.  It's like a car, seatbelt like you

22  have.

23  **Q.**   Like you tested the water dummies with the seatbelts?

24  **A.**   Well, it's a little different but --

04:46:48  25  **Q.**   But the same routing?

*KEVIN BREEN - CROSS BY MR. WEST*

1  **A.**   Same routing, right.

2  **Q.**   And then seatbelt reminder.  Any seatbelt reminders

3  on the MULE?

4  **A.**   No.

04:46:57  5  **Q.**   Anything that kept Kawasaki from putting seatbelt

6  reminders?  Is that the bell, the ding, ding, ding, the

7  seatbelt bell?

8  **A.**   The thing we have dealt with over the years, yes.

9  **Q.**   Does it irritate you?

04:47:07  10  **A.**   At times, sure.

11  **Q.**   Does it remind you to put a seatbelt on?

12  **A.**   At times it does.

13  **Q.**   And that's what this 11.2 is?

14  **A.**   Right.

04:47:14  15  **Q.**   There wasn't anything like that, advising, warning,

16  reminding people to put seatbelts on in this particular

17  vehicle, was there?

18  **A.**   Correct.  There was not.  Other than two of the

19  warning label.

04:47:24  20  **Q.**   I got you.  And then let's go to the 11.3.1.1.  There

21  are two areas down here, talks about zone one for -- under

22  the occupant retention system, the protection, there is

23  zone one.  What is in the zone one?

24  **A.**   Leg and foot area.

04:47:44  25  **Q.**   Okay.  And how does --

*KEVIN BREEN - CROSS BY MR. WEST*

1           MR. WEST:  Mr. McDonald, let me have --

2  highlight from here down to here.  Right here.

3                      And down a few lines.

4  BY MR. WEST:

04:48:00   5  **Q.**    That raised entryway, it's similar to a footwell.  It

6  has a lip, right?  Do you have the standard in your file

7  there?

8  **A.**    Yes.

9  **Q.**    Good.  Why did you have that standard in your file,

04:48:16   10  that ROHVA standard?

11  **A.**    Because I pulled several standards here for ANSI

12  B56.8 to have the standards to look at different types of

13  vehicles.

14  **Q.**    And the -- according to this other industry voluntary

04:48:32   15  standard for occupant retention systems, Zone 1, why don't

16  you read that highlighted portion out loud for us, please,

17  sir, Mr. Breen.

18  **A.**    "The raised entryway shown as the shaded area in

19  Figure 6, otherwise a barrier, door, net, or other

04:48:49   20  suitable device, shall be provided to block the shaded

21  area in Figure 6 when the vehicle is in operation."

22  **Q.**    And so for these other vehicles, they get either a

23  foot well, or a barrier, or bolsters and a door?

24  **A.**    This is what this standard requires, yes.

04:49:12   25  **Q.**    And then let's go to 11.3.1.2.  That's Zone 2.  Do

*KEVIN BREEN - CROSS BY MR. WEST*

1   you agree that all passengers are entitled to safety?

2   **A.**   Sure.

3   **Q.**   And so Zone 2 of this other standard provides for

4   shoulder and hip bolsters?

5   **A.**   Can you go back to the first page?  What year

6   standard are we looking at here?

7   **Q.**   This is defense exhibit -- I think it's the 2011.

8   Which one do you have?

9   **A.**   I have 2010 which would be applicable to vehicles --

10  this is not applicable to vehicles of the 2013 vintage.

11  That is why I asked.

12  **Q.**   Okay.  But does the -- does that standard provide the

13  same level of protection for occupants when we are just

14  focusing on the feet, and then the shoulders and the hip

15  protection?

16  **A.**   There are some differences.

17  **Q.**   What are the differences in the 2010 and the 2011?

18  Did it get more protective or less protective?

19  **A.**   Over time, there has been an increase in protective

20  areas in the ROHVA standard.

21  **Q.**   So let's just focus on those two zones, please,

22  Mr. Breen.  At a very high level, just tell me the

23  differences in those two zones, one and two.

24  **A.**   Well, the 2010 version, which is typical of the 2013

25  model vehicles, has a provision for the restraints that

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN - CROSS BY MR. WEST*

1   meet J2292, which is seatbelts.

2   **Q.**   And what is -- what's the one that we are looking at?

3   **A.**   This is 2011, which would be applicable to vehicles

4   manufactured in 20, either, 14 or 15.  I can't remember

04:51:40   5   now which.

6   **Q.**   Yeah.  But what's the difference in the seatbelt

7   standard?

8   **A.**   Seatbelt is the same.

9   **Q.**   Okay.  So what is the difference in the two?

04:51:47   10   **A.**   The requirements for these ORS zones aren't

11   applicable for vehicles in 2013.

12   **Q.**   I got you.  But, again, there was nothing that -- no

13   standard that kept Kawasaki from putting doors in?

14   **A.**   No.

04:52:11   15   **Q.**   Now, you said something about 150 percent more stable

16   on the tilt table than the J2258 required?

17   **A.**   Yes.

18   **Q.**   Do you get that because J2258 requires it to be

19   stable at 20 degrease, and so since this one was at 30,

04:52:30   20   that was your 150 percent?

21   **A.**   Right.  30 divided by 20 is 150 percent.

22   **Q.**   No other source for that 150 percent more stable?

23   **A.**   Right.  My testimony.

24   **Q.**   Yeah.  And that is a static stability?

04:52:42   25   **A.**   Right.  That is, yes.

*KEVIN BREEN – CROSS BY MR. WEST*

1   **Q.**   And these things typically are moving when they're

2   being in use?

3   **A.**   Sure.

4   **Q.**   That's when they have a risk of rolling over?

04:52:52   5   **A.**   Depends on how they're operated, sure.

6   **Q.**   Not much of a risk rolling over when it is sitting

7   still?

8   **A.**   Depending on what kind of slope you're parked on.

9         THE COURT:  When you get to a convenient

04:53:09   10   stopping point, we will let this good jury go home for the

11   weekend.

12         MR. WEST:  Well, when you say it like that,

13   Judge, I think this is a good stopping point.

14         THE COURT:  You seemed to be pausing.

04:53:19   15         MR. WEST:  I was switching.

16         THE COURT:  If it is, indeed, a good stopping

17   point, then I'll take you at your word.

18           Ladies and gentlemen, we have made it

19   through our first week.  I think my prediction on timing,

04:53:32   20   it's still in the realm of guess, but it's not a bad guess.

21   That's as much as I can say.  Don't take it to the bank.

22   But do have a nice weekend.  You have three days.  Enjoy

23   them all.

24           Remember not to do any independent

04:53:47   25   research.  Remember to keep an open mind on every issue.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*KEVIN BREEN – CROSS BY MR. WEST*

1 Remember not to communicate or allow any communication with

2 you in any way, shape, or form about anything relating to

3 the case.

4                         If you have taken notes, you know what to

04:54:03  5 do with them.  They stay in the jury room over the weekend

6 as well.

7                         Enjoy the weekend.  And I look forward to

8 continuing to present the case to you at 8:30 on Tuesday

9 morning.  Thank you for your close attention, your

04:54:19 10 cooperation, and your good cheer.  All are appreciated.

11 Thank you.

12 (Excerpt concluded at 4:54 p.m.)

13              COURT REPORTER'S CERTIFICATE

14

15    I, Kathleen K. Miller, certify that the foregoing is a

16 correct transcript from the record of proceedings in the

17 above-entitled matter.

18

19 DATE:  Dec. 23, 2019    /s/    _Kathleen K. Miller_

20                         Kathleen K. Miller, RPR, RMR, CRR

21

22

23

24

25

**$**

**$60,000** [1] - 101:10

**'**

**'90s** [2] - 10:25, 11:12

**/**

**/s** [1] - 150:19

**0**

**002** [1] - 53:7
**065** [1] - 72:21

**1**

**1** [2] - 73:17, 146:15
**1,000** [1] - 143:7
**1.6** [1] - 103:12
**10** [2] - 32:4, 59:3
**100** [4] - 57:6, 57:8, 71:16, 87:22
**100-pounds** [2] - 126:19, 126:21
**105** [1] - 88:9
**10th** [2] - 104:14, 104:18
**10W30** [2] - 9:5, 9:7
**11** [2] - 59:3, 108:5
**11.2** [1] - 145:13
**11.3.1.1** [1] - 145:20
**11.3.1.2** [1] - 146:25
**112** [2] - 122:24, 124:13
**112.006** [1] - 122:19
**119** [2] - 5:18, 5:25
**1194** [1] - 60:25
**11th** [6] - 41:6, 104:4, 104:15, 107:10, 108:10, 108:15
**12** [1] - 124:6
**120** [3] - 5:13, 121:9, 121:10
**126** [6] - 58:21, 58:22, 58:25, 59:2, 126:3, 129:3
**126.001** [1] - 49:11
**126.005** [1] - 78:4
**126.008** [3] - 30:15, 30:17, 33:1
**126.010** [1] - 61:6
**126.013** [1] - 71:19
**126.014** [1] - 45:18
**126.016** [1] - 49:22
**126.05** [1] - 127:20
**126.10** [3] - 58:9, 59:7, 60:9

**126.12** [1] - 70:20
**126.16** [1] - 49:10
**12th** [1] - 108:10
**130** [1] - 126:23
**135** [1] - 141:16
**14** [11] - 33:5, 63:24, 64:12, 66:13, 70:11, 74:3, 74:4, 95:21, 120:19, 129:3, 148:4
**14-mile-an-hour** [2] - 63:21, 64:15
**15** [12] - 5:17, 32:4, 62:17, 62:20, 63:24, 74:4, 76:25, 90:21, 119:23, 120:8, 120:21, 148:4
**15-foot** [3] - 76:17, 77:3, 124:19
**150** [7] - 34:9, 34:15, 71:16, 148:15, 148:20, 148:21, 148:22
**1500** [2] - 62:14, 63:6
**151** [1] - 90:15
**155** [2] - 23:16, 23:18
**16** [7] - 71:9, 73:3, 73:4, 77:13, 95:20, 104:6, 140:1
**16.001** [1] - 134:21
**1600** [2] - 1:20, 42:21
**164-A** [1] - 54:10
**164-B** [1] - 55:25
**165** [2] - 72:23, 72:24
**16th** [2] - 101:15, 101:16
**17** [4] - 104:3, 104:7, 104:8, 104:22
**17-character** [1] - 143:12
**17.2** [1] - 103:22
**1700** [2] - 2:8, 142:17
**176** [1] - 127:13
**18** [2] - 100:22, 120:3
**180** [3] - 77:11, 77:15, 126:25
**18th** [1] - 101:14
**19** [4] - 120:2, 120:5, 120:12, 121:8
**19-foot** [2] - 120:24, 121:5
**1988** [2] - 10:4, 10:5
**1994** [1] - 11:2
**1996** [1] - 11:1
**1:29** [1] - 1:5

**2**

**2** [6] - 30:19, 30:21, 73:23, 121:9, 146:25, 147:3

**2,000** [1] - 42:18
**20** [13] - 21:3, 21:6, 31:24, 32:3, 32:10, 106:22, 120:22, 121:14, 122:9, 136:19, 148:4, 148:19, 148:21
**20-degree** [1] - 32:9
**200** [1] - 127:12
**2001** [1] - 6:14
**2003** [2] - 10:5, 24:13
**2010** [8] - 13:6, 13:7, 21:7, 23:19, 24:16, 147:9, 147:17, 147:24
**2011** [3] - 147:7, 147:17, 148:3
**2013** [8] - 21:13, 53:20, 132:23, 142:5, 143:17, 147:10, 147:24, 148:11
**2016** [1] - 103:7
**2017** [1] - 103:9
**2018** [8] - 1:6, 40:12, 41:6, 103:20, 108:5, 108:10, 108:15, 108:23
**2019** [1] - 150:19
**205** [1] - 140:13
**216** [2] - 129:24, 130:14
**22** [3] - 33:6, 95:23, 120:20
**2258** [7] - 10:24, 22:10, 22:15, 23:3, 34:3, 34:8, 65:5
**23** [2] - 100:22, 150:19
**2358** [4] - 23:25, 24:1, 24:8, 24:9
**25** [2] - 32:10, 143:23
**250** [1] - 5:7
**281-277-1500** [1] - 1:21
**29** [1] - 121:13

**3**

**3** [3] - 66:19, 74:5, 103:12
**3.14** [1] - 121:8
**30** [6] - 33:10, 121:1, 121:11, 143:21, 148:19, 148:21
**30-foot** [2] - 121:15, 122:10
**301** [1] - 2:8
**31** [2] - 104:24, 105:6
**314-552-6000** [1] - 2:5
**34** [1] - 144:8

**34-point-something** [1] - 65:15
**34.6** [1] - 66:2
**34.8** [5] - 78:18, 79:10, 80:4, 127:4, 127:5
**35** [3] - 29:17, 65:16, 79:15
**356** [3] - 34:20, 35:2, 35:15
**357** [4] - 34:20, 35:2, 35:3, 44:17
**358** [1] - 37:4
**359** [6] - 58:19, 58:24, 59:1, 61:10, 63:2, 64:17
**360** [2] - 77:12, 77:15
**360-degree** [1] - 77:17
**3700** [1] - 142:17
**3750** [1] - 143:16
**38** [1] - 121:9
**3:31** [1] - 93:4
**3:48** [1] - 93:4

**4**

**4** [3] - 3:3, 66:19, 74:12
**40** [3] - 3:3, 67:14, 105:14
**40-weight** [1] - 9:7
**4010** [11] - 21:10, 21:14, 23:10, 23:21, 32:22, 37:6, 49:14, 54:15, 61:21, 64:23, 88:24
**42** [1] - 3:4
**45** [2] - 16:23, 118:18
**450** [1] - 1:20
**4:16-CV-2424** [1] - 1:3
**4:54** [2] - 1:5, 150:12

**5**

**5** [13] - 1:6, 1:12, 52:15, 63:25, 64:13, 66:14, 66:16, 74:16, 100:22, 107:7, 107:9, 107:14
**5,000** [1] - 67:15
**500** [1] - 1:23
**505** [1] - 2:3
**512-472-0288** [1] - 2:9
**515** [1] - 2:12

**6**

**6** [9] - 63:25, 64:13, 66:15, 66:16, 69:5, 123:25, 146:19, 146:21

**60** [3] - 3:4, 122:11, 122:16
**61** [1] - 3:5
**620** [1] - 21:10
**63101** [1] - 2:4

**7**

**7** [17] - 66:8, 68:23, 69:3, 77:23, 79:4, 116:24, 117:16, 117:23, 118:10, 118:14, 118:21, 119:5, 119:10, 119:17, 141:16
**70** [3] - 95:1, 95:5, 95:13
**711** [1] - 1:23
**713-222-8800** [1] - 1:24
**713-250-5087** [1] - 2:13
**77002** [2] - 1:24, 2:13
**77478** [1] - 1:20
**78701** [1] - 2:8
**7th** [1] - 2:3

**8**

**8** [3] - 103:7, 103:10, 140:2
**8004** [1] - 2:12
**8:30** [1] - 150:8

**9**

**9** [1] - 120:15
**90** [1] - 65:19
**90-degree** [2] - 120:25, 121:12
**95** [2] - 52:11, 52:14
**99** [2] - 3:5, 67:1

**A**

**A-pillar** [13] - 35:5, 35:10, 35:21, 36:12, 49:16, 58:14, 59:16, 85:1, 85:4, 85:6, 85:9, 85:11, 138:6
**AAA** [1] - 17:22
**abbreviation** [1] - 131:3
**ability** [2] - 56:12, 83:24
**able** [4] - 57:3, 57:16, 57:19, 97:9
**above-entitled** [1] - 150:17
**abreast** [1] - 19:24

absorbers [1] - 118:7
acceleration [7] - 41:21, 41:23, 62:22, 62:24, 67:3, 117:17, 118:15
accelerations [7] - 77:22, 77:25, 116:24, 117:2, 117:8, 119:4, 119:5
accelerator [1] - 55:12
accepted [1] - 15:8
access [1] - 57:19
accessories [2] - 50:25, 51:7
Accident [1] - 18:4
accident [43] - 18:6, 18:7, 18:8, 18:17, 19:1, 19:3, 19:6, 19:15, 20:12, 20:13, 20:19, 29:12, 29:13, 30:3, 30:4, 38:22, 38:24, 45:5, 45:7, 54:16, 58:17, 61:1, 65:4, 66:2, 66:6, 67:15, 70:5, 70:7, 78:11, 84:10, 84:13, 84:15, 84:20, 88:14, 97:23, 100:7, 100:17, 100:18, 105:19, 105:21, 105:24, 106:1, 119:16
accident-reconstruction-type [1] - 100:18
accidents [4] - 29:14, 29:15, 29:19, 106:4
accomplish [1] - 46:23
accomplished [1] - 46:24
accordance [1] - 129:22
according [3] - 65:9, 129:1, 146:14
account [1] - 128:20
accredited [1] - 7:14
accurate [1] - 125:24
achieve [1] - 77:2
achieved [2] - 17:12, 77:22
active [1] - 13:20
activities [1] - 100:18
actual [6] - 40:18, 63:3, 63:18, 79:23, 109:3, 139:21
add [5] - 88:12, 104:6, 104:7, 127:13, 127:25
added [1] - 105:3

addition [2] - 4:4, 55:21
additional [1] - 102:2
address [1] - 93:6
addressed [1] - 48:2
addressing [2] - 89:19, 89:24
admitted [4] - 64:19, 107:11, 107:12, 124:7
adopted [2] - 11:13, 24:9
Advancement [1] - 17:13
advisable [5] - 96:10, 97:18, 97:20, 99:2, 99:4
advises [1] - 137:8
advising [1] - 145:15
affect [1] - 38:6
affected [1] - 83:24
affects [2] - 38:7, 38:8
affiliations [2] - 8:5, 15:23
affixed [1] - 46:17
afternoon [3] - 4:23, 4:24, 90:20
agencies [2] - 13:7, 13:11, 26:17
agency [1] - 13:14
aggressive [8] - 68:22, 69:9, 75:20, 77:9, 121:4, 122:4, 135:13, 135:14
aggressively [3] - 66:21, 69:5, 69:12
ago [6] - 16:23, 49:25, 58:13, 106:22, 116:2, 118:18
agree [5] - 98:6, 99:17, 100:1, 126:17, 147:1
agreeing [2] - 93:9, 117:16
agreement [1] - 106:19
agricultural [3] - 8:14, 26:4, 26:21
ahead [8] - 41:15, 48:17, 68:17, 84:8, 84:11, 88:8, 92:2, 93:18
aid [1] - 97:7
air [3] - 51:19, 52:18, 52:22
airplane [1] - 5:11
airplanes [1] - 8:13
AL [1] - 1:8
all-terrain [1] - 10:17
allegations [1] -

100:25
allow [5] - 89:25, 93:15, 98:17, 133:15, 150:1
allowed [2] - 11:19, 18:24
allows [1] - 25:17
almost [3] - 67:14, 76:15, 91:25
amount [4] - 42:9, 43:2, 45:10, 114:13
amounts [1] - 72:16
AN [1] - 1:4
analyses [1] - 82:6
analysis [11] - 19:14, 20:20, 20:23, 64:21, 80:15, 82:21, 97:22, 118:12, 125:23, 134:5, 141:13
analyze [1] - 61:24
AND [1] - 1:3
angle [2] - 87:21, 127:8
animals [1] - 57:14
announcements [1] - 11:25
ANSI [1] - 146:11
answer [7] - 29:1, 50:4, 50:16, 81:22, 97:3, 97:19, 100:24
anticipate [2] - 119:4, 119:15
anticipated [1] - 116:24
anyway [2] - 87:3, 130:12
appear [1] - 63:13
APPEARANCES [1] - 1:17
applicable [5] - 13:5, 147:9, 147:10, 148:3, 148:11
application [2] - 7:17, 26:8, 50:8
applications [5] - 6:12, 8:12, 8:13, 14:1, 56:21
applied [8] - 6:25, 36:19, 39:20, 59:15, 59:24, 59:25, 60:17, 61:1
applies [2] - 21:13, 24:1
apply [7] - 23:21, 24:20, 28:18, 60:15, 60:19, 82:16, 139:12
applying [1] - 19:8
appreciated [1] - 150:10
approach [1] - 72:14

approaching [2] - 18:13
appropriate [5] - 47:25, 114:20, 131:1, 134:4, 136:5
approve [1] - 12:4
April [1] - 41:6
arc [5] - 120:25, 121:11, 121:12, 122:10
area [47] - 7:5, 12:12, 16:2, 16:16, 16:24, 17:14, 18:5, 32:4, 32:11, 33:11, 33:12, 33:13, 36:23, 38:9, 38:11, 39:20, 47:6, 47:7, 47:10, 48:19, 48:25, 54:17, 56:25, 57:1, 63:12, 68:11, 71:3, 71:4, 86:5, 87:19, 89:12, 89:13, 89:14, 92:7, 94:2, 98:16, 102:5, 106:24, 115:13, 123:11, 132:15, 132:18, 133:2, 133:5, 145:24, 146:18, 146:21
areas [10] - 19:17, 19:25, 20:19, 20:22, 28:8, 28:9, 56:17, 145:21, 147:20
arms [1] - 128:19
arranged [1] - 101:24
AS [1] - 1:3
aspect [1] - 8:22
aspects [2] - 9:14, 22:17
asphalt [1] - 136:7
asserting [1] - 82:23
assist [1] - 48:12
assisted [1] - 2:15
associated [1] - 33:15
Associates [1] - 6:18
Association [1] - 17:13
assume [7] - 20:14, 76:18, 77:2, 77:21, 114:3, 143:13, 143:15
assumption [2] - 119:1, 119:3
attach [1] - 38:4
attachment [1] - 37:19
attempting [1] - 46:6
attend [1] - 12:5
attending [1] - 55:3
attention [1] - 150:9
ATV [4] - 26:20, 28:21, 28:24, 28:25

ATVs [1] - 106:5
August [1] - 101:11
Austin [1] - 2:8
austin.com [1] - 2:9
Australia [1] - 26:22
Australian [1] - 26:20
Automotive [3] - 8:7, 8:9, 17:13
automotive [7] - 6:4, 6:5, 6:6, 6:11, 8:12, 8:13, 9:10
available [3] - 51:7, 100:17, 132:25
Avenue [1] - 2:8
average [1] - 86:10
aware [3] - 82:22, 83:1, 139:14

## B

B-pillar [10] - 36:20, 47:8, 129:12, 131:8, 132:8, 132:15, 132:18, 132:24, 133:10
B56.8 [1] - 146:12
Bachelor [1] - 6:21
background [4] - 6:20, 27:21, 28:1, 67:22
backseat [3] - 87:22, 88:9, 137:12
bad [2] - 87:9, 149:20
bank [1] - 149:21
Bank [1] - 2:4
bar [9] - 33:19, 38:2, 46:17, 46:19, 46:21, 48:22, 48:24, 49:3, 86:8
barrels [1] - 74:18
barrier [2] - 146:19, 146:23
based [3] - 25:1, 81:17, 119:1
bases [1] - 81:4
basic [1] - 7:1
basis [8] - 8:24, 52:8, 67:23, 68:6, 81:6, 81:9, 82:4, 86:22
Beaman [1] - 2:7
become [1] - 11:24
becomes [2] - 127:4, 127:8
bed [6] - 55:15, 55:18, 55:20, 56:13, 57:2
BEFORE [1] - 1:13
began [1] - 11:1
behind [1] - 63:9
bell [2] - 145:6, 145:7
below [2] - 19:17,

153

62:20
**belt** [2] - 127:23, 139:3
**belted** [1] - 141:4
**belts** [2] - 127:25, 144:14
**bench** [1] - 55:19
**bend** [29] - 6:24, 36:16, 36:20, 36:22, 36:23, 38:13, 38:17, 38:21, 38:23, 39:21, 39:24, 40:4, 40:5, 42:10, 42:22, 44:18, 44:23, 45:3, 45:5, 45:6, 45:7, 45:10, 49:16, 58:16, 60:18, 60:22, 60:23
**bending** [4] - 39:5, 39:21, 41:5, 58:13
**benefits** [1] - 84:2
**bent** [11] - 36:13, 38:10, 38:12, 39:6, 39:8, 42:23, 44:20, 44:23, 48:25, 60:25, 85:6
**better** [4] - 26:12, 34:10, 39:9, 62:11
**between** [4] - 21:17, 68:21, 136:6, 136:16
**beyond** [2] - 32:3, 41:2
**Bible** [1] - 140:16
**big** [4] - 14:12, 33:9, 52:2, 71:13
**big-name** [1] - 52:2
**bigger** [3] - 55:15, 55:18, 119:19
**biggest** [1] - 17:22
**bill** [2] - 103:9, 103:25
**billing** [12] - 17:8, 101:6, 101:10, 102:13, 102:15, 102:20, 103:19, 103:21, 103:24, 105:1, 105:5, 116:20
**billings** [1] - 103:3
**bills** [2] - 101:12, 104:1
**bit** [19] - 5:3, 8:8, 22:14, 27:11, 27:21, 41:21, 59:19, 65:6, 66:3, 66:25, 69:2, 69:8, 75:22, 75:23, 79:10, 79:25, 84:9, 84:11, 128:18
**blah** [3] - 114:9
**block** [2] - 18:22, 146:20
**blocks** [2] - 48:6, 48:7
**blow** [3] - 134:22, 140:2, 141:16

**board** [2] - 28:6, 87:21
**boats** [1] - 106:4
**Bobcat** [1] - 50:7
**body** [1] - 48:2
**bolster** [15] - 83:17, 84:6, 87:6, 87:11, 87:22, 87:23, 87:24, 88:1, 88:3, 88:7, 88:18, 88:25, 90:11, 98:25
**bolsters** [10] - 50:12, 82:25, 83:3, 83:11, 113:13, 113:16, 130:23, 134:3, 146:23, 147:4
**bolt** [1] - 49:16
**book** [1] - 123:6
**boom** [1] - 18:15
**bottom** [4] - 62:13, 62:23, 95:9, 95:16
**bracket** [1] - 47:8
**brake** [5] - 16:10, 133:7, 139:5, 139:13, 139:17
**brakes** [2] - 9:18, 25:6
**brand** [1] - 52:17
**brand-new-stock** [1] - 52:17
**break** [6] - 6:24, 87:1, 90:16, 90:20, 123:11
**Breen** [27] - 4:8, 4:23, 5:1, 6:18, 30:17, 35:1, 40:12, 44:13, 49:13, 49:24, 71:2, 89:22, 93:15, 94:25, 102:20, 105:17, 108:6, 116:17, 117:2, 117:7, 118:12, 119:5, 132:8, 141:20, 143:15, 146:17, 147:22
**BREEN** [3] - 1:15, 3:2, 4:19
**Breen's** [3] - 117:4, 117:9, 119:6
**brief** [1] - 93:11
**briefly** [5] - 14:5, 23:13, 23:14, 60:12, 94:9
**broad** [1] - 6:11
**brochures** [1] - 52:5
**brought** [2] - 5:23, 124:2
**Broussard** [1] - 115:17
**Brown** [1] - 2:7
**brush** [2] - 56:18, 56:25
**bubble** [1] - 25:2

**buckle** [1] - 36:17
**built** [1] - 37:8
**bullet** [1] - 142:5
**burying** [1] - 138:19
**business** [1] - 134:20
**BY** [74] - 4:22, 20:8, 21:5, 21:24, 23:17, 24:5, 30:16, 34:25, 37:16, 40:11, 41:3, 41:16, 42:8, 42:19, 44:16, 45:19, 49:12, 49:23, 50:23, 52:13, 54:11, 56:2, 58:10, 59:6, 60:14, 61:9, 61:14, 64:20, 67:10, 68:5, 68:20, 71:1, 71:20, 72:25, 73:18, 73:24, 74:6, 74:13, 74:17, 75:6, 78:5, 79:21, 81:2, 81:16, 81:24, 87:2, 90:2, 94:24, 95:4, 96:15, 97:2, 98:9, 98:19, 99:8, 99:16, 99:22, 100:5, 102:6, 102:19, 106:18, 107:1, 108:4, 123:20, 124:12, 127:22, 132:6, 132:14, 133:19, 134:24, 136:3, 139:10, 140:3, 141:17, 146:4

## C

**cab** [5] - 51:1, 51:4, 51:6, 52:17, 52:22
**cage** [11] - 31:6, 31:14, 32:7, 32:13, 32:18, 33:15, 33:25, 39:6, 46:21, 52:8
**calculations** [5] - 30:13, 119:22, 120:5, 120:14, 120:25
**call-in** [1] - 12:19
**camera** [1] - 73:13
**camping** [1] - 135:19
**Canada** [3] - 13:23, 13:25, 14:1
**Canadian** [1] - 26:22
**candidate** [1] - 27:14
**cannot** [3] - 20:7, 42:4, 42:5
**car** [13] - 9:1, 9:9, 9:16, 10:13, 16:6, 16:9, 17:17, 17:20, 48:14, 66:25, 85:19, 86:12, 144:21

**career** [2] - 7:23, 107:5
**cargo** [2] - 56:12, 56:13, 57:3
**Carhart** [6] - 94:6, 116:8, 116:23, 117:16, 118:20, 119:8
**Carhart's** [6] - 92:3, 98:15, 116:11, 116:14, 116:18, 117:4
**carry** [2] - 56:12, 57:3
**cars** [6] - 8:13, 8:19, 51:10, 51:14, 54:25, 86:4
**cart** [1] - 25:1
**Carter** [14] - 36:24, 44:20, 44:22, 61:21, 63:7, 63:18, 66:12, 68:22, 72:2, 72:6, 76:19, 89:3, 89:9, 90:4
**Carter's** [1] - 57:23
**case** [39] - 10:20, 17:5, 20:16, 20:24, 21:10, 27:7, 27:23, 29:23, 32:21, 33:2, 33:18, 34:7, 40:22, 45:13, 49:3, 50:10, 53:9, 54:6, 83:3, 89:2, 96:4, 100:7, 100:20, 101:3, 102:9, 102:21, 102:24, 104:22, 105:8, 108:20, 116:8, 116:10, 116:14, 116:19, 126:9, 130:7, 133:25, 150:3, 150:8
**CASE** [1] - 94:18
**cases** [1] - 67:15
**catch** [2] - 88:13, 101:20
**caused** [1] - 98:7
**causing** [1] - 85:1
**CCs** [1] - 143:7
**cement** [1] - 136:7
**center** [3] - 128:9, 128:13, 136:13
**certain** [9] - 7:13, 16:9, 19:14, 22:19, 25:14, 30:11, 92:16, 114:13, 116:17
**certainly** [3] - 16:10, 19:22, 118:9
**certainty** [4] - 81:18, 96:10, 97:24, 99:10
**CERTIFICATE** [1] - 150:13

**certify** [1] - 150:15
**chair** [1] - 88:20
**chairman** [4] - 10:5, 11:13, 24:11, 24:13
**chalk** [1] - 63:9
**change** [2] - 9:3, 59:2
**changed** [2] - 9:1, 11:23
**changes** [1] - 16:7
**channels** [1] - 15:9
**characteristics** [11] - 29:5, 34:9, 38:6, 45:15, 46:5, 47:17, 80:17, 82:17, 82:18, 92:16, 98:11
**characterize** [2] - 82:10, 82:16
**chart** [7] - 30:18, 31:19, 33:3, 52:7, 58:12, 62:22, 62:23
**check** [4] - 52:7, 97:9, 123:4, 143:6
**checking** [2] - 57:18, 57:21
**checks** [1] - 48:6
**cheer** [1] - 150:10
**Chevy** [1] - 86:10
**CHIEF** [1] - 1:13
**choices** [1] - 9:5
**choose** [1] - 140:24
**chose** [3] - 130:11, 140:5, 140:6
**chuckled** [1] - 137:19
**circle** [1] - 11:19
**circles** [2] - 57:16, 77:10
**circumference** [1] - 121:10
**claims** [1] - 100:11
**class** [8] - 49:9, 50:3, 51:25, 52:3, 53:19, 53:22, 53:24, 54:2
**classes** [1] - 19:14
**clear** [7] - 53:20, 81:10, 85:9, 87:25, 88:1, 138:5
**clearly** [1] - 46:11
**client** [1] - 101:8
**clients** [1] - 125:20
**clip** [1] - 56:19
**close** [9] - 45:6, 56:18, 57:9, 57:10, 57:19, 97:3, 119:12, 130:13, 150:9
**closed** [3] - 10:17, 51:14, 52:21
**closely** [1] - 4:17
**closer** [2] - 97:1
**Coburn** [1] - 2:3
**code** [1] - 99:20

**coefficients** [1] - 136:6
**collected** [1] - 62:12
**College** [2] - 7:5, 8:1
**collision** [4] - 18:12, 41:17, 60:16, 60:24
**column** [2] - 9:21, 36:16
**comfortable** [3] - 48:10, 118:14, 134:19
**coming** [4] - 48:25, 84:25, 85:2, 91:12
**committee** [30] - 8:20, 9:6, 9:11, 10:5, 11:6, 11:13, 11:18, 11:21, 12:1, 12:3, 12:9, 12:10, 12:14, 12:16, 12:25, 13:2, 13:12, 14:6, 14:19, 14:23, 15:3, 15:13, 24:8, 24:9, 24:12, 24:15, 24:18, 27:16, 32:21
**Committee** [9] - 10:3, 10:14, 11:4, 11:8, 12:23, 13:9, 24:10, 24:19, 29:2
**committee's** [1] - 14:3
**committees** [8] - 9:22, 9:23, 9:25, 12:15, 14:5, 14:21, 14:25
**communicate** [1] - 150:1
**communicated** [1] - 16:13
**communication** [4] - 150:1
**communities** [4] - 25:3, 25:14, 25:15, 25:16
**community** [2] - 10:17, 25:16
**companies** [1] - 26:2
**company** [8] - 5:4, 6:8, 6:16, 14:12, 26:4, 53:19, 103:3, 108:9
**compare** [3] - 44:11, 44:18, 72:5
**compared** [1] - 45:5
**compares** [1] - 34:7
**compensated** [1] - 15:20
**competitive** [3] - 29:4, 50:8, 137:1
**competitive-type** [1] - 137:1
**competitors** [1] - 114:8
**complete** [5] - 52:23,

77:11, 77:12, 77:15, 77:17
**compliant** [1] - 129:24
**complies** [1] - 23:5
**comply** [7] - 23:10, 34:2, 113:15, 130:13, 140:5, 140:6, 142:18
**component** [2] - 28:12, 42:25
**computer** [4] - 2:15, 28:6, 60:2, 60:6
**computer-assisted** [1] - 2:15
**concentrated** [2] - 128:8, 128:10
**conceptually** [2] - 26:5, 75:12
**concerned** [6] - 9:16, 29:24, 31:2, 39:18, 50:24, 85:15
**concluded** [1] - 150:12
**conclusion** [4] - 42:10, 66:5, 84:14, 99:1
**conclusions** [7] - 23:8, 38:19, 40:3, 97:22, 97:25, 98:2, 98:12
**conditioning** [3] - 51:19, 52:18, 52:22
**conditions** [1] - 92:16
**conducted** [2] - 59:23, 72:10
**cones** [4] - 71:4, 71:6, 72:15, 73:19
**confer** [4] - 61:13, 81:15, 91:8, 93:20
**Confers** [1] - 70:18
**configuration** [5] - 53:16, 60:25, 66:2, 82:20, 92:19
**configure** [1] - 48:1
**configured** [7] - 48:4, 49:8, 50:3, 52:6, 52:9, 58:3, 78:9
**confirm** [1] - 103:15
**confusing** [2] - 21:17, 21:21
**Congress** [1] - 2:8
**connected** [1] - 37:10
**Conroe** [1] - 5:22
**cons** [2] - 83:7, 83:15
**consequences** [3] - 85:15, 114:1, 114:2
**consider** [1] - 101:8
**consideration** [2] - 26:16, 100:2
**considered** [1] - 12:13

**considering** [1] - 80:17
**consistent** [8] - 48:3, 50:2, 54:1, 65:1, 65:2, 69:18, 90:4, 90:6
**construction** [2] - 8:14, 56:8
**consulting** [1] - 5:7
**contact** [1] - 84:25
**contacting** [1] - 74:9
**containment** [1] - 140:19
**continually** [1] - 48:16
**CONTINUED** [1] - 61:8
**continued** [1] - 7:3
**Continued** [1] - 42:7
**continuing** [4] - 7:22, 19:20, 19:24, 150:8
**control** [1] - 142:8
**convenient** [1] - 149:9
**conversion** [1] - 55:14
**conveyed** [2] - 117:2, 117:8, 119:5
**cool** [1] - 51:20
**cooperation** [1] - 150:10
**coordinate** [1] - 30:1
**coordinates** [1] - 63:4
**copy** [5] - 5:25, 21:7, 59:19, 91:5, 117:6
**corner** [3] - 78:16, 84:25, 88:20
**CORP** [1] - 1:7
**Correct** [1] - 144:12
**correct** [58] - 10:7, 11:15, 20:12, 24:14, 24:17, 29:11, 30:24, 33:20, 33:23, 36:1, 37:2, 38:14, 40:1, 40:13, 40:14, 40:16, 41:22, 41:25, 42:3, 43:4, 45:11, 53:13, 63:11, 65:20, 66:9, 74:21, 76:3, 77:4, 77:12, 77:24, 78:19, 79:13, 85:20, 88:4, 89:1, 95:12, 101:15, 103:18, 105:11, 109:14, 115:4, 117:22, 120:23, 126:11, 126:15, 126:20, 129:2, 129:8, 134:11, 136:15, 139:18, 140:11, 143:9, 143:11, 143:20, 144:6, 145:18, 150:16
**corrected** [2] - 118:20,

135:15
**correctly** [1] - 10:6
**correlate** [1] - 66:25
**Council** [1] - 26:23
**counsel** [3] - 61:13, 70:18, 100:16
**Counsel** [1] - 81:15
**counted** [1] - 143:13
**country** [1] - 17:23
**Counts** [1] - 2:2
**couple** [11] - 18:10, 22:17, 31:8, 56:9, 57:3, 68:25, 91:11, 93:11, 94:15, 97:21, 144:10
**course** [6] - 25:16, 63:6, 67:20, 70:4, 77:20, 128:21
**courses** [1] - 19:21
**COURT** [93] - 1:1, 2:11, 4:2, 4:10, 4:15, 20:6, 21:22, 24:4, 34:22, 37:15, 40:8, 40:24, 41:2, 41:11, 41:15, 42:15, 44:15, 50:18, 50:21, 60:12, 61:4, 61:7, 64:19, 67:5, 67:7, 67:25, 68:2, 68:4, 68:13, 68:16, 68:18, 74:25, 75:4, 79:20, 81:1, 81:13, 81:22, 86:21, 86:25, 89:21, 89:23, 89:25, 90:16, 90:19, 90:23, 91:5, 91:8, 91:19, 91:22, 92:2, 92:8, 92:13, 92:22, 93:1, 93:6, 93:13, 93:21, 93:25, 94:8, 94:13, 94:17, 94:20, 95:2, 96:13, 96:25, 97:5, 98:6, 98:17, 99:14, 99:21, 100:3, 102:4, 106:20, 106:24, 107:13, 107:15, 107:18, 107:22, 108:1, 122:23, 123:4, 123:10, 123:14, 123:17, 124:3, 124:7, 124:11, 133:15, 135:25, 149:9, 149:14, 149:16, 150:13
**court** [1] - 20:16
**courtroom** [3] - 36:21, 83:21, 90:25
**courts** [1] - 20:18
**cover** [5] - 18:3, 21:2, 34:17, 92:14, 93:11

**coverage** [5] - 51:11, 51:12, 51:13, 53:2
**covered** [2] - 51:21, 104:18
**CPSC** [2] - 14:2, 27:1
**craft** [2] - 14:17, 98:11
**crash** [5] - 18:9, 36:12, 38:25, 39:10, 61:2
**crashes** [4] - 5:11, 17:17, 17:18
**Crawford** [2] - 37:1, 55:17
**create** [3] - 40:4, 52:6, 84:1
**created** [1] - 10:14
**criteria** [4] - 9:12, 22:10, 22:19, 22:21
**Cross** [1] - 3:5
**CROSS** [1] - 99:15
**cross** [5] - 4:5, 41:11, 41:12, 114:12, 144:20
**cross-examination** [2] - 41:11, 41:12
**CROSS-EXAMINATION** [1] - 99:15
**cross-examining** [2] - 4:5, 114:12
**CRR** [2] - 2:12, 150:20
**CSR** [1] - 2:12
**cumulative** [2] - 74:23, 74:24
**cut** [2] - 35:20, 118:2
**CV** [1] - 5:25

# D

**damage** [3] - 49:15, 80:12, 85:1
**dash** [1] - 89:12
**data** [13] - 12:6, 61:18, 62:4, 62:6, 62:12, 62:15, 63:13, 63:15, 63:18, 64:10, 69:6, 77:6, 105:21
**date** [9] - 66:6, 104:1, 104:8, 104:10, 104:11, 104:13, 108:5, 108:9, 108:13
**DATE** [1] - 150:19
**dated** [1] - 103:25
**DAY** [1] - 1:12
**days** [1] - 149:22
**deal** [4] - 8:12, 19:23, 96:20, 116:3
**dealing** [2] - 20:12, 116:2
**deals** [6] - 16:8, 16:10,

16:11, 22:15, 22:18, 92:8
**dealt** [3] - 6:23, 140:18, 145:8
**debate** [1] - 106:22
**Dec** [1] - 150:19
**December** [1] - 104:18
**decide** [1] - 32:15
**decision** [3] - 32:17, 33:21, 33:25
**decisions** [1] - 18:14
**Deere** [3] - 26:3, 26:4, 50:7
**defective** [1] - 105:9
**DEFENDANT** [1] - 2:1
**Defendant's** [5] - 122:24, 124:5, 124:13, 126:3, 134:21
**defendants** [1] - 4:8
**defense** [2] - 141:19, 147:7
**Defense** [3] - 122:19, 140:1, 141:15
**defensive** [1] - 18:21
**define** [1] - 144:13
**definition** [2] - 141:22, 142:5
**deflection** [2] - 58:15, 59:24
**deform** [2] - 6:25, 59:15
**deformed** [1] - 30:12
**degrease** [1] - 148:19
**degree** [9] - 7:14, 44:18, 77:15, 81:17, 86:18, 96:9, 97:24, 99:10
**degrees** [16] - 7:25, 31:24, 32:3, 33:11, 65:15, 65:16, 66:1, 66:3, 77:7, 78:18, 79:10, 79:15, 80:4, 122:11, 122:16, 127:4
**demo** [1] - 132:17
**demonstrate** [4] - 54:20, 55:13, 56:5, 65:23
**demonstrating** [4] - 54:22, 55:1, 55:21, 84:18
**demonstration** [1] - 85:8
**demonstrations** [1] - 13:3
**Demonstrative** [1] - 53:7
**demonstrative** [3] - 34:21, 37:3, 39:16

**DENISE** [1] - 1:3
**Department** [2] - 6:23, 13:24
**depended** [2] - 31:7, 31:8
**Depo** [4] - 107:7, 107:9, 107:14, 123:25
**deposed** [1] - 116:23
**deposition** [13] - 100:13, 100:22, 101:14, 101:17, 105:2, 105:6, 116:15, 117:5, 120:15, 123:18, 123:22, 125:2, 134:8
**depositions** [7] - 30:5, 85:3, 115:15, 115:19, 116:5, 121:25, 134:10
**depressing** [1] - 118:7
**depression** [3] - 69:23, 70:7, 95:9
**depth** [1] - 72:5
**describe** [8] - 10:11, 59:10, 73:8, 75:20, 82:4, 82:6, 83:6, 87:18
**described** [6] - 54:7, 57:24, 67:20, 76:17, 87:3, 94:9
**describing** [1] - 87:5
**design** [25] - 6:24, 20:19, 47:20, 47:22, 54:1, 80:19, 82:19, 82:21, 92:7, 96:5, 97:13, 98:25, 100:8, 100:12, 100:19, 100:24, 100:25, 101:1, 101:2, 101:4, 131:9, 132:7, 133:13, 133:14
**designated** [6] - 30:19, 30:21, 46:14, 92:11, 100:6, 138:14
**designed** [7] - 47:6, 56:14, 82:1, 107:6, 128:18, 136:10, 136:12
**designer** [1] - 32:6
**designs** [2] - 98:24, 99:2
**detail** [1] - 59:10
**detailed** [3] - 67:7, 103:1, 116:20
**determination** [1] - 119:15
**determine** [1] - 121:24
**determined** [4] - 9:6, 31:12, 39:2, 42:1

**develop** [1] - 8:15
**developed** [12] - 8:22, 9:11, 11:6, 11:9, 13:19, 14:1, 24:23, 24:25, 25:4, 25:8, 26:2, 68:10
**developing** [2] - 26:11, 26:16
**development** [3] - 5:9, 27:16, 114:24
**device** [3] - 60:3, 60:6, 146:20
**devices** [2] - 83:22, 84:19
**devoted** [1] - 20:23
**diagonal** [1] - 138:2
**diagram** [2] - 109:9, 125:24
**diamond** [1] - 47:12
**difference** [5] - 21:17, 92:20, 136:16, 148:6, 148:9
**differences** [3] - 147:16, 147:17, 147:23
**different** [18] - 5:14, 5:16, 9:25, 31:25, 46:22, 60:21, 70:12, 71:15, 102:5, 106:24, 122:8, 123:11, 132:16, 136:6, 144:16, 144:21, 144:24, 146:12
**differently** [1] - 61:1
**digging** [1] - 122:7
**dimension** [1] - 37:17
**dimensions** [1] - 49:5
**ding** [3] - 145:6
**Dire** [2] - 3:3, 3:4
**dire** [5] - 40:7, 41:1, 41:2, 41:10, 60:10
**DIRE** [2] - 40:10, 60:13
**direct** [1] - 93:16
**Direct** [3] - 3:3, 3:4, 3:5
**DIRECT** [3] - 4:21, 42:7, 61:8
**direction** [4] - 60:16, 60:17, 60:20, 60:23
**directions** [1] - 137:9
**directly** [1] - 35:22
**director** [1] - 6:4
**dirt** [1] - 51:21
**dirty** [1] - 51:20
**disadvantage** [1] - 97:7
**discipline** [2] - 16:3, 18:8

**disclosed** [2] - 86:24, 94:5
**disclosure** [1] - 86:20
**discovery** [2] - 102:5, 134:11
**discretion** [1] - 32:6
**discussing** [1] - 59:11
**discussion** [2] - 75:17, 114:12
**discussions** [1] - 12:25
**displace** [1] - 38:15
**displacement** [1] - 143:7
**display** [1] - 123:15
**disputes** [1] - 102:5
**disregard** [3] - 92:5, 93:24, 94:1
**distance** [9] - 4:18, 95:16, 95:19, 109:13, 109:15, 109:16, 109:18, 121:21, 121:22
**distinction** [1] - 88:1
**DISTRICT** [3] - 1:1, 1:1, 1:14
**divided** [1] - 148:21
**DIVISION** [1] - 1:2
**Division** [3] - 14:7, 14:10, 14:13
**division** [4] - 14:14, 14:17, 14:23, 14:24
**document** [5] - 22:9, 30:22, 124:17, 125:6
**documented** [2] - 7:15, 36:14
**documents** [2] - 30:4, 123:21
**done** [29] - 4:6, 15:7, 26:14, 26:17, 28:4, 30:7, 40:15, 41:6, 46:22, 51:15, 62:13, 62:20, 64:25, 65:2, 67:19, 68:8, 71:25, 74:2, 75:5, 80:16, 82:6, 93:12, 105:14, 125:13, 125:23, 133:17, 133:21, 141:4, 141:13
**door** [27] - 51:11, 51:12, 52:9, 53:12, 53:15, 53:23, 83:15, 83:17, 84:6, 87:6, 87:11, 87:18, 87:21, 88:5, 88:18, 88:25, 89:15, 89:24, 90:5, 90:15, 91:13, 91:25, 92:19, 98:24, 146:19, 146:23
**doors** [15] - 50:10,

50:12, 50:16, 50:24, 52:14, 52:24, 82:24, 83:2, 83:11, 113:12, 113:14, 113:16, 130:23, 134:3, 148:13
**DORIS** [1] - 1:3
**double** [1] - 128:23
**double-strapped** [1] - 128:23
**down** [24] - 5:24, 9:21, 12:4, 18:4, 18:22, 36:2, 36:18, 38:8, 44:12, 48:25, 51:4, 52:12, 63:7, 76:16, 78:15, 85:2, 86:9, 88:21, 90:23, 109:5, 122:25, 145:21, 146:2, 146:3
**Dr** [21] - 92:3, 94:6, 98:15, 116:6, 116:8, 116:11, 116:12, 116:14, 116:18, 116:23, 117:3, 117:4, 117:9, 117:12, 117:14, 117:15, 117:16, 118:12, 118:20, 119:6, 119:8
**draft** [2] - 59:22, 124:24
**drawing** [4] - 28:6, 95:7, 120:16, 125:15
**drawings** [3] - 7:21, 124:24, 132:7
**drive** [6] - 8:19, 56:17, 66:25, 74:8, 137:2
**driven** [2] - 25:2, 31:9
**driver** [8] - 35:22, 89:3, 91:12, 91:23, 91:24, 92:7, 126:25, 127:1
**driver's** [5] - 128:24, 128:25, 132:24, 133:10, 133:17
**drivers'** [1] - 26:16
**drives** [2] - 62:5, 62:6
**driving** [20] - 16:6, 28:9, 30:8, 38:3, 62:13, 63:9, 63:24, 66:18, 67:2, 69:4, 69:8, 69:10, 70:8, 72:13, 73:11, 135:13, 135:14, 136:25
**driving-type** [1] - 30:8
**drop** [1] - 107:8
**drove** [3] - 63:3, 63:5, 75:15
**due** [1] - 7:20

**dug** [3] - 70:5, 71:8, 71:24
**DUI** [1] - 17:24
**duly** [1] - 4:20
**dummies** [7] - 71:13, 73:12, 127:11, 127:23, 128:18, 128:23, 144:23
**dummy** [3] - 88:9, 88:10, 90:5
**dump** [2] - 55:19, 57:2
**dune** [1] - 136:23
**durability** [1] - 28:13
**during** [3] - 63:6, 123:21, 128:21
**dusty** [1] - 51:20
**dynamic** [2] - 87:4, 118:6
**dynamics** [8] - 84:15, 84:20, 89:19, 91:12, 92:3, 92:12, 94:5, 138:14

**E**

**early** [2] - 29:25, 31:4
**Earp** [2] - 115:17, 115:22
**easily** [2] - 35:21, 57:4
**east** [1] - 109:13
**easy** [2] - 48:15, 54:24
**edition** [2] - 13:6, 23:19
**education** [4] - 7:3, 7:23, 7:25, 19:20
**educational** [1] - 6:20
**effect** [2] - 11:18, 114:7
**effort** [2] - 15:20, 16:8
**eight** [1] - 93:2
**eighty** [2] - 127:7, 143:3
**either** [15] - 16:1, 18:24, 27:8, 28:1, 32:21, 44:19, 52:4, 56:4, 78:1, 84:18, 93:18, 94:5, 99:2, 146:22, 148:4
**ejected** [3] - 88:17, 138:9, 138:12
**ejection** [1] - 98:21
**electronic** [1] - 61:17
**element** [1] - 16:11
**ELMO** [2] - 58:19, 102:16
**Email** [4] - 1:21, 1:25, 2:5, 2:9
**emergency** [1] - 115:11
**employees** [1] - 13:10

**EMS** [5] - 115:7, 115:14, 116:4, 121:25, 138:18
**encapsulated** [1] - 47:8
**enclosed** [4] - 51:1, 51:4, 51:6, 51:10
**enclosures** [1] - 52:17
**encumbrances** [1] - 57:20
**end** [4] - 17:19, 120:13, 138:1, 138:19
**endeavor** [5] - 16:2, 16:25, 17:15, 19:25, 61:24
**ended** [1] - 66:5
**endorsed** [1] - 114:22
**energy** [3] - 38:15, 42:10, 42:13
**engage** [2] - 54:6, 86:8
**engine** [2] - 9:16, 143:7
**engineer** [6] - 7:8, 7:11, 28:6, 30:1, 46:2, 47:21
**engineer's** [1] - 96:5
**Engineering** [6] - 5:4, 6:22, 6:23, 7:4, 7:5, 8:2
**engineering** [15] - 5:7, 6:4, 7:1, 7:14, 7:16, 7:17, 7:19, 7:25, 28:5, 81:17, 82:9, 96:10, 97:24, 99:10, 100:1
**Engineers** [2] - 8:7, 99:24
**engineers** [5] - 5:12, 7:19, 17:16, 40:19, 99:17
**engines** [1] - 6:10
**enhancement** [1] - 96:23
**enjoy** [2] - 149:22, 150:7
**entire** [4] - 40:22, 43:3, 107:5, 122:15
**entitled** [3] - 22:1, 147:1, 150:17
**entries** [2] - 124:16, 125:18
**entryway** [2] - 146:5, 146:18
**environment** [1] - 51:21
**environmental** [1] - 53:3
**environments** [1] -

16:4
**equal** [1] - 12:9
**equals** [1] - 41:21
**equate** [1] - 42:4
**equated** [1] - 42:13
**equation** [1] - 43:5
**equilibrium** [1] - 117:18
**Equipment** [3] - 14:7, 14:9, 14:13
**equipment** [6] - 8:14, 8:15, 16:4, 16:15, 135:5
**equivalent** [1] - 13:24
**ergonomic** [1] - 48:7
**Ergonomic** [2] - 15:25, 16:18
**ergonomics** [1] - 16:2
**ESI** [7] - 5:5, 5:6, 5:12, 6:5, 6:6, 6:13, 102:23
**especially** [3] - 13:18, 57:17, 82:12
**essentially** [7] - 35:19, 52:16, 53:2, 53:15, 71:14, 75:10, 86:4
**establish** [1] - 122:23
**ET** [1] - 1:8
**ethics** [1] - 99:20
**evaluate** [15] - 10:15, 23:4, 26:2, 29:16, 32:22, 45:14, 64:22, 69:22, 83:3, 83:15, 100:7, 100:11, 100:19, 133:23, 134:3
**evaluated** [5] - 25:10, 65:7, 67:16, 87:11
**evaluating** [2] - 67:12, 98:23
**evaluation** [11] - 29:4, 31:20, 46:4, 54:5, 83:22, 87:5, 133:17, 133:22, 134:14, 134:18, 134:19
**evaluations** [4] - 55:23, 67:19, 69:25, 119:2
**event** [7] - 20:9, 39:10, 48:12, 87:15, 118:15, 121:4, 121:22
**events** [1] - 5:11
**evidence** [18] - 10:19, 19:7, 21:17, 34:23, 58:21, 59:9, 64:16, 70:24, 121:23, 121:24, 123:2, 123:14, 124:3, 124:8, 144:2, 144:3,

144:4, 144:6
**exact** [2] - 36:23, 88:3
**exactly** [2] - 91:25, 132:21
**examination** [4] - 36:11, 41:11, 41:12, 93:17
**EXAMINATION** [6] - 4:21, 40:10, 42:7, 60:13, 61:8, 99:15
**examine** [2] - 30:2, 45:14
**examining** [2] - 4:5, 114:12
**example** [14] - 8:17, 8:25, 14:16, 15:19, 16:5, 25:5, 25:15, 26:3, 26:19, 33:23, 46:10, 52:19, 57:7, 63:12
**examples** [1] - 25:25
**exceed** [3] - 47:18, 77:22, 82:18
**exceeded** [1] - 43:3
**exceeds** [1] - 47:19
**except** [2] - 126:25, 143:18
**Excerpt** [1] - 150:12
**excess** [2] - 119:10, 119:14
**excuse** [12] - 21:20, 40:24, 50:15, 58:20, 81:8, 83:17, 86:19, 89:18, 89:23, 102:4, 106:20, 107:15
**executive** [2] - 14:19, 14:22
**exemplar** [3] - 45:22, 83:20, 83:22
**exhibit** [8] - 34:19, 35:15, 52:12, 61:4, 122:18, 123:19, 123:24, 147:7
**Exhibit** [36] - 5:18, 21:3, 21:6, 23:16, 23:18, 30:14, 33:1, 45:18, 49:10, 49:22, 53:7, 54:9, 58:9, 58:18, 58:21, 59:7, 61:10, 63:2, 64:17, 95:1, 95:5, 95:13, 107:7, 107:9, 107:14, 120:15, 122:19, 122:24, 123:25, 124:6, 124:13, 126:3, 129:3, 134:21, 140:1, 141:15
**exhibits** [2] - 125:21, 141:19

144:4, 144:6
**Exhibits** [1] - 35:1
**expect** [1] - 122:5
**experience** [6] - 7:15, 67:22, 75:14, 79:23, 80:1, 119:2
**experiences** [3] - 25:20, 27:6, 27:8
**experiment** [4] - 39:18, 39:23, 39:24, 75:22
**experiments** [1] - 28:2
**expert** [5] - 105:13, 105:16, 106:2, 107:3, 134:10
**expertise** [1] - 16:25
**expired** [1] - 106:16
**explain** [19] - 7:10, 11:20, 22:14, 30:25, 31:1, 32:19, 36:5, 36:9, 38:18, 45:20, 46:4, 46:5, 51:23, 52:1, 68:6, 72:8, 76:11, 78:20, 86:22
**exploring** [2] - 135:22, 136:21
**Explosions** [1] - 5:10
**express** [1] - 20:16
**expressed** [2] - 41:23, 99:9, 101:22
**expresses** [1] - 40:7
**extends** [1] - 37:8
**extent** [3] - 7:1, 45:8, 92:8
**extra** [1] - 48:6
**eyebrow** [1] - 130:18

**F**

**facility** [2] - 28:8, 116:18
**fact** [9] - 5:21, 23:10, 36:6, 38:10, 38:14, 66:11, 66:14, 69:21, 82:22
**factor** [1] - 136:11
**factors** [8] - 7:6, 16:2, 16:5, 16:21, 20:20, 26:16, 28:12, 105:19
**Factors** [2] - 15:25, 16:18
**facts** [1] - 100:17
**failed** [1] - 109:15
**failure** [1] - 19:14
**fair** [3] - 20:14, 53:11, 68:19
**fairly** [6] - 31:4, 56:17, 56:23, 57:13, 71:3, 119:3
**fall** [6] - 14:16, 14:18, 22:20, 33:24, 88:22,

128:6
**falls** [1] - 33:2
**familiar** [7] - 10:21, 48:15, 113:22, 115:18, 133:2, 140:12, 140:15
**far** [24] - 20:23, 23:2, 23:23, 27:21, 27:22, 29:13, 29:23, 31:1, 33:1, 34:3, 34:6, 38:17, 39:18, 42:9, 45:3, 45:14, 50:24, 53:18, 59:19, 84:14, 84:20, 85:15, 87:17, 97:18
**farm** [4] - 57:5, 57:11, 66:23, 135:16
**Farm** [1] - 26:20
**farming** [1] - 54:17
**farms** [1] - 56:7
**fast** [6] - 31:9, 32:3, 32:12, 33:14, 120:19, 143:18
**faster** [1] - 32:10
**feature** [3] - 46:12, 55:16
**features** [10] - 46:7, 46:9, 46:10, 47:4, 47:22, 54:1, 54:20, 55:22, 80:18, 97:14
**February** [3] - 103:24, 103:25, 104:9
**federal** [3] - 17:21, 25:5, 139:21
**Federal** [6] - 24:25, 139:19, 139:22, 140:7, 140:12
**feet** [16] - 71:9, 95:20, 95:22, 95:23, 119:23, 120:5, 120:8, 120:20, 120:22, 121:1, 121:10, 121:11, 121:14, 122:9, 143:4, 147:14
**feet's** [1] - 131:10
**fell** [1] - 14:18
**felt** [5] - 24:24, 25:7, 130:25, 134:13
**female** [1] - 88:10
**fence** [15] - 56:18, 57:9, 57:10, 57:18, 57:19, 57:20, 57:21, 70:4, 71:7, 71:9, 72:14, 95:17, 96:1, 97:9, 109:13
**fences** [1] - 57:9
**few** [6] - 18:20, 48:6, 49:25, 58:13, 59:14, 146:3

**field** [4] - 70:4, 118:8, 122:2, 122:5
**fields** [1] - 20:11
**fifth** [1] - 88:10
**fight** [1] - 51:17
**Figure** [4] - 30:19, 30:21, 146:19, 146:21
**figure** [3] - 48:16, 117:17, 120:12
**figured** [1] - 137:22
**figures** [1] - 125:23
**file** [9] - 123:23, 123:24, 124:2, 125:15, 125:16, 142:20, 142:25, 146:6, 146:9
**files** [2] - 61:17, 62:2
**fill** [1] - 71:14
**final** [1] - 20:2
**finally** [1] - 80:7
**fine** [4] - 37:15, 39:14, 44:15, 94:17
**finger** [1] - 37:25
**firefighting** [1] - 13:18
**fires** [1] - 5:10
**Firm** [1] - 1:19
**firm** [2] - 5:7, 17:10
**first** [4] - 4:25, 6:21, 7:13, 8:6, 10:2, 10:23, 15:25, 16:16, 20:15, 27:12, 27:15, 29:2, 32:20, 33:4, 45:20, 54:12, 54:23, 59:7, 61:11, 61:15, 71:11, 71:22, 73:11, 77:18, 80:15, 96:6, 96:17, 117:7, 118:1, 144:10, 147:5, 149:19
**fishing** [1] - 135:21
**five** [4] - 9:22, 91:9, 126:4, 143:4
**fixture** [2] - 36:18, 59:15
**flat** [4] - 38:12, 47:14, 70:3, 71:3
**flew** [1] - 101:16
**flight** [1] - 101:20
**flip** [1] - 62:9
**floor** [2] - 47:12, 47:13
**Florida** [5] - 28:8, 54:18, 57:1, 72:10, 101:16
**FMVSS** [2] - 129:24, 130:13
**focus** [2] - 7:5, 147:21
**focused** [2] - 6:8, 133:25
**focusing** [1] - 147:14

**follow** [2] - 47:15, 114:15
**follow-up** [1] - 47:15
**following** [3] - 15:7, 45:5, 114:1
**follows** [1] - 4:20
**foot** [13] - 47:6, 47:7, 47:9, 55:6, 120:2, 131:5, 131:6, 131:9, 132:16, 132:25, 133:23, 145:24, 146:23
**football** [2] - 18:19
**footrest** [4] - 47:10, 48:19, 131:2, 131:3
**footwell** [1] - 146:5
**FOR** [3] - 1:1, 1:18, 2:1
**force** [21] - 16:8, 36:15, 38:12, 39:4, 41:14, 41:20, 41:21, 42:4, 42:9, 42:13, 45:10, 58:14, 59:24, 59:25, 60:15, 60:16, 60:19, 60:20, 60:23, 61:1, 86:18
**forces** [2] - 39:9, 40:3
**foregoing** [1] - 150:15
**Forest** [2] - 13:16, 26:23
**forest** [1] - 13:17
**form** [1] - 150:2
**Fort** [1] - 54:17
**forth** [3] - 12:25, 64:5, 99:23
**forward** [3] - 4:16, 88:21, 150:7
**foundation** [14] - 59:5, 59:8, 60:10, 67:4, 80:24, 80:25, 81:9, 81:11, 81:20, 96:12, 122:22, 123:1, 123:12, 124:10
**four** [21] - 9:24, 9:25, 28:16, 28:17, 28:19, 28:21, 28:22, 28:24, 33:9, 55:14, 56:11, 58:4, 65:25, 66:7, 67:12, 78:16, 79:9, 82:24, 106:5, 142:16
**four-seat** [1] - 58:4
**four-wheeled** [1] - 67:12
**four-wheeler** [1] - 28:22
**four-wheelers** [5] - 28:16, 28:17, 28:24, 106:5
**fourteen** [1] - 120:21
**fourth** [1] - 58:4

**frame** [4] - 11:2, 13:15, 42:23, 44:20
**frequently** [1] - 96:20
**friction** [1] - 136:6
**FRIEND** [1] - 1:4
**frightening** [1] - 47:15
**front** [35] - 35:8, 35:9, 35:12, 35:20, 35:22, 37:7, 37:9, 37:11, 38:1, 39:7, 42:25, 46:16, 46:17, 47:9, 48:9, 48:24, 51:13, 55:11, 58:13, 85:15, 85:18, 85:19, 85:22, 85:25, 86:3, 89:11, 89:15, 91:12, 91:23, 91:24, 126:21, 132:9, 132:18, 138:19
**full** [20] - 28:11, 51:11, 51:12, 51:13, 52:17, 52:21, 53:2, 63:16, 75:18, 75:19, 75:23, 75:24, 76:1, 76:2, 76:4, 76:5, 76:12, 136:13
**full-cab** [1] - 52:17
**full-coverage** [4] - 51:11, 51:12, 51:13
**fun** [1] - 136:24
**function** [4] - 42:2, 55:20, 133:18
**functional** [1] - 83:21
**functionality** [2] - 30:10, 54:7
**functions** [1] - 57:25
**furrow** [1] - 122:6
**furrowing** [3] - 122:1, 122:5, 138:19

# G

**game** [1] - 18:19
**gather** [1] - 92:23
**Gator** [2] - 26:6, 26:13
**gear** [7] - 33:5, 33:6, 33:13, 70:12, 143:25, 144:5
**gearshift** [1] - 55:11
**general** [4] - 133:4, 133:21, 136:12, 140:14
**generally** [3] - 6:9, 20:12, 125:22
**generate** [3] - 39:4, 39:21, 59:21
**generated** [2] - 39:3, 125:16
**gentleman** [1] - 54:18
**gentlemen** [1] - 4:3,

90:19, 94:21, 149:18
**Germer** [1] - 2:7
**given** [5] - 60:21, 80:25, 97:13, 103:4, 108:22
**glad** [1] - 102:12
**glasses** [1] - 53:5
**gloves** [1] - 129:9
**go-to** [1] - 107:2
**golf** [2] - 25:1, 25:16
**golf-cart** [1] - 25:1
**gouging** [1] - 122:1
**government** [10] - 13:7, 13:14, 25:5, 114:15, 114:18, 114:19, 114:22, 114:25, 139:21, 139:23
**government's** [1] - 114:13
**governmental** [2] - 13:11, 26:17
**governs** [1] - 21:8
**GPS** [2] - 63:4, 63:13
**grab** [3] - 38:2, 65:23
**grad** [1] - 16:19
**graph** [2] - 59:20, 60:5
**graphs** [1] - 62:15
**grass** [3] - 15:1, 122:6, 122:8
**grass-roots** [1] - 15:1
**grassy** [2] - 70:3, 71:4
**gravity** [5] - 42:2, 128:6, 128:9, 128:13, 136:13
**greater** [13] - 34:13, 45:8, 45:10, 65:18, 79:15, 80:2, 80:4, 118:16, 118:19, 119:25, 142:17, 143:16
**green** [4] - 16:7, 18:14, 33:11, 33:24
**grime** [1] - 51:22
**grip** [4] - 46:14, 59:16, 129:9, 129:10
**grips** [1] - 46:15
**gross** [3] - 142:16, 142:22, 143:15
**ground** [10] - 66:4, 66:8, 69:2, 78:25, 79:3, 79:9, 79:11, 85:2, 136:7, 138:20
**Group** [1] - 26:20
**group** [4] - 8:11, 11:7, 13:20, 17:16
**groups** [1] - 6:7
**Gs** [20] - 41:25, 62:23, 62:24, 63:22, 63:25, 65:12, 66:8, 67:1,

67:17, 69:3, 77:23,
79:4, 79:23, 79:25,
116:25, 117:23,
118:10, 118:21,
119:5, 119:10
**guess** [18] - 10:3,
12:21, 14:5, 14:23,
17:5, 17:8, 27:12,
29:10, 64:2, 67:14,
69:11, 73:19, 81:6,
82:24, 85:5, 137:23,
149:20
**guidance** [1] - 32:15
**guidelines** [1] -
114:20
**guy** [9] - 9:2, 18:13,
18:23, 45:25, 55:7,
58:5, 92:5, 92:7,
107:2
**guys** [6] - 5:24, 55:10,
75:19, 115:14,
116:4, 138:18
**guys'** [1] - 121:25
**GVRW** [1] - 142:24

**H**

**hair** [1] - 65:15
**half** [10] - 20:3, 35:20,
76:14, 77:1, 83:11,
84:6, 97:4, 121:16,
122:10, 137:22
**halfway** [1] - 76:15
**hammer** [1] - 44:24
**hamper** [1] - 96:18
**hand** [18] - 4:12,
31:15, 32:2, 32:8,
44:17, 46:14, 46:15,
58:18, 59:7, 59:16,
71:6, 72:15, 78:15,
108:16, 129:9,
129:10
**hand-in-hand** [1] -
31:15
**handhold** [3] - 38:1,
48:9, 55:11
**handholds** [1] - 22:21
**handle** [1] - 37:13
**handles** [1] - 14:14
**handling** [4] - 9:18,
9:19, 26:9, 82:2
**handrail** [1] - 137:12
**hands** [1] - 28:5
**handy** [1] - 91:6
**hard** [3] - 52:21, 53:6,
71:4
**hard-shell** [1] - 52:21
**harder** [1] - 71:8
**Hawkins** [8] - 2:7,
17:6, 17:8, 23:4,

27:7, 27:22, 28:3,
29:23
**HAWKINS** [2] - 37:12,
45:17
**hazards** [1] - 84:2
**hcounts@
thompsoncoburn.
com** [1] - 2:6
**head** [1] - 121:2
**headgear** [1] - 135:8
**headlights** [1] - 9:18
**health** [1] - 16:20
**hear** [2] - 20:7, 68:1
**heard** [5] - 10:19,
11:17, 21:16, 135:6,
137:24
**heater** [3] - 51:18,
52:18, 52:23
**Heather** [1] - 2:2
**heavier** [2] - 127:1,
128:24
**heavy** [2] - 33:8,
136:25
**height** [2] - 53:16,
91:24
**held** [2] - 11:21, 23:24
**helmet** [1] - 135:11
**helmets** [4] - 17:20,
105:22, 105:23,
105:25
**help** [3] - 7:1, 124:24,
125:20
**high** [8] - 23:24, 33:6,
33:13, 66:17,
113:12, 113:14,
120:3, 147:22
**high-speed** [2] -
113:12, 113:14
**higher** [3] - 88:3,
89:15, 89:16
**highest** [1] - 69:6
**highlight** [1] - 146:2
**highlighted** [1] -
146:16
**Highway** [1] - 1:20
**hip** [14] - 22:21, 22:24,
46:18, 46:25, 47:1,
48:10, 87:21, 87:23,
88:1, 90:11, 90:12,
131:4, 147:4, 147:14
**hire** [1] - 105:13
**hired** [4] - 15:11,
25:21, 27:7, 101:7
**Hisada's** [1] - 141:7
**hit** [6] - 74:7, 74:10,
74:11, 75:8, 138:6
**hitting** [5] - 70:10,
77:14, 96:1, 138:20
**Hogan** [3] - 1:22, 1:23
**hold** [8] - 35:18, 36:2,

38:2, 44:17, 62:8,
99:17, 127:11, 128:1
**holding** [4] - 18:23,
46:16, 129:10,
137:12
**hole** [26] - 70:5, 70:6,
70:9, 70:10, 70:11,
71:8, 71:22, 71:24,
72:1, 72:5, 72:9,
72:12, 72:17, 73:21,
73:25, 74:7, 74:9,
74:10, 74:11, 74:14,
74:24, 75:8, 77:14,
77:15, 95:16
**Holland** [1] - 50:7
**home** [1] - 149:10
**honest** [1] - 126:16
**Honor** [43] - 4:7,
21:20, 21:23, 24:2,
34:20, 34:24, 37:12,
40:9, 40:23, 41:9,
42:13, 44:14, 50:15,
58:20, 61:12, 64:17,
67:4, 67:24, 68:12,
68:14, 74:23, 79:17,
81:8, 81:14, 89:18,
91:4, 92:10, 92:17,
93:8, 93:23, 94:3,
95:3, 98:4, 98:15,
99:7, 99:19, 102:3,
106:17, 122:22,
123:13, 124:1,
133:11
**HONORABLE** [1] -
1:13
**honors** [2] - 8:5, 15:24
**hood** [17] - 85:15,
85:18, 85:19, 85:22,
85:25, 86:3, 86:6,
86:17, 86:18, 89:12,
89:14, 91:12, 91:16,
91:17, 91:20, 93:24
**hooks** [3] - 86:6, 86:8,
86:9
**hope** [1] - 94:25
**hoping** [1] - 56:1
**hot** [1] - 51:19
**hour** [17] - 32:4, 33:6,
62:16, 62:17, 62:20,
63:24, 64:12, 66:13,
70:11, 74:3, 74:4,
95:21, 120:20,
120:21, 143:21,
143:23
**hours** [16] - 40:22,
101:19, 101:24,
102:9, 103:7,
103:10, 103:12,
103:15, 103:22,
104:3, 104:8,

104:16, 104:21,
104:22, 104:24,
105:6
**HOUSTON** [1] - 1:2
**Houston** [2] - 1:24,
2:13
**houston** [1] - 1:4
**huge** [1] - 71:14
**human** [10] - 7:6, 16:1,
16:5, 16:11, 16:21,
17:19, 20:20, 26:15,
28:12, 105:19
**Human** [2] - 15:25,
16:18
**hundred** [1] - 55:4
**hundreds** [3] - 8:18,
14:12, 62:3
**hunting** [1] - 135:19
**Husqvarna** [2] - 50:7,
53:1

**I**

**ID** [1] - 121:8
**idea** [3] - 99:2, 99:3,
125:8
**identified** [1] - 129:7
**identify** [3] - 30:17,
45:21, 78:7
**Illinois** [2] - 6:22, 8:1
**immediately** [2] -
45:5, 137:13
**impulse** [1] - 41:17
**IN** [1] - 1:1
**inaccurate** [1] -
125:10
**inadequate** [1] - 24:24
**inappropriate** [1] -
94:7
**inch** [2] - 79:1, 79:5
**inches** [1] - 143:3
**inclined** [2] - 56:15,
93:13
**include** [4] - 25:6,
34:1, 104:9
**includes** [2] - 30:8
**including** [1] - 92:15
**inconsistent** [1] - 90:4
**increase** [1] - 147:19
**incrementally** [1] -
19:2
**indeed** [1] - 149:16
**independent** [3] -
134:5, 141:14,
149:24
**INDEX** [1] - 3:1
**indication** [1] - 141:6
**individual** [2] - 14:20,
14:21
**INDIVIDUALLY** [1] -

1:3
**individuals** [3] -
13:10, 65:9, 114:25
**induce** [2] - 39:17,
39:19
**inducing** [1] - 38:17
**Industrial** [1] - 7:4
**Industry** [1] - 26:23
**industry** [5] - 48:4,
113:22, 141:24,
142:3, 146:14
**influence** [1] - 69:22
**information** [17] -
8:16, 10:15, 15:4,
16:7, 16:12, 16:13,
16:14, 38:23, 61:25,
85:3, 85:14, 85:21,
89:2, 89:8, 90:3,
90:13, 94:1
**initial** [1] - 117:19
**INJURED** [1] - 1:4
**injuries** [4] - 17:25,
98:8, 98:13, 98:22
**injury** [2] - 17:19,
135:9
**inner** [1] - 11:19
**input** [6] - 12:13,
70:12, 72:16, 73:14,
73:15, 118:7
**inspect** [1] - 40:20
**inspection** [2] - 71:25,
85:5
**instead** [1] - 144:17
**instruction** [3] - 92:5,
93:23, 94:11
**instrumentation** [2] -
59:23, 73:14
**integrity** [1] - 38:7
**intended** [7] - 47:13,
82:2, 82:13, 82:20,
83:25, 132:8, 141:5
**intent** [1] - 141:1
**intentionally** [1] -
56:14
**interact** [1] - 16:4
**interacting** [1] - 72:16
**interaction** [1] - 93:24
**interest** [1] - 13:19
**interested** [2] - 13:25,
31:4
**Internet** [2] - 11:23,
12:1
**intersection** [1] -
18:12
**interview** [2] - 115:10,
134:2
**introduction** [1] - 5:2
**investigated** [1] -
29:18
**investigation** [2] -

5:10, 20:13
**investigator** [3] -
115:6, 115:23
**invoice** [2] - 104:12,
104:20
**invoices** [3] - 103:5,
104:15, 104:17
**involve** [4] - 28:11,
28:12, 73:3, 84:1
**involved** [25] - 5:9,
14:2, 23:9, 25:21,
27:14, 27:19, 29:4,
29:14, 30:3, 30:12,
32:23, 33:2, 34:7,
36:12, 38:22, 39:10,
45:7, 52:2, 54:16,
58:17, 59:17, 84:5,
105:21, 105:23,
115:12
**involvement** [2] -
103:16, 114:14
**involves** [4] - 19:7,
19:9, 21:10, 28:10
**inward** [1] - 59:16
**irrelevant** [2] - 42:12,
86:23
**irritate** [1] - 145:9
**issue** [10] - 21:25,
22:3, 91:2, 91:22,
93:7, 98:5, 98:6,
100:20, 101:2,
149:25
**issued** [6] - 19:18,
24:19, 40:12, 40:21,
41:4, 102:8
**issues** [6] - 13:18,
17:24, 22:15, 31:10,
116:2, 116:3
**item** [1] - 114:3
**items** [1] - 129:6
**itself** [3] - 38:25,
39:22, 58:17

**J**

**J1194** [3] - 60:24,
129:22, 140:6
**J2208** [1] - 22:7
**J2258** [17] - 10:20,
10:21, 11:5, 13:6,
21:7, 27:15, 30:18,
31:2, 34:12, 46:8,
47:16, 50:6, 83:10,
114:3, 114:22,
148:16, 148:18
**J2292** [1] - 148:1
**J2358** [2] - 23:19,
23:21
**Jan** [1] - 104:4
**January** [13] - 40:12,

102:8, 103:20,
103:21, 103:25,
104:14, 104:15,
104:18, 104:20,
107:10, 108:5,
108:10, 108:23
**Jeffrey** [1] - 2:7
**jhawkins@germer** [1]
- 2:9
**jhawkins@germer-**
**austin.com** [1] - 2:9
**Jiffy** [1] - 8:25
**job** [1] - 51:22
**John** [3] - 26:3, 26:4,
50:6
**joined** [1] - 16:19
**Judge** [3] - 86:19,
124:9, 149:13
**JUDGE** [2] - 1:13, 1:14
**jugs** [1] - 71:14
**Jury** [4] - 4:1, 90:22,
93:5, 94:19
**jury** [65] - 5:22, 6:19,
7:10, 8:8, 10:8,
11:17, 11:21, 13:6,
16:1, 16:17, 17:14,
18:5, 21:16, 22:15,
23:8, 23:18, 24:22,
25:24, 27:11, 27:25,
29:13, 31:1, 32:19,
33:1, 33:17, 34:6,
35:3, 35:4, 35:12,
36:5, 36:9, 36:10,
37:14, 38:16, 39:12,
39:25, 40:2, 46:4,
51:5, 54:13, 56:4,
59:21, 67:23, 68:6,
70:2, 72:8, 73:8,
76:11, 79:22, 83:6,
84:19, 85:9, 86:2,
87:12, 87:25, 88:16,
92:5, 93:23, 94:18,
95:22, 96:16, 97:24,
149:10, 150:5
**JURY** [1] - 1:11

**K**

**KAF** [1] - 21:10
**Kathleen** [4] - 2:12,
150:15, 150:19,
150:20
**KAWASAKI** [1] - 1:7
**Kawasaki** [42] - 21:10,
21:14, 23:5, 23:10,
23:21, 24:1, 27:7,
27:9, 32:22, 33:18,
33:22, 34:1, 34:6,
34:13, 37:6, 37:18,
39:16, 47:23, 49:14,

64:23, 82:10, 98:1,
98:13, 100:16,
100:19, 101:2,
115:6, 115:23,
128:1, 130:7,
130:11, 130:23,
132:23, 134:2,
137:8, 140:5,
140:24, 141:12,
142:6, 143:17,
145:5, 148:13
**Kawasaki's** [1] - 4:4
**Keep** [1] - 97:3
**keep** [6] - 19:24,
51:18, 51:20, 76:24,
95:2, 149:25
**keeping** [1] - 56:6
**keeps** [1] - 74:24
**kept** [3] - 80:6, 145:5,
148:13
**Kevin** [2] - 4:8, 5:1
**KEVIN** [3] - 1:15, 3:2,
4:19
**kicked** [1] - 27:17
**kilograms** [1] - 142:17
**kind** [46] - 9:3, 11:20,
14:20, 14:24, 15:14,
28:14, 28:17, 29:22,
31:19, 35:6, 37:17,
38:5, 43:4, 47:12,
49:1, 51:20, 51:25,
52:20, 53:15, 54:13,
54:17, 54:22, 56:25,
60:2, 66:24, 69:24,
71:4, 71:7, 75:13,
75:19, 83:11, 88:21,
97:21, 105:12,
132:9, 132:25,
135:19, 136:20,
137:8, 137:16,
137:19, 138:19,
141:13, 144:17,
149:8
**kinds** [2] - 51:16,
57:24
**knob** [1] - 86:5
**knowledgeable** [1] -
8:21
**Kubota** [2] - 50:7,
52:19

**L**

**lab** [2] - 28:7, 36:15
**label** [5] - 130:1,
135:7, 139:8, 140:4,
145:19
**labeling** [2] - 26:17,
135:17
**lack** [2] - 26:12, 62:10

**ladies** [4] - 4:2, 90:19,
94:20, 149:18
**lady** [7] - 76:19, 89:3,
89:5, 89:9, 90:4,
90:7, 90:14
**laid** [2] - 48:8, 70:4
**Land** [1] - 1:20
**large** [5] - 12:24,
13:12, 15:5, 15:16,
50:4
**largely** [2] - 26:18,
28:4
**last** [9] - 18:3, 22:23,
30:20, 48:18, 59:14,
75:5, 99:7, 101:6,
101:10
**lastly** [3] - 47:3, 47:11
**latch** [3] - 91:17,
91:18, 91:20
**latches** [2] - 86:7, 86:9
**latching** [2] - 85:24,
86:2
**lateral** [23] - 31:21,
48:12, 62:22, 63:22,
64:22, 65:8, 65:12,
66:7, 67:1, 67:3,
67:17, 77:22, 79:23,
79:25, 84:5, 116:24,
117:2, 117:8,
117:16, 118:15,
119:4, 119:5
**laterally** [1] - 47:2
**Law** [1] - 1:19
**law** [4] - 20:16, 115:3,
115:4, 139:24
**laws** [5] - 17:21,
17:22, 17:23, 19:8,
114:15
**lawsuit** [1] - 32:23
**lawyer** [1] - 125:20
**lawyers** [3] - 101:7,
124:24
**lay** [4] - 59:8, 67:7,
123:12, 124:10
**lead** [2] - 67:25, 68:2
**leading** [4] - 50:19,
50:22, 67:24, 79:18
**lean** [1] - 4:16
**learned** [2] - 85:5,
85:6, 119:3
**least** [5] - 7:21, 16:21,
31:24, 37:18, 109:16
**leave** [6] - 66:4,
101:19, 118:2,
127:5, 139:12
**led** [1] - 18:11
**LEE** [1] - 1:13
**leeway** [1] - 42:16
**left** [9] - 32:6, 71:6,
72:15, 78:15, 84:23,

126:18, 127:3,
127:20, 139:16
**left-hand** [2] - 71:6,
78:15
**leg** [1] - 145:24
**legal** [1] - 7:20
**legs** [1] - 128:19
**less** [12] - 36:22, 67:2,
75:24, 78:1, 95:25,
119:24, 121:4,
128:24, 143:3,
143:7, 147:18
**level** [11] - 15:5, 32:9,
39:4, 48:10, 69:7,
79:12, 117:3, 117:8,
119:6, 147:13,
147:22
**levels** [2] - 70:12,
71:15
**licensed** [2] - 7:7, 7:11
**life** [2] - 41:6, 140:15
**lift** [3] - 69:8, 78:23,
96:25
**light** [11] - 10:13, 16:7,
18:13, 18:14, 135:5,
135:18, 136:16,
136:20, 137:6,
137:9, 137:10
**lighter** [1] - 128:25
**lighting** [1] - 71:5
**likely** [1] - 120:8
**limit** [2] - 66:22, 80:3
**line** [13] - 18:22,
52:20, 52:21, 56:18,
57:18, 57:21, 62:19,
70:5, 71:7, 71:9,
72:14, 97:9
**lines** [4] - 62:11,
100:22, 139:16,
146:3
**lip** [1] - 146:6
**list** [8] - 9:22, 19:21,
57:12, 108:12,
108:14, 108:18,
108:22, 115:5
**listed** [3] - 8:6, 19:17,
107:19
**listing** [3] - 107:9,
108:8, 134:6
**lists** [1] - 108:19
**literally** [3] - 48:9,
51:9, 57:6
**literature** [1] - 68:9
**litigation** [1] - 25:22
**LLP** [1] - 2:3
**load** [11] - 36:19, 39:3,
39:20, 39:21, 42:22,
43:3, 59:15, 59:17,
127:7, 142:23
**loaded** [4] - 33:8,

74:19, 86:7, 128:24
**loading** [1] - 117:23
**loads** [3] - 6:25, 39:19, 60:6
**located** [1] - 48:19
**lock** [7] - 63:16, 75:23, 75:24, 76:1, 76:2, 76:6, 76:12
**locked** [2] - 75:18, 75:19
**locks** [1] - 86:11
**logger** [2] - 61:18, 77:6
**longitudinal** [1] - 62:23
**look** [40] - 6:2, 17:17, 17:24, 18:20, 26:20, 31:21, 35:11, 39:3, 49:18, 50:10, 59:18, 63:1, 63:12, 64:4, 69:25, 70:17, 73:2, 73:5, 83:7, 84:3, 87:14, 93:3, 94:25, 99:9, 100:16, 102:12, 103:14, 105:23, 107:7, 125:12, 126:3, 126:4, 129:3, 133:2, 135:7, 144:8, 146:12, 150:7
**looked** [22] - 5:22, 27:13, 27:15, 27:17, 29:8, 29:9, 31:10, 39:1, 44:12, 44:25, 45:2, 45:7, 46:9, 50:1, 62:3, 115:5, 125:11, 133:1, 136:19, 139:16, 140:21, 140:23
**looking** [43] - 6:2, 7:24, 9:21, 18:8, 18:22, 19:2, 19:5, 19:7, 22:4, 26:9, 26:15, 30:9, 30:10, 31:5, 31:20, 35:23, 47:5, 49:4, 49:13, 49:24, 52:2, 52:4, 54:14, 56:9, 58:11, 62:8, 62:10, 63:7, 63:15, 63:17, 64:11, 69:16, 71:2, 73:13, 77:10, 78:6, 78:15, 83:23, 93:14, 98:7, 105:21, 147:6, 148:2
**looks** [12] - 9:22, 16:5, 17:19, 17:21, 19:7, 20:3, 30:25, 63:23, 103:21, 133:18, 143:14
**loss** [1] - 5:10

**loud** [1] - 146:16
**Louis** [1] - 2:4
**Louisiana** [1] - 1:23
**low** [8] - 23:20, 33:5, 33:13, 57:13, 70:11, 82:14, 143:25, 144:4
**low-speed** [3] - 23:20, 57:13, 82:14
**lower** [5] - 47:8, 78:15, 89:15, 127:8, 128:8
**Lube** [1] - 8:25

# M

**M.N** [1] - 1:4
**ma'am** [1] - 92:17
**managed** [1] - 74:7
**MANAGER** [1] - 94:18
**managing** [1] - 6:3
**maneuver** [2] - 69:3, 73:3
**maneuverable** [1] - 57:15
**maneuvers** [2] - 70:9, 78:1
**manner** [1] - 122:5
**manual** [2] - 137:5, 137:8
**manuals** [2] - 30:5, 137:3
**manufactured** [1] - 148:4
**manufacturer** [1] - 105:9
**manufacturers** [4] - 33:24, 50:25, 51:8, 52:3
**map** [1] - 63:5
**marine** [7] - 6:4, 6:5, 6:9, 6:11, 8:14, 14:17
**marine-type** [1] - 6:9
**mark** [1] - 37:4
**marked** [4] - 44:17, 58:18, 123:25, 124:5
**market** [1] - 29:6
**marketplace** [1] - 114:7
**markings** [1] - 63:10
**mass** [1] - 41:21
**Master's** [1] - 7:4
**material** [2] - 27:13, 38:4
**Materials** [1] - 6:23
**materials** [13] - 6:24, 19:14, 85:6, 107:10, 107:19, 108:8, 108:12, 108:14, 108:19, 108:22, 115:5, 134:7

**math** [1] - 77:16
**mathematically** [2] - 80:11, 80:13
**matter** [3] - 5:21, 23:10, 150:17
**matters** [1] - 134:11
**max** [1] - 70:11
**maximum** [1] - 142:23
**McDonald** [2] - 127:18, 146:1
**mean** [15] - 10:10, 15:19, 31:3, 45:9, 51:5, 72:4, 79:4, 79:6, 95:24, 98:11, 101:7, 105:3, 107:4, 128:17, 132:20
**means** [5] - 7:10, 9:7, 34:12, 38:11, 65:17
**meant** [2] - 136:14, 137:20
**measure** [3] - 36:15, 59:23, 67:16
**measured** [8] - 33:4, 33:7, 36:19, 42:17, 44:25, 59:17, 63:22, 70:6
**measurements** [5] - 36:14, 72:1, 72:6, 109:7, 109:10
**measuring** [1] - 60:6
**mechanical** [2] - 2:14, 7:1
**mechanism** [2] - 85:25, 86:2
**medical** [5] - 17:16, 115:12, 115:14, 116:2, 116:3
**Medicine** [1] - 17:14
**meet** [3] - 47:18, 114:9, 148:1
**meeting** [1] - 12:6
**meetings** [4] - 11:18, 11:21, 12:1, 12:9
**meets** [1] - 143:17
**member** [5] - 10:3, 12:17, 16:17, 24:15, 99:23
**members** [5] - 12:2, 13:8, 13:11, 14:13, 15:2
**membership** [2] - 15:3, 17:12
**memorized** [2] - 140:14, 142:19
**mentions** [1] - 15:24
**met** [1] - 142:6
**methodology** [1] - 65:3
**mic** [3] - 4:16, 96:25, 97:3

**mid** [2] - 10:25, 136:22
**middle** [2] - 62:22, 101:11
**Midwest** [2] - 7:5, 8:1
**might** [7] - 28:11, 31:22, 37:12, 39:11, 56:24, 57:22, 136:23
**mile** [10] - 32:4, 33:5, 33:6, 62:16, 62:17, 62:20, 63:24, 64:12, 70:11, 74:4
**miles** [7] - 66:13, 74:3, 95:21, 120:19, 120:21, 143:21, 143:23
**Miller** [13] - 2:12, 116:6, 116:12, 117:3, 117:9, 117:12, 117:13, 117:14, 117:15, 119:6, 150:15, 150:19, 150:20
**mincing** [1] - 119:13
**mind** [5] - 56:6, 90:24, 102:17, 149:25
**minimum** [5] - 32:16, 34:4, 34:8, 34:10, 40:3
**MINOR** [1] - 1:4
**minute** [4] - 32:25, 78:21, 78:22, 116:2
**minutes** [9] - 49:25, 58:13, 59:14, 90:21, 91:9, 91:10, 93:2, 93:12, 118:18
**mislabeling** [1] - 130:4
**missed** [5] - 18:23, 22:23, 30:20, 74:11, 97:4
**missing** [2] - 77:14, 134:13
**Missouri** [1] - 2:4
**misstates** [1] - 50:20
**mistaken** [1] - 119:8
**misunderstanding** [1] - 118:22
**model** [9] - 30:7, 35:7, 51:9, 53:1, 53:21, 55:22, 132:16, 132:17, 147:25
**models** [2] - 29:10, 53:20
**moderate** [1] - 136:17
**molded** [1] - 73:21
**monitored** [1] - 88:15
**months** [3] - 40:15, 41:4, 41:7
**morning** [1] - 150:9
**most** [3] - 7:22, 62:19,

66:20
**motion** [3] - 48:13, 59:25, 92:6
**Motor** [6] - 24:25, 139:20, 139:22, 139:23, 140:7, 140:12
**motorcycle** [2] - 10:12, 17:18
**motorcycles** [1] - 14:16
**motorized** [1] - 18:1
**MOTORS** [1] - 1:7
**move** [11] - 35:12, 64:1, 92:4, 93:23, 102:5, 106:24, 123:10, 128:13, 128:16, 133:16, 138:24
**moved** [1] - 139:2
**movement** [2] - 92:9, 92:15
**moves** [1] - 128:17
**moving** [7] - 15:23, 26:7, 50:17, 102:17, 118:6, 128:22, 149:1
**MR** [220] - 4:7, 4:22, 20:8, 21:3, 21:5, 21:20, 21:23, 21:24, 23:16, 23:17, 24:2, 24:5, 30:14, 30:16, 34:19, 34:24, 34:25, 37:12, 37:16, 40:6, 40:9, 40:11, 40:23, 40:25, 41:3, 41:9, 41:12, 41:13, 41:16, 42:6, 42:8, 42:12, 42:19, 44:14, 44:16, 45:17, 45:19, 49:10, 49:12, 49:21, 49:23, 50:15, 50:17, 50:19, 50:23, 52:12, 52:13, 54:9, 54:11, 55:25, 56:2, 58:9, 58:10, 58:20, 58:22, 58:23, 58:24, 58:25, 59:1, 59:3, 59:4, 59:6, 60:9, 60:10, 60:14, 61:3, 61:6, 61:9, 61:11, 61:14, 64:16, 64:18, 64:20, 67:4, 67:6, 67:9, 67:10, 67:24, 68:1, 68:3, 68:5, 68:12, 68:14, 68:17, 68:19, 68:20, 70:19, 70:21, 70:22, 70:23, 70:25, 71:1, 71:18, 71:20, 72:19, 72:22, 72:24, 72:25, 73:18, 73:24, 74:6,

74:13, 74:17, 74:23,
75:2, 75:6, 78:4,
78:5, 79:17, 79:19,
79:21, 80:24, 81:2,
81:8, 81:11, 81:14,
81:16, 81:20, 81:24,
86:19, 86:23, 87:2,
89:18, 89:22, 89:24,
90:1, 90:2, 90:18,
91:4, 91:7, 91:11,
91:16, 91:17, 91:21,
91:24, 92:3, 92:10,
92:17, 92:18, 92:25,
93:8, 93:20, 93:22,
94:3, 94:4, 94:12,
94:15, 94:24, 95:3,
95:4, 96:12, 96:15,
97:2, 98:4, 98:9,
98:15, 98:19, 99:6,
99:8, 99:12, 99:13,
99:16, 99:19, 99:22,
100:5, 102:3, 102:6,
102:17, 102:18,
102:19, 106:17,
106:18, 106:21,
107:1, 107:11,
107:14, 107:17,
107:19, 107:20,
107:23, 108:2,
108:4, 122:18,
122:22, 122:24,
122:25, 123:2,
123:3, 123:6, 123:8,
123:12, 123:15,
123:18, 123:20,
124:1, 124:4, 124:5,
124:9, 124:12,
127:20, 127:22,
132:6, 132:12,
132:14, 133:11,
133:13, 133:19,
134:21, 134:24,
136:3, 139:8,
139:10, 140:1,
140:3, 141:15,
141:17, 146:1,
146:4, 149:12,
149:15
**Mueller** [6] - 2:2, 3:3,
3:4, 3:5, 120:19,
138:1
**MUELLER** [125] - 4:7,
4:22, 20:8, 21:3,
21:5, 21:23, 21:24,
23:16, 23:17, 24:5,
30:14, 30:16, 34:19,
34:24, 34:25, 37:16,
40:23, 40:25, 41:9,
41:12, 42:8, 42:19,
44:14, 44:16, 45:19,
49:10, 49:12, 49:21,

49:23, 50:17, 50:23,
52:12, 52:13, 54:9,
54:11, 55:25, 56:2,
58:9, 58:10, 58:22,
58:24, 59:1, 59:4,
59:6, 60:9, 61:6,
61:9, 61:11, 61:14,
64:16, 64:20, 67:6,
67:9, 67:10, 68:1,
68:3, 68:5, 68:12,
68:14, 68:19, 68:20,
70:19, 70:22, 70:25,
71:1, 71:18, 71:20,
72:19, 72:22, 72:24,
72:25, 73:18, 73:24,
74:6, 74:13, 74:17,
75:2, 75:6, 78:4,
78:5, 79:19, 79:21,
81:2, 81:11, 81:14,
81:16, 81:24, 87:2,
89:24, 90:2, 90:18,
91:16, 91:21, 91:24,
92:18, 93:8, 93:20,
94:3, 94:12, 94:15,
94:24, 95:3, 95:4,
96:15, 97:2, 98:9,
98:19, 99:6, 99:8,
99:12, 99:19, 102:3,
102:18, 106:17,
106:21, 107:11,
107:20, 107:23,
122:22, 122:25,
123:3, 123:8, 124:1,
124:4, 133:11
**MULE** [55] - 21:11,
21:14, 23:5, 23:10,
23:21, 24:1, 24:20,
26:6, 26:21, 27:7,
27:9, 27:12, 29:5,
30:7, 32:23, 33:2,
33:18, 34:7, 34:13,
36:24, 37:1, 37:6,
37:18, 39:16, 40:18,
45:14, 45:22, 46:5,
47:23, 49:14, 54:15,
55:16, 61:22, 63:18,
64:23, 78:9, 82:11,
88:25, 96:11, 98:1,
98:13, 100:8,
100:19, 101:2,
109:3, 128:1, 130:4,
132:23, 135:3,
135:8, 137:4, 142:6,
143:17, 144:17,
145:3
**MULES** [1] - 27:13
**multiuse** [1] - 135:5
**must** [2] - 38:24,
65:21
**Mxxx** [3] - 92:12,

98:14, 137:12
**Myers** [1] - 54:17

# N

**name** [5] - 4:25, 5:1,
28:16, 52:2, 54:18
**names** [1] - 115:18
**National** [1] - 99:24
**natural** [1] - 48:20
**nature** [2] - 7:21, 13:4
**near** [1] - 76:1
**necessary** [5] - 32:7,
40:4, 78:2, 97:14,
134:14
**need** [8] - 31:13,
44:12, 55:3, 91:1,
94:10, 106:25,
107:8, 109:9
**needed** [7] - 31:6,
96:11, 97:18, 97:20,
99:2, 134:16
**neglected** [1] - 58:8
**negotiate** [2] - 56:17,
56:23
**net** [2] - 96:20, 146:19
**nets** [3] - 50:11, 50:16,
93:14
**netting** [12] - 93:15,
93:18, 94:16, 96:4,
96:7, 96:10, 96:17,
97:6, 97:7, 97:10,
97:17
**never** [10] - 40:18,
69:12, 77:18, 77:22,
105:8, 109:1, 109:3,
135:6, 143:13
**new** [3] - 26:2, 34:19,
52:17
**New** [1] - 50:7
**Newbold** [23] - 53:12,
53:15, 53:23, 61:25,
66:11, 69:4, 76:16,
82:23, 83:4, 83:8,
83:12, 83:15, 83:17,
84:5, 87:6, 87:11,
87:18, 87:21, 88:25,
95:7, 96:6, 125:16
**Newbold's** [16] -
61:18, 63:17, 68:22,
77:6, 89:15, 90:5,
90:15, 91:25, 92:19,
95:15, 98:24, 99:1,
100:11, 100:24,
101:3, 109:9
**next** [14] - 7:14, 8:4,
17:12, 19:12, 19:21,
35:8, 48:22, 49:4,
53:4, 57:10, 62:9,
63:1, 103:9

**NEXT** [1] - 1:3
**nice** [1] - 149:22
**nine** [1] - 104:20
**nineteen** [1] - 121:9
**NO** [1] - 1:3
**nobody** [2] - 11:19,
133:11
**noncompliant** [1] -
114:6
**none** [1] - 124:19
**nonstraddle** [1] -
142:10
**normal** [2] - 66:17,
67:20
**NORRIS** [1] - 1:3
**north** [1] - 51:17
**North** [1] - 54:17
**Northcutt** [1] - 115:17
**notations** [1] - 125:9
**note** [1] - 137:11
**noted** [6] - 30:11,
36:11, 38:21, 39:8,
124:13, 137:15
**notes** [3] - 115:6,
115:8, 150:4
**nothing** [4] - 91:13,
128:11, 130:22,
148:12
**notices** [1] - 12:17
**November** [3] - 103:7,
104:6, 104:7
**nuances** [1] - 48:5
**number** [24] - 5:14,
7:15, 12:9, 13:2,
14:14, 15:16, 19:17,
19:20, 23:24, 27:18,
30:3, 31:10, 31:11,
50:5, 61:5, 65:14,
67:23, 68:6, 68:23,
70:8, 79:15, 108:2,
114:2, 137:7
**Number** [2] - 47:15,
91:11
**numbers** [4] - 34:19,
59:20, 66:14, 103:15
**Nxxxxx** [2] - 98:14,
137:12
**Nxxxxxxx** [1] - 92:12

# O

**object** [3] - 21:20,
40:25, 99:19
**objected** [1] - 91:2
**objection** [17] - 24:2,
42:12, 50:18, 50:19,
61:3, 64:18, 67:4,
67:24, 68:15, 79:17,
80:24, 81:20, 92:23,
96:12, 98:4, 107:18,

107:25
**observations** [1] -
19:6
**observe** [2] - 12:24,
13:1
**observed** [1] - 36:24
**obtained** [1] - 30:6
**obviously** [7] - 9:15,
26:5, 28:17, 48:4,
73:11, 114:14,
138:15
**occasion** [1] - 27:3
**occasions** [3] - 12:23,
13:2, 26:25
**occupant** [45] - 22:11,
22:15, 22:22, 23:1,
23:2, 23:11, 26:10,
30:9, 45:14, 46:5,
46:9, 46:11, 47:17,
47:22, 48:1, 50:1,
50:9, 65:8, 80:18,
82:3, 82:17, 82:18,
84:4, 84:7, 86:5,
87:16, 88:15, 88:17,
89:19, 91:12, 92:3,
92:12, 92:15, 94:4,
97:12, 97:15, 98:11,
129:6, 138:14,
140:18, 144:8,
144:13, 145:22,
146:15
**occupant-retention**
[7] - 23:11, 80:18,
82:17, 82:18, 97:12,
97:15, 98:11
**occupants** [10] - 92:6,
92:9, 92:11, 138:9,
138:11, 140:19,
140:25, 141:4,
141:8, 147:13
**occur** [1] - 19:4
**occurred** [6] - 38:24,
39:21, 88:14, 100:7,
100:17, 106:22
**occurs** [1] - 18:9
**October** [1] - 104:12
**OCTOBER** [1] - 1:6
**OF** [3] - 1:1, 1:4, 1:15
**off-road** [7] - 25:13,
28:8, 56:14, 66:19,
136:1, 136:8, 136:14
**offer** [2] - 64:16,
107:15
**offering** [2] - 34:22,
60:9
**offhand** [3] - 102:10,
133:4, 142:19
**office** [1] - 5:21
**offices** [4] - 5:14,
5:16, 5:19, 5:20

**often** [1] - 125:20
**oil** [6] - 9:1, 9:3, 9:7, 9:15
**old** [1] - 53:6
**on-product** [1] - 26:16
**on-road** [7] - 25:12, 25:13, 25:14, 25:19, 28:9, 136:10, 136:12
**once** [2] - 76:8, 76:14
**One** [2] - 2:4, 93:9
**one** [111] - 5:24, 6:7, 7:13, 9:5, 9:24, 10:2, 13:5, 13:13, 13:14, 17:22, 18:3, 18:4, 21:2, 22:18, 27:3, 29:6, 29:7, 29:25, 35:2, 35:13, 35:16, 35:24, 36:2, 36:6, 36:11, 37:3, 37:9, 37:13, 39:13, 40:19, 45:23, 46:20, 47:6, 47:15, 48:23, 48:25, 49:6, 49:25, 52:20, 53:19, 54:16, 54:23, 55:1, 55:19, 56:10, 56:22, 59:1, 61:12, 62:16, 64:7, 75:5, 75:21, 76:5, 76:14, 76:19, 76:20, 77:1, 81:14, 83:19, 83:21, 84:18, 85:10, 85:12, 86:13, 87:13, 91:1, 91:11, 91:14, 93:11, 97:22, 99:7, 107:21, 107:24, 108:16, 108:17, 108:18, 109:4, 109:10, 120:10, 123:24, 127:17, 127:19, 127:20, 128:23, 128:25, 129:20, 129:22, 133:16, 140:6, 140:15, 141:18, 142:10, 142:13, 142:18, 143:3, 143:6, 143:8, 143:9, 143:25, 144:3, 145:21, 145:23, 147:8, 147:23, 148:2, 148:19
**one-and-a-half** [2] - 76:14, 77:1
**one-row** [1] - 85:10
**ones** [3] - 75:20, 75:25, 144:19
**ongoing** [1] - 7:22
**online** [1] - 52:5
**open** [7] - 12:1, 51:9, 57:8, 57:9, 86:17,

86:18, 149:25
**opened** [1] - 85:23
**opening** [2] - 89:11, 119:2
**openings** [1] - 52:24
**operate** [4] - 136:4, 138:23, 143:22, 143:24
**operated** [4] - 27:17, 27:18, 118:9, 149:5
**operating** [2] - 16:15, 138:24
**operation** [2] - 14:20, 146:21
**operator** [1] - 126:18
**opinion** [14] - 40:7, 47:21, 80:18, 80:22, 81:4, 81:5, 81:18, 81:25, 86:20, 96:9, 96:14, 98:17, 98:18, 120:10
**opinions** [2] - 20:16, 99:9
**opportunity** [5] - 4:4, 12:19, 15:11, 19:13, 67:16
**opposed** [4] - 9:7, 47:14, 65:4, 79:24
**opposite** [1] - 35:19
**order** [9] - 19:3, 68:25, 77:2, 79:8, 79:14, 79:24, 116:24, 119:4, 119:15
**organization** [5] - 15:1, 15:6, 15:14, 17:12, 141:25
**organized** [1] - 90:17
**orienting** [1] - 46:24
**ORS** [1] - 148:10
**otherwise** [2] - 144:2, 146:19
**ought** [2] - 15:10, 32:13
**outside** [5] - 15:2, 89:19, 90:24, 90:25, 91:13
**overall** [3] - 97:13, 97:15, 133:13
**overlap** [1] - 94:9
**overruled** [4] - 42:15, 61:4, 81:22, 96:13
**oversaw** [1] - 14:20
**oversee** [1] - 15:6
**oversees** [1] - 14:24
**overturn** [2] - 31:22, 87:15
**overturned** [2] - 138:5, 138:6
**overview** [1] - 29:22
**own** [5] - 6:16, 48:5,

48:7, 103:16, 135:17
**owners** [1] - 30:5
**Oxton** [1] - 54:18

**P**

**p.m** [3] - 1:5, 150:12
**page** [16] - 8:4, 19:12, 19:21, 20:3, 62:9, 62:14, 63:1, 63:2, 100:22, 122:21, 129:3, 140:2, 141:16, 144:8, 147:5
**pages** [4] - 20:4, 20:10, 62:3
**panel** [1] - 89:13
**panels** [1] - 83:20
**paper** [2] - 20:10, 115:21
**paperwork** [1] - 137:3
**paragraphs** [1] - 144:10
**paramount** [2] - 99:17, 100:1
**Park** [1] - 13:22
**parked** [1] - 149:8
**parking** [5] - 133:7, 138:25, 139:5, 139:13, 139:17
**part** [48] - 6:3, 9:9, 9:10, 9:12, 15:24, 16:14, 22:22, 22:23, 23:1, 23:3, 25:13, 27:14, 27:15, 28:10, 29:4, 30:20, 32:20, 34:16, 36:18, 39:7, 39:9, 42:25, 45:13, 46:4, 47:4, 49:16, 51:24, 54:5, 64:21, 69:21, 74:8, 82:21, 84:9, 84:10, 84:13, 87:5, 87:7, 97:14, 99:23, 114:11, 114:12, 115:14, 115:21, 117:7, 125:14, 136:24, 137:14
**participant** [1] - 13:20
**participate** [2] - 12:6, 12:11
**participated** [3] - 13:12, 114:24, 115:1
**particular** [4] - 8:22, 63:4, 109:4, 145:16
**particularly** [1] - 12:15
**partner** [1] - 116:11
**parts** [4] - 30:11, 39:6, 39:8, 48:2
**pass** [5] - 37:14, 91:21, 99:6, 99:12,

114:11
**passed** [1] - 11:12
**passenger** [11] - 10:13, 35:8, 36:13, 38:1, 46:15, 89:6, 90:8, 90:10, 126:21, 126:23, 134:1
**passengers** [3] - 74:20, 132:10, 147:1
**past** [2] - 29:16, 53:21
**pasture** [2] - 118:8, 135:23
**pastures** [1] - 136:7
**path** [3] - 63:3, 89:9, 90:3
**patterns** [1] - 31:11
**pause** [2] - 4:11, 11:16
**pausing** [1] - 149:14
**pavement** [1] - 136:4
**pedal** [2] - 16:10, 55:12
**pedestrian** [1] - 17:18
**people** [38] - 5:8, 8:11, 8:21, 11:20, 12:2, 12:9, 12:10, 12:23, 13:2, 14:2, 15:15, 16:3, 16:12, 16:13, 17:16, 17:25, 19:5, 24:3, 26:14, 28:22, 30:9, 32:15, 33:9, 48:15, 50:6, 50:7, 51:15, 51:25, 54:2, 69:19, 75:17, 78:10, 92:1, 92:21, 114:15, 115:2, 141:2, 145:16
**people's** [1] - 144:6
**per** [10] - 33:7, 62:16, 95:22, 95:23, 120:20, 120:22, 121:15, 122:10, 122:11, 122:16
**percent** [10] - 34:9, 34:15, 52:11, 52:14, 52:15, 67:2, 148:15, 148:20, 148:21, 148:22
**percentile** [1] - 88:10
**perfectly** [2] - 47:14, 134:19
**perform** [6] - 26:25, 27:23, 64:22, 69:17, 73:2, 133:18
**performance** [3] - 100:8, 100:19, 101:2
**performed** [2] - 59:11, 78:12
**perhaps** [1] - 73:7
**period** [4] - 18:15, 59:25, 121:15, 122:15

**permit** [1] - 93:17
**permits** [1] - 25:17
**person** [3] - 55:11, 83:23, 128:9
**personal** [2] - 14:17, 68:8
**personally** [3] - 24:24, 27:18, 109:2
**personnel** [1] - 115:11
**perspective** [2] - 45:4, 86:17
**photograph** [8] - 33:17, 45:22, 46:6, 49:14, 71:6, 109:18, 132:15, 132:20
**photographically** [1] - 109:17
**photographs** [2] - 53:8, 58:15
**photos** [1] - 30:5
**physical** [3] - 19:7, 52:4, 121:24
**physics** [1] - 41:21
**pi** [1] - 121:8
**pick** [1] - 4:18
**picked** [1] - 88:20
**picking** [1] - 58:6
**pickup** [2] - 28:18, 52:25
**picture** [6] - 17:25, 35:11, 35:24, 65:21, 71:10, 90:15
**pictures** [1] - 53:9
**piece** [6] - 36:16, 38:5, 38:12, 39:5, 63:8, 85:18
**pieces** [1] - 11:10
**pillar** [24] - 35:5, 35:7, 35:10, 35:21, 36:12, 36:20, 47:8, 49:16, 58:14, 59:16, 85:1, 85:4, 85:6, 85:9, 85:11, 129:12, 131:8, 132:8, 132:15, 132:18, 132:24, 133:10, 138:6
**pin** [1] - 143:12
**pipe** [1] - 38:5
**pitch** [3] - 84:25, 87:15, 87:17
**place** [6] - 9:2, 65:22, 72:10, 73:25, 84:6, 86:9
**placed** [1] - 71:4
**places** [1] - 51:19
**plaintiff** [1] - 4:3
**PLAINTIFFS** [1] - 1:18
**plaintiffs'** [1] - 4:5
**plastic** [1] - 71:14

**plate** [1] - 47:12
**platform** [1] - 118:2
**play** [3] - 18:19, 18:24, 36:5
**played** [5] - 73:17, 73:23, 74:5, 74:12, 74:16
**Plaza** [1] - 2:4
**pleadings** [1] - 134:11
**PLLC** [1] - 2:7
**plot** [2] - 58:14, 63:5
**plus** [2] - 127:13
**point** [23] - 13:22, 29:7, 32:5, 35:6, 41:13, 47:21, 78:17, 104:23, 117:18, 117:19, 118:1, 119:17, 120:3, 121:5, 138:7, 138:9, 138:12, 138:16, 140:15, 144:16, 149:10, 149:13, 149:17
**pointed** [1] - 89:14
**pointing** [3] - 35:13, 46:19, 71:22
**points** [2] - 37:19, 142:5
**Pontiac** [1] - 86:11
**pop** [1] - 86:18
**popping** [1] - 86:16
**portion** [3] - 62:2, 62:4, 146:16
**position** [6] - 46:15, 48:20, 75:13, 75:15, 87:22, 119:9
**positioned** [3] - 48:5, 83:24, 88:11
**positions** [1] - 23:24
**possible** [1] - 40:3
**posted** [1] - 11:25
**potential** [1] - 83:7
**pothole** [4] - 69:24, 70:7, 95:9, 95:25
**pounds** [12] - 42:18, 42:21, 71:16, 71:17, 88:10, 126:23, 127:1, 127:8, 127:12, 127:13, 142:17, 143:16
**practice** [4] - 6:7, 7:19, 12:5, 22:8
**Practices** [1] - 22:1
**practices** [4] - 15:4, 15:8, 21:18, 54:2
**predicate** [3] - 21:9, 67:8, 122:23
**prediction** [1] - 149:19
**preface** [1] - 27:21
**preliminary** [1] - 61:16

**preparation** [1] - 104:21
**prepared** [1] - 95:7
**present** [2] - 4:4, 150:8
**presentations** [1] - 13:3
**pretty** [23] - 9:9, 9:19, 12:20, 13:20, 23:24, 32:5, 32:9, 32:11, 33:8, 37:19, 48:13, 48:19, 57:14, 63:14, 66:17, 66:21, 69:5, 69:9, 119:12, 128:20, 138:4, 138:5, 138:15
**prevalent** [1] - 11:24
**preventing** [1] - 17:25
**prevents** [1] - 130:23
**preview** [1] - 54:14
**previous** [1] - 108:18
**primarily** [1] - 105:19
**primary** [2] - 86:13, 86:15
**principal** [6] - 6:3, 20:22, 60:15, 60:19, 102:21, 103:6
**principals** [1] - 102:23
**principles** [2] - 7:2, 7:16
**print** [1] - 60:5
**problem** [3] - 15:18, 98:7, 102:18
**proceed** [2] - 94:23, 99:13
**Proceedings** [1] - 93:4
**proceedings** [2] - 2:14, 150:16
**process** [7] - 7:12, 11:22, 16:6, 16:12, 26:7, 32:14, 59:21
**produce** [1] - 125:6
**produced** [3] - 2:15, 108:23, 139:15
**product** [4] - 9:10, 9:12, 26:11, 26:16
**products** [4] - 8:16, 9:14, 26:2, 106:3
**Professional** [1] - 99:24
**professional** [2] - 8:5, 15:17
**progressed** [1] - 108:20
**project** [4] - 16:20, 30:1, 45:24, 54:19
**projects** [2] - 26:25, 27:19
**proper** [6] - 15:9, 41:1,

41:9, 47:23, 80:25, 81:21
**property** [8] - 58:7, 61:21, 63:8, 63:19, 66:12, 68:23, 72:2, 72:6
**proponents** [1] - 17:23
**proposed** [1] - 87:6
**pros** [2] - 83:7, 83:15
**protection** [6] - 53:3, 82:3, 129:6, 145:22, 147:13, 147:15
**protective** [6] - 129:14, 129:18, 135:8, 147:18, 147:19
**provide** [7] - 10:15, 25:8, 47:13, 56:9, 61:17, 96:23, 147:12
**provided** [8] - 30:4, 47:9, 62:5, 103:5, 117:6, 123:21, 123:23, 146:20
**provides** [3] - 46:20, 97:6, 147:3
**provision** [2] - 22:18, 147:25
**provisions** [2] - 25:6, 25:18
**prudent** [1] - 93:17
**public** [4] - 12:2, 12:16, 12:24, 99:18
**publications** [1] - 21:25
**published** [2] - 10:25, 136:18
**pull** [23] - 4:16, 5:18, 21:3, 30:14, 45:17, 49:10, 49:11, 49:21, 54:9, 55:25, 58:9, 70:16, 70:19, 78:4, 90:14, 102:13, 109:15, 122:18, 134:21, 139:8, 140:1, 141:15, 143:2
**pulled** [3] - 93:14, 109:13, 146:11
**purchase** [1] - 51:9
**purchased** [2] - 55:17, 56:7
**purple** [1] - 10:10
**Purpose** [9] - 10:3, 10:14, 11:4, 11:8, 12:22, 13:8, 24:10, 24:18, 29:2
**purpose** [17] - 10:9, 10:12, 10:16, 12:16, 13:17, 14:18, 26:18, 51:8, 82:2, 82:13,

82:20, 83:25, 105:15, 105:18, 107:5, 125:11, 135:12
**purposes** [4] - 34:21, 39:16, 56:21, 135:13
**push** [1] - 86:8
**pushing** [2] - 16:10, 66:22
**put** [29] - 11:7, 11:10, 16:9, 23:16, 33:11, 36:18, 51:18, 51:19, 59:14, 62:7, 65:24, 71:16, 71:18, 72:14, 78:23, 83:20, 87:20, 87:21, 87:22, 88:9, 113:12, 117:17, 122:25, 125:20, 139:3, 139:17, 144:17, 145:11, 145:16
**putting** [4] - 55:9, 130:23, 145:5, 148:13
**puzzle** [1] - 11:10

## Q

**qualified** [1] - 20:18
**quarter** [2] - 79:1, 79:5
**questions** [10] - 43:6, 47:15, 61:16, 93:12, 93:18, 94:2, 94:15, 101:22, 102:2, 118:14
**quickly** [4] - 19:11, 21:2, 60:11, 93:7
**quote** [1] - 140:16

## R

**radius** [7] - 76:17, 77:1, 77:3, 119:23, 120:24, 121:5, 124:19
**raise** [1] - 4:12
**raised** [3] - 130:18, 146:5, 146:18
**ranch** [2] - 57:5, 66:23
**ranches** [1] - 56:8
**range** [6] - 6:11, 8:12, 32:11, 66:15, 66:16, 136:22
**ranged** [1] - 75:21
**rarely** [1] - 66:24
**rate** [7] - 75:16, 121:18, 121:19, 122:11, 122:12, 122:14, 122:17
**rather** [1] - 36:17

**rating** [3] - 142:16, 142:23, 143:16
**reach** [2] - 38:2, 48:10
**reached** [2] - 38:20, 95:25
**reaching** [1] - 57:21
**reaction** [1] - 16:5
**read** [6] - 53:5, 95:10, 115:19, 121:25, 137:3, 146:16
**ready** [2] - 94:13, 94:23
**real** [4] - 60:10, 93:7, 138:24, 139:3
**realize** [2] - 39:15, 85:10
**really** [6] - 34:17, 64:8, 75:19, 88:12, 96:22, 137:1
**realm** [1] - 149:20
**rear** [11] - 37:9, 55:5, 75:13, 75:14, 84:4, 87:16, 126:23, 129:6, 132:9, 132:10, 133:25
**rear-occupant** [1] - 129:6
**rear-seat** [1] - 84:4
**reason** [1] - 130:3
**reasonable** [6] - 81:17, 82:19, 96:9, 97:24, 99:10, 119:3
**reasonably** [4] - 47:23, 80:20, 81:19, 82:1
**rebounding** [1] - 118:8
**receive** [5] - 85:14, 85:21, 89:2, 89:8, 90:13
**received** [8] - 6:21, 7:3, 85:3, 98:14, 107:10, 108:9, 108:12
**recently** [2] - 61:16, 61:25
**recessed** [1] - 93:4
**recognize** [1] - 132:18
**recognizing** [1] - 39:5
**recollection** [2] - 116:19, 133:1
**recommend** [1] - 135:11
**recommended** [4] - 12:5, 15:4, 21:18, 22:8
**Recommended** [1] - 22:1
**reconstruction** [15] - 18:6, 18:7, 18:17,

19:1, 19:15, 20:13, 20:19, 29:12, 29:13, 84:10, 84:14, 97:23, 100:18, 105:19, 106:1
**Reconstructionists** [1] - 18:5
**record** [7] - 4:25, 61:13, 70:13, 70:18, 77:6, 81:15, 150:16
**recorded** [4] - 2:14, 60:2, 73:4, 109:16
**recording** [1] - 73:15
**recreation** [7] - 135:18, 136:17, 136:20, 136:25, 137:9
**recreational** [5] - 105:18, 106:3, 135:13, 135:17, 137:6
**red** [2] - 16:7, 18:13
**redesigned** [1] - 31:17
**reduces** [1] - 135:8
**refer** [4] - 6:10, 8:9, 53:11, 126:4
**reference** [3] - 35:6, 96:4, 137:14
**referred** [4] - 28:15, 28:21, 69:23, 137:6
**referring** [7] - 35:13, 37:5, 51:2, 53:25, 54:3, 69:23, 87:7
**refers** [1] - 6:3
**reflecting** [1] - 75:10
**regard** [3] - 72:9, 72:12, 137:18
**regarding** [1] - 8:16
**regardless** [1] - 69:12
**region** [1] - 33:24
**regions** [2] - 31:1, 31:3
**regular** [2] - 8:23, 54:24
**relate** [3] - 8:18, 9:13, 22:11
**related** [5] - 7:18, 25:22, 26:18, 31:11, 129:21
**relates** [2] - 23:20, 28:1
**relating** [1] - 150:2
**relationship** [3] - 11:3, 11:5, 68:21
**relatively** [3] - 18:9, 70:3, 82:13
**release** [2] - 86:5, 88:13
**relevance** [4] - 61:3, 106:17, 106:23,

133:11
**relevancy** [1] - 99:20
**relevant** [3] - 15:7, 25:19, 100:4
**relied** [1] - 125:13
**relying** [1] - 92:23
**remember** [9] - 102:10, 116:23, 137:17, 137:19, 142:19, 148:4, 149:24, 149:25, 150:1
**remind** [1] - 145:11
**reminder** [1] - 145:2
**reminders** [2] - 145:2, 145:6
**reminding** [1] - 145:16
**repeat** [1] - 97:3
**rephrase** [8] - 21:22, 24:4, 50:22, 67:25, 68:2, 79:20, 81:1, 81:13
**report** [36] - 30:4, 40:12, 40:15, 40:21, 40:22, 41:4, 41:7, 53:12, 91:3, 91:5, 91:7, 92:16, 92:22, 92:24, 93:2, 95:8, 102:7, 103:16, 104:2, 104:8, 104:10, 104:11, 104:13, 104:21, 108:10, 108:23, 117:4, 117:6, 117:9, 117:11, 117:17, 119:7, 137:7, 137:10, 137:11, 137:14
**REPORTER** [2] - 2:11, 20:6
**REPORTER'S** [1] - 150:13
**reports** [4] - 19:18, 53:8, 134:10
**reposition** [1] - 97:7
**represent** [1] - 71:7
**representative** [1] - 13:23
**request** [1] - 27:1
**require** [2] - 33:14, 45:10
**required** [7] - 7:16, 42:22, 65:5, 65:7, 130:9, 130:11, 148:16
**requirement** [2] - 7:22, 140:5
**requirements** [12] - 22:11, 23:3, 23:11, 34:4, 34:8, 34:10,

47:18, 47:19, 82:19, 140:19, 143:17, 148:10
**requires** [5] - 33:8, 34:13, 60:20, 146:24, 148:18
**research** [10] - 5:9, 6:4, 6:6, 11:8, 12:3, 16:20, 19:9, 26:25, 67:12, 149:25
**resistance** [1] - 47:13
**respect** [1] - 56:5
**respects** [1] - 23:5
**Response** [1] - 75:1
**response** [4] - 24:23, 67:5, 74:25, 89:23
**rest** [5] - 7:23, 15:12, 19:10, 75:7, 85:2
**rested** [1] - 4:3
**restrains** [1] - 131:7
**restraint** [12] - 46:18, 46:25, 47:10, 48:11, 90:12, 131:4, 131:5, 131:9, 132:9, 132:25, 133:9
**restraints** [7] - 22:21, 22:24, 55:6, 133:23, 147:25
**restricting** [1] - 83:2
**rests** [1] - 131:6
**result** [5] - 39:23, 39:24, 84:24, 97:22, 141:3
**resulted** [1] - 36:19
**resume** [1] - 99:23
**retain** [1] - 46:12
**retained** [5] - 17:5, 29:21, 29:22, 100:16, 100:21
**retaining** [1] - 23:1
**retention** [26] - 22:12, 22:16, 22:22, 23:2, 23:11, 26:10, 30:9, 45:15, 46:5, 46:9, 46:11, 47:17, 47:22, 48:1, 50:1, 50:9, 80:18, 82:17, 82:18, 97:12, 97:15, 98:11, 144:9, 144:13, 145:22, 146:15
**retirement** [1] - 25:15
**review** [1] - 132:24
**reviewed** [7] - 30:3, 68:10, 115:21, 134:6, 137:5, 140:16
**reviewing** [1] - 14:3
rhogan@hoganfirm. com [1] - 1:25
**Richard** [2] - 1:22, 2:2
**Rick** [1] - 54:18

**ride** [3] - 54:6, 63:4, 139:3
**rider** [1] - 87:14
**riders** [1] - 46:16
**riding** [11] - 55:22, 61:21, 63:18, 65:10, 66:21, 67:20, 68:22, 69:16, 69:17, 69:21, 135:23
**rigged** [1] - 126:12
**rights** [1] - 99:18
**rise** [1] - 94:18
**risk** [3] - 135:9, 149:4, 149:6
**RMR** [2] - 2:12, 150:20
rmueller@ thompsoncoburn. com [1] - 2:5
**road** [16] - 25:3, 25:12, 25:13, 25:14, 25:19, 28:8, 28:9, 56:14, 66:19, 106:11, 136:1, 136:8, 136:10, 136:12, 136:14
**robust** [1] - 25:9
**rode** [2] - 66:11, 69:12
**ROHVA** [7] - 113:15, 141:18, 141:24, 143:18, 144:11, 146:10, 147:20
**role** [2] - 36:5, 38:17
**roles** [2] - 9:25, 46:1
**roll** [21] - 31:6, 31:14, 32:7, 32:13, 32:18, 33:15, 33:19, 33:25, 35:20, 39:6, 46:21, 52:8, 79:14, 79:24, 80:8, 84:25, 87:15, 87:18, 88:13, 143:21
**rolled** [3] - 69:12, 77:18, 119:20
**rolling** [4] - 54:12, 79:12, 149:4, 149:6
**rollover** [6] - 84:5, 98:1, 98:5, 98:7, 129:14, 129:17
**Room** [1] - 2:12
**room** [2] - 12:10, 150:5
**roots** [1] - 15:1
**ROPS** [9] - 37:6, 37:18, 37:23, 38:18, 60:20, 129:14, 130:9, 130:14, 140:4
**ROSENTHAL** [1] - 1:13
**rotation** [2] - 76:2, 76:5
**roughly** [1] - 36:23

**roundhouse** [1] - 93:11
**routine** [1] - 56:21
**routing** [2] - 144:25, 145:1
**ROV** [3] - 141:22, 142:5, 143:17
**row** [1] - 85:10
**RPR** [1] - 150:20
**ruled** [1] - 100:3
**Run** [5] - 73:17, 73:23, 74:5, 74:12, 74:16
**run** [4] - 15:8, 56:18, 73:1, 73:11
**running** [2] - 139:12, 139:17
**runs** [16] - 47:1, 61:20, 62:19, 63:21, 64:11, 64:15, 73:2, 74:2, 75:7, 75:9, 75:12, 75:18, 75:23, 76:10, 77:5, 77:13
**Rusk** [1] - 2:12

## S

**SAE** [51] - 8:9, 8:11, 8:18, 8:20, 9:5, 9:6, 9:11, 9:21, 10:20, 11:18, 14:10, 14:11, 15:14, 21:7, 21:19, 21:25, 22:7, 23:6, 23:19, 23:24, 23:25, 24:7, 25:7, 27:15, 30:18, 30:23, 31:2, 34:3, 46:8, 47:16, 60:20, 65:1, 65:2, 65:5, 65:7, 78:20, 78:21, 78:22, 79:9, 82:15, 82:19, 83:10, 114:16, 114:22, 129:20, 129:21, 130:10, 130:22, 139:19, 140:6
**safe** [4] - 47:24, 80:20, 81:19, 82:2
**safer** [1] - 130:23
**Safety** [7] - 24:25, 26:20, 139:20, 139:22, 139:23, 140:7, 140:12
**safety** [5] - 9:14, 15:21, 96:24, 99:18, 147:1
**samples** [1] - 52:4
**sand** [1] - 136:23
**sat** [1] - 75:13
**satellite** [1] - 63:8
**save** [1] - 120:16
**saw** [10] - 15:18,

36:24, 53:12, 69:6,
69:11, 73:21, 75:11,
95:8, 130:1, 130:16
**scale** [5] - 95:13,
95:15, 95:16, 109:10
**scene** [8] - 30:2, 70:5,
70:7, 72:1, 109:7,
115:15, 116:4,
134:17
**school** [2] - 7:4, 16:20
**science** [2] - 19:8,
38:4
**Science** [1] - 6:21
**scientific** [1] - 16:3
**scientists** [1] - 17:17
**scope** [1] - 89:19
**Scott** [1] - 1:19
**scott@westfirm.com**
[1] - 1:21
**screen** [1] - 120:17
**scrub** [1] - 56:25
**sealing** [1] - 52:23
**searching** [1] - 52:5
**seat** [26] - 45:25, 46:3,
46:13, 46:17, 47:9,
48:24, 52:9, 55:5,
55:19, 58:4, 71:16,
71:17, 84:4, 87:16,
88:19, 89:6, 90:8,
90:10, 132:9,
132:10, 132:17,
133:12, 139:3,
144:13
**seatbelt** [23] - 17:23,
31:14, 32:7, 33:15,
33:25, 46:11, 46:12,
48:13, 55:5, 55:9,
133:6, 138:22,
139:4, 144:21,
145:2, 145:5, 145:7,
145:11, 148:6, 148:8
**seatbelts** [15] - 9:17,
17:20, 22:19, 26:10,
31:7, 32:13, 32:18,
33:18, 52:8, 54:24,
127:25, 141:3,
144:23, 145:16,
148:1
**seated** [2] - 4:2, 94:20
**seater** [2] - 55:14,
55:15
**seating** [1] - 142:10
**seats** [3] - 17:20, 65:8,
85:11
**second** [17] - 44:13,
61:12, 81:14, 84:3,
87:7, 95:22, 95:23,
95:25, 120:20,
120:22, 121:15,
122:10, 122:11,

122:16, 137:16
**secondary** [1] - 86:13
**secondly** [2] - 46:14,
47:20
**seconds** [4] - 18:10,
18:20, 62:14, 63:6
**secret** [1] - 11:18
**section** [6] - 30:21,
37:5, 37:7, 37:10,
37:23
**see** [61] - 10:2, 18:2,
18:22, 27:5, 36:20,
39:12, 39:25, 46:8,
46:9, 46:16, 49:19,
50:9, 50:10, 52:5,
53:14, 56:22, 57:23,
58:19, 62:17, 62:19,
63:9, 64:4, 64:7,
65:22, 71:5, 71:8,
73:8, 74:9, 76:19,
80:14, 84:6, 85:1,
90:10, 107:23,
115:6, 115:22,
116:1, 116:25,
117:4, 117:7,
117:10, 118:24,
120:17, 122:1,
122:2, 122:5,
123:12, 124:13,
125:24, 127:9,
127:17, 132:17,
132:20, 132:25,
137:7, 138:20,
140:8, 141:19,
142:4, 144:9
**seeing** [2] - 33:18,
73:8
**seek** [3] - 115:10,
116:4, 134:2
**seizing** [1] - 9:16
**sell** [2] - 50:25, 53:1
**send** [1] - 12:16
**sense** [2] - 6:19, 56:4
**sent** [2] - 11:25, 109:5
**September** [5] -
101:14, 103:9,
104:7, 108:14, 134:8
**sequence** [1] - 119:17
**series** [1] - 71:5
**served** [1] - 9:23
**Service** [2] - 13:16,
13:22
**set** [4] - 14:11, 59:4,
66:2, 99:23
**setting** [3] - 25:12,
26:21, 56:14
**setup** [1] - 58:4
**seven** [4] - 40:21,
102:9, 103:15,
104:16

**several** [7] - 20:10,
48:1, 48:2, 64:2,
108:19, 129:21,
146:11
**shaded** [2] - 146:18,
146:20
**shall** [2] - 99:17,
146:20
**shape** [3] - 37:8, 72:4,
150:2
**shell** [1] - 52:21
**shifting** [1] - 16:9
**shock** [1] - 118:7
**shoot** [1] - 70:13
**short** [4] - 18:10,
18:15, 50:3, 56:19
**shorter** [1] - 46:21
**shots** [1] - 56:5
**shoulder** [18] - 50:12,
59:19, 82:24, 83:2,
83:11, 83:17, 84:6,
87:6, 87:11, 87:23,
87:24, 88:3, 88:7,
88:18, 88:25, 98:25,
144:19, 147:4
**shoulders** [1] - 147:14
**show** [13] - 12:18,
18:20, 46:6, 51:5,
56:5, 58:16, 71:10,
72:24, 92:22, 93:1,
95:1, 102:11, 132:21
**showed** [1] - 138:19
**showing** [6] - 54:23,
55:9, 55:10, 56:20,
58:5, 80:3
**shown** [2] - 49:15,
146:18
**shows** [2] - 58:12,
132:8
**side** [17] - 26:15,
28:25, 35:5, 35:19,
35:25, 36:13, 71:6,
105:9, 109:13,
126:18, 128:24,
128:25, 132:24,
133:10, 133:18
**side-by-side** [2] -
26:15, 105:9
**side-by-sides** [1] -
28:25
**sidebar** [1] - 21:21
**sides** [2] - 28:25,
130:24
**sideways** [3] - 31:22,
121:20, 121:22
**sightseeing** [1] -
136:21
**signals** [1] - 25:18
**significance** [3] -
66:11, 66:13, 68:23

**significantly** [1] -
96:18
**similar** [15] - 26:5,
26:22, 30:6, 49:9,
53:1, 54:15, 54:16,
54:25, 58:16, 70:4,
70:6, 72:7, 75:12,
83:20, 146:5
**simply** [1] - 94:1
**simulate** [1] - 74:19
**sit** [2] - 48:20, 48:23
**site** [3] - 51:22, 55:10,
109:1
**sits** [1] - 28:6
**sitting** [8] - 35:9,
45:25, 46:3, 78:16,
88:19, 90:8, 133:12,
149:6
**situation** [4] - 84:7,
106:12, 117:21,
137:1
**situations** [2] - 26:23,
114:10
**six** [1] - 122:21
**Six** [1] - 1:20
**size** [4] - 70:6, 72:5,
88:2, 92:19
**skip** [5] - 19:10, 23:13,
23:14, 84:11, 142:12
**skipped** [1] - 84:8
**slam** [2] - 86:7, 86:9
**slid** [1] - 121:22
**slide** [4] - 77:25, 78:2,
84:23, 128:3
**sliding** [4] - 121:20,
122:4, 122:7, 122:15
**slip** [1] - 47:14
**slope** [1] - 149:8
**slow** [2] - 32:5, 57:17
**small** [5] - 25:1, 37:13,
39:11, 54:17, 77:10
**smaller** [1] - 55:15
**snow** [1] - 51:17
**Society** [6] - 8:7, 8:8,
15:25, 16:18, 18:4,
99:24
**soft** [1] - 56:15
**sold** [1] - 52:16
**someone** [4] - 13:16,
13:21, 20:15, 88:20
**sometimes** [8] - 19:8,
25:2, 70:10, 72:16,
72:17, 74:10, 74:11
**somewhere** [3] - 11:2,
135:8, 142:20
**son** [8] - 46:2, 46:3,
48:23, 49:4, 55:8,
109:5, 109:10, 129:4
**son's** [2] - 132:16,
134:17

**sorry** [19] - 15:18,
45:18, 59:1, 59:5,
68:1, 68:3, 68:13,
79:17, 81:10, 95:3,
107:20, 107:24,
120:1, 121:9, 126:1,
127:19, 134:22,
135:25, 143:10
**sort** [15] - 7:18, 9:10,
17:25, 52:2, 52:6,
54:13, 56:20, 56:21,
56:23, 57:7, 58:14,
73:10, 84:22, 89:12,
136:22
**sound** [1] - 115:18
**sounded** [1] - 69:22
**sounds** [2] - 101:12,
105:4
**source** [1] - 148:22
**SOUTHERN** [1] - 1:1
**Special** [12] - 10:2,
10:14, 11:4, 11:8,
12:22, 13:8, 14:6,
14:9, 14:13, 24:10,
24:18, 29:2
**special** [13] - 10:9,
10:10, 10:12, 10:16,
12:15, 13:17, 14:18,
26:18, 51:8, 105:12,
105:14, 105:18,
107:5
**specialty** [1] - 14:14
**specific** [1] - 129:17
**specifically** [3] -
22:18, 115:25,
119:16
**specifications** [4] -
23:3, 142:21,
142:22, 143:1
**speculation** [1] - 24:3
**speed** [14] - 23:20,
32:10, 33:4, 41:23,
42:4, 42:14, 57:13,
57:17, 62:16, 70:11,
73:15, 82:14,
113:12, 113:14
**speeds** [2] - 64:12,
70:11
**spend** [1] - 15:20
**spent** [3] - 19:23,
26:8, 107:4
**spoken** [1] - 116:18
**sporty** [2] - 26:8,
26:12
**sporty-type** [1] - 26:8
**spot** [1] - 57:10
**spring** [2] - 86:7,
86:11
**squared** [2] - 28:15,
41:24

**squiggly** [1] - 62:11
**St** [1] - 2:4
**stability** [17] - 31:21, 31:22, 32:17, 32:22, 33:7, 34:4, 34:7, 34:8, 34:9, 64:23, 65:8, 80:17, 82:2, 82:8, 82:10, 82:12, 148:24
**stable** [20] - 31:8, 31:13, 31:16, 31:18, 31:23, 32:1, 32:2, 32:5, 32:9, 32:12, 33:13, 34:11, 65:19, 66:7, 79:9, 128:24, 141:10, 148:15, 148:19, 148:22
**staff** [1] - 15:17
**stages** [1] - 48:2
**stamping** [1] - 7:20
**stand** [4] - 4:9, 4:16, 94:23, 135:15
**standard** [59] - 10:20, 10:24, 11:7, 11:9, 11:12, 11:14, 12:5, 15:10, 21:8, 21:13, 22:8, 22:9, 22:17, 23:6, 23:12, 23:20, 24:20, 24:23, 24:24, 25:4, 25:8, 25:9, 26:13, 27:15, 30:19, 30:21, 30:23, 31:2, 33:7, 33:8, 34:2, 47:5, 47:16, 47:18, 48:13, 82:19, 106:12, 106:14, 113:25, 114:1, 114:6, 114:11, 129:17, 130:10, 130:22, 139:21, 141:18, 146:6, 146:9, 146:10, 146:15, 146:24, 147:3, 147:6, 147:12, 147:20, 148:7, 148:13
**Standard** [3] - 25:1, 140:7, 140:13
**standards** [30] - 5:8, 8:15, 8:18, 8:20, 8:23, 9:11, 9:13, 9:17, 10:15, 13:25, 15:3, 15:21, 21:18, 29:3, 65:1, 65:2, 82:15, 113:15, 114:9, 114:14, 114:16, 129:20, 129:21, 139:19, 143:18, 144:11, 146:11, 146:12

**Standards** [4] - 22:5, 139:20, 139:22, 139:23
**standpoint** [19] - 7:20, 14:11, 28:5, 30:10, 38:4, 47:16, 47:20, 48:7, 69:15, 82:3, 82:10, 82:15, 96:5, 96:24, 97:6, 97:12, 98:10, 98:25, 131:9
**stands** [2] - 135:3, 135:4
**start** [10] - 20:9, 21:9, 32:16, 54:13, 56:3, 66:4, 69:1, 76:19, 88:12, 117:19
**started** [3] - 27:12, 73:10, 77:25
**starts** [4] - 84:23, 84:24
**state** [2] - 4:25, 17:21
**statement** [1] - 101:5
**statements** [1] - 24:19
**states** [1] - 7:22
**STATES** [2] - 1:1, 1:14
**static** [4] - 117:21, 117:23, 118:4, 148:24
**statically** [1] - 87:14
**stationary** [1] - 128:20
**statistics** [2] - 105:20, 106:1
**stay** [4] - 99:21, 102:1, 131:10, 150:5
**stays** [1] - 65:25
**steal** [1] - 78:21
**steel** [3] - 36:16, 59:13, 86:7
**steer** [4] - 74:9, 75:24, 76:1
**steering** [8] - 70:12, 72:16, 73:14, 73:15, 76:7, 77:7, 142:7
**stenography** [1] - 2:14
**step** [4] - 7:14, 73:3, 90:23, 114:20
**steps** [4] - 7:13, 19:2, 114:18, 114:19
**stick** [1] - 37:4
**stiffer** [1] - 38:9
**stiffness** [1] - 46:20
**still** [11] - 65:19, 78:16, 81:20, 101:22, 106:10, 106:11, 118:3, 118:21, 123:8, 149:7, 149:20
**stock** [1] - 52:17
**stop** [2] - 75:3, 78:24
**stopping** [3] - 149:10,

149:13, 149:16
**stops** [1] - 47:1
**stored** [1] - 5:23
**straddling** [1] - 74:24
**straight** [4] - 36:3, 36:6, 36:17, 121:20
**strapped** [1] - 128:23
**straps** [1] - 144:20
**Street** [1] - 2:3
**strength** [3] - 30:11, 38:6, 49:5
**strictly** [1] - 25:11
**strike** [2] - 50:17, 92:4
**strong** [1] - 77:17
**structural** [2] - 38:7, 46:20
**structure** [15] - 14:11, 35:20, 37:18, 38:5, 38:11, 38:18, 39:2, 39:7, 43:1, 46:23, 49:17, 51:10, 59:13, 129:15, 129:18
**strut** [1] - 38:14
**studies** [1] - 80:16
**study** [2] - 16:25, 29:5
**studying** [1] - 27:8
**stuff** [7] - 20:13, 28:5, 28:7, 56:24, 58:6, 115:12, 135:19
**subject** [4] - 30:12, 49:15, 63:18, 66:12
**submit** [2] - 12:6
**substantially** [1] - 75:10
**sufficient** [3] - 68:12, 68:14, 131:8
**Sugar** [1] - 1:20
**suggestion** [1] - 137:9
**suggestions** [1] - 83:4
**suit** [1] - 77:17
**suitable** [3] - 47:23, 97:16, 146:20
**Suite** [3] - 1:20, 1:23, 2:8
**summary** [2] - 81:7, 84:22
**Sunday** [1] - 101:16
**support** [2] - 38:11, 47:8
**supported** [1] - 37:24
**supports** [1] - 138:3
**supposed** [3] - 7:20, 18:25, 78:24
**Surface** [1] - 22:4
**surface** [3] - 47:11, 47:14, 122:7
**surfaces** [2] - 56:15
**survey** [6] - 50:5, 51:24, 52:1, 53:4, 53:18, 54:3

**Susan** [1] - 55:17
**suspension** [3] - 136:10, 136:11, 136:13
**sustain** [2] - 50:18, 50:21
**switch** [1] - 132:12
**switching** [1] - 149:15
**sworn** [3] - 4:12, 4:13, 4:20
**system** [8] - 22:22, 23:1, 30:9, 48:1, 50:2, 97:15, 130:9, 145:22
**systematic** [1] - 52:7
**Systems** [1] - 5:4
**systems** [5] - 26:10, 50:9, 144:9, 144:13, 146:15

# T

**table** [20] - 31:23, 64:22, 64:25, 65:13, 65:25, 78:8, 78:23, 79:5, 80:7, 88:11, 117:23, 118:4, 126:5, 127:3, 127:5, 128:3, 129:1, 144:20, 148:16
**tail** [1] - 138:1
**talks** [1] - 145:21
**taped** [1] - 126:9
**tasks** [1] - 16:9
**teach** [1] - 19:14
**team** [1] - 30:2
**technical** [9] - 8:11, 8:16, 8:21, 10:15, 12:12, 15:4, 18:7, 19:18, 68:9
**TECHNICIAN** [4] - 72:21, 72:23, 122:21, 127:19
**technology** [1] - 14:17
**teeter** [2] - 117:24, 137:22
**Tel** [5] - 1:21, 1:24, 2:5, 2:9, 2:13
**ten** [4] - 91:9, 93:12, 106:16, 134:20
**tending** [2] - 58:6
**tenths** [2] - 66:24, 67:2
**term** [6] - 10:11, 26:12, 28:18, 51:6, 137:10
**terminology** [3] - 22:7, 28:15, 76:12
**terms** [7] - 7:19, 16:12, 16:14, 17:18,

17:19, 19:6, 26:11, 26:15, 41:23, 48:8, 48:20, 49:16, 65:12, 67:3, 75:16, 76:13, 86:16, 99:3, 114:7, 122:17
**terrain** [2] - 10:17, 136:24
**test** [40] - 7:16, 7:17, 7:18, 9:11, 9:18, 28:7, 28:8, 36:18, 41:5, 44:19, 59:11, 59:14, 59:17, 65:5, 65:13, 71:3, 73:2, 74:8, 78:8, 78:12, 78:20, 78:21, 78:22, 78:23, 78:24, 79:2, 79:9, 80:3, 80:6, 80:7, 88:12, 90:5, 96:7, 118:4, 126:12, 128:21, 129:1, 140:24, 141:7
**tested** [8] - 25:10, 31:23, 39:7, 58:16, 129:18, 129:22, 144:20, 144:23
**tester** [1] - 92:7
**testified** [3] - 4:20, 92:14, 105:8
**testify** [2] - 4:16, 92:13
**testifying** [3] - 17:3, 29:15, 92:15
**TESTIMONY** [1] - 1:15
**testimony** [18] - 11:17, 44:20, 50:20, 57:23, 69:11, 89:20, 92:4, 92:20, 93:14, 95:11, 137:15, 137:18, 138:2, 138:18, 141:7, 144:1, 144:7, 148:23
**testing** [30] - 5:9, 19:9, 27:23, 28:2, 28:10, 28:11, 28:12, 28:13, 28:23, 28:24, 30:7, 30:8, 40:16, 45:23, 54:6, 54:8, 58:12, 60:20, 63:23, 64:22, 64:25, 67:12, 68:8, 70:14, 82:6, 126:5, 139:15, 141:4
**tests** [4] - 72:10, 72:14, 96:6, 126:9
**TEXAS** [1] - 1:1
**Texas** [6] - 1:4, 1:20, 1:24, 2:8, 2:13, 5:20
**THE** [98] - 1:1, 1:1, 1:13, 1:18, 2:1, 4:2, 4:10, 4:14, 4:15, 20:6, 21:22, 24:4,

34:22, 37:15, 40:8, 40:24, 41:2, 41:11, 41:15, 42:15, 44:15, 50:18, 50:21, 60:12, 61:4, 61:7, 64:19, 67:5, 67:7, 67:25, 68:2, 68:4, 68:13, 68:16, 68:18, 74:25, 75:4, 79:20, 81:1, 81:13, 81:22, 86:21, 86:25, 89:21, 89:23, 89:25, 90:16, 90:19, 90:23, 91:5, 91:8, 91:19, 91:22, 92:2, 92:8, 92:13, 92:22, 93:1, 93:6, 93:13, 93:21, 93:25, 94:8, 94:13, 94:17, 94:18, 94:20, 95:2, 96:13, 96:25, 97:5, 98:6, 98:17, 99:14, 99:21, 100:3, 102:4, 106:20, 106:24, 107:13, 107:15, 107:18, 107:22, 108:1, 122:23, 123:4, 123:10, 123:14, 123:17, 124:3, 124:7, 124:11, 133:15, 135:25, 136:2, 149:9, 149:14, 149:16
**theirs** [1] - 141:14
**thickness** [2] - 37:17, 49:5
**thinking** [1] - 31:7
**thinks** [1] - 118:21
**third** [2] - 58:5, 65:19
**Thompson** [1] - 2:3
**thorough** [2] - 133:17, 133:21
**thousands** [2] - 14:12, 29:18
**three** [3] - 20:22, 31:1, 31:2, 62:15, 67:2, 101:19, 101:24, 106:5, 106:7, 142:12, 142:14, 144:16, 149:22
**three-point** [1] - 144:16
**three-tenths** [1] - 67:2
**three-wheelers** [2] - 106:5, 106:7
**throughout** [1] - 64:10
**thumb** [2] - 62:4, 62:6
**tied** [1] - 43:4
**tier** [1] - 64:13

**tight** [11] - 56:17, 56:23, 56:24, 57:16, 63:14, 63:19, 64:5, 64:8, 64:11, 66:13, 119:23
**Tiller** [3] - 89:5, 90:7, 90:14
**tilt** [20] - 31:23, 64:22, 64:25, 65:12, 65:24, 78:8, 78:22, 80:7, 87:21, 88:11, 117:23, 118:4, 126:5, 127:3, 127:5, 128:3, 128:17, 129:1, 144:20, 148:16
**tilted** [2] - 65:17, 88:21
**tilting** [2] - 80:6, 80:7
**tilts** [2] - 128:14, 128:16
**timing** [1] - 149:19
**tip** [3] - 79:6, 79:8, 117:20
**tire** [1] - 136:13
**tires** [4] - 27:17, 78:25, 127:5, 136:6
**title** [2] - 6:8, 22:4
**today** [4] - 17:2, 35:21, 106:14, 114:10
**together** [7] - 8:20, 11:7, 11:11, 37:10, 121:3, 125:21, 134:20
**took** [8] - 38:12, 42:10, 45:22, 59:13, 83:19, 88:11, 101:14, 101:17
**tool** [1] - 46:24
**top** [12] - 6:2, 19:12, 62:15, 62:16, 63:20, 63:22, 63:24, 64:12, 66:3, 66:4, 134:22
**topic** [2] - 91:2, 93:11
**total** [4] - 104:15, 104:24, 105:6, 121:10
**totally** [1] - 51:10
**totter** [1] - 117:24
**tottered** [1] - 137:16
**tottering** [1] - 137:20
**toward** [1] - 128:6
**towards** [1] - 4:17
**toy** [2] - 65:24, 78:21
**trace** [1] - 63:9
**tracing** [1] - 37:24
**track** [1] - 73:15
**tracks** [1] - 114:15
**trails** [1] - 56:24
**trajectory** [2] - 89:9,

89:17
**transcribed** [1] - 115:20
**transcript** [1] - 150:16
**Transcript** [1] - 2:15
**transcription** [1] - 2:15
**transparent** [1] - 12:21
**Transport** [1] - 13:23
**transportation** [1] - 56:11
**Transportation** [1] - 13:24
**travel** [1] - 90:4
**traveling** [2] - 121:14, 122:9
**tree** [1] - 139:16
**TRIAL** [2] - 1:11, 1:15
**Trial** [2] - 124:5
**tried** [2] - 44:23, 74:11
**tripped** [1] - 88:14
**truck** [3] - 10:13, 28:19, 52:25
**try** [8] - 17:24, 19:10, 39:9, 44:18, 51:18, 51:20, 69:21, 69:24
**trying** [8] - 11:10, 56:4, 56:16, 59:8, 74:10, 75:22, 97:9, 132:21
**tube** [3] - 37:11, 39:5, 39:21
**Tuesday** [2] - 93:19, 150:8
**turn** [21] - 20:6, 25:18, 51:9, 57:16, 64:11, 72:15, 75:16, 75:18, 76:12, 76:17, 76:21, 77:1, 77:3, 77:7, 77:17, 84:23, 119:23, 122:14, 124:19, 137:13
**turned** [1] - 137:16
**turns** [10] - 63:14, 63:16, 63:19, 64:5, 64:8, 66:13, 70:9, 75:9, 75:19, 77:1
**TV** [1] - 18:18
**Two** [1] - 20:4
**two** [31] - 9:25, 36:2, 46:1, 46:19, 47:4, 47:15, 55:10, 55:15, 56:10, 66:24, 73:12, 74:18, 74:20, 83:19, 86:6, 86:14, 86:15, 87:13, 92:1, 92:21, 93:8, 100:6, 100:10, 109:10, 142:12,

145:18, 145:21, 147:21, 147:23, 148:9
**two-tenths** [1] - 66:24
**type** [32] - 6:9, 14:14, 25:9, 26:8, 26:10, 26:21, 28:2, 28:5, 28:25, 30:8, 30:13, 31:5, 31:6, 31:20, 39:9, 47:14, 52:10, 53:3, 56:12, 56:21, 57:22, 58:4, 87:18, 96:5, 100:18, 106:3, 107:2, 132:22, 137:1, 144:16, 144:17
**types** [3] - 5:10, 29:19, 146:12
**typical** [3] - 58:5, 66:18, 147:24
**typically** [3] - 18:9, 51:15, 149:1

**U**

**ultimate** [1] - 81:9
**ultimately** [2] - 12:4, 18:14
**unbelted** [6] - 84:5, 87:16, 88:10, 140:19, 140:25, 141:8
**under** [16] - 7:24, 8:4, 9:21, 14:16, 15:23, 22:20, 42:17, 63:24, 65:16, 86:6, 92:16, 101:10, 143:18, 143:21, 143:23, 145:21
**understood** [2] - 65:11, 78:9
**unimproved** [1] - 56:25
**unit** [1] - 78:10
**UNITED** [2] - 1:1, 1:14
**University** [2] - 6:22, 8:1
**unless** [1] - 123:15
**unlike** [1] - 10:12
**unsafe** [1] - 105:9
**unstable** [3] - 118:10, 127:4, 127:8
**up** [89] - 4:11, 4:18, 5:18, 8:6, 12:4, 12:18, 14:11, 15:2, 15:3, 18:11, 21:3, 23:16, 24:13, 30:14, 33:8, 35:1, 36:16, 38:2, 38:8, 44:18, 45:17, 47:1, 47:15,

49:10, 49:11, 49:22, 51:14, 51:17, 53:20, 54:9, 54:13, 57:19, 58:6, 58:9, 59:4, 62:7, 65:14, 65:18, 65:25, 66:2, 66:5, 66:8, 70:16, 70:19, 71:15, 71:18, 74:19, 78:4, 78:23, 78:24, 79:25, 80:6, 80:7, 85:23, 86:25, 87:21, 88:3, 88:20, 89:12, 90:14, 91:1, 95:1, 95:2, 102:4, 102:17, 104:6, 104:7, 105:3, 106:10, 108:3, 117:20, 120:13, 122:18, 123:11, 124:24, 127:7, 134:21, 134:22, 137:25, 138:1, 139:8, 140:1, 140:2, 141:15, 141:16, 143:2, 144:9
**update** [1] - 8:23
**uphill** [3] - 78:25, 118:2, 127:7
**upper** [1] - 138:6
**US** [1] - 2:4
**USA** [1] - 1:7
**usability** [2] - 96:24, 97:6
**useful** [2] - 46:24, 56:11
**users** [1] - 97:7
**utility** [7] - 10:16, 56:6, 56:21, 66:22, 82:13, 96:19, 134:25
**UTV** [1] - 119:2
**UTVs** [1] - 29:3

**V**

**variety** [3] - 5:8, 20:10, 67:17
**various** [6] - 5:10, 16:4, 29:19, 51:8, 65:8, 72:16
**Vehicle** [19] - 10:3, 10:14, 11:4, 11:8, 12:22, 13:9, 14:6, 14:9, 14:13, 22:5, 24:10, 24:19, 24:25, 29:2, 139:20, 139:22, 139:23, 140:7, 140:12
**vehicle** [159] - 5:22, 6:9, 8:22, 9:18, 10:9, 10:10, 10:11, 20:13, 22:20, 23:9, 25:5,

25:14, 25:17, 25:19, 26:5, 26:7, 26:9, 27:13, 27:16, 28:11, 29:19, 30:2, 30:10, 30:11, 30:12, 31:5, 31:8, 31:9, 31:11, 31:12, 31:15, 31:22, 31:24, 32:1, 32:4, 32:8, 32:13, 33:5, 33:7, 33:9, 33:16, 34:11, 35:6, 35:7, 36:12, 38:22, 42:20, 42:24, 43:3, 46:8, 47:2, 47:5, 47:7, 47:12, 48:4, 48:21, 49:15, 50:2, 51:10, 53:22, 54:15, 54:20, 55:2, 55:3, 55:14, 56:7, 56:9, 56:13, 56:16, 56:20, 56:23, 57:4, 57:6, 57:8, 57:12, 57:13, 58:3, 65:4, 65:17, 66:7, 66:12, 66:19, 69:1, 73:12, 73:16, 77:25, 78:2, 78:16, 79:6, 79:8, 79:14, 79:23, 80:12, 80:16, 80:19, 81:19, 82:1, 82:9, 82:12, 82:14, 82:16, 82:17, 82:23, 83:20, 83:22, 83:23, 83:25, 84:15, 84:20, 84:22, 86:14, 87:4, 87:20, 88:11, 88:13, 89:10, 95:25, 96:11, 96:18, 96:19, 96:23, 96:24, 97:8, 97:13, 97:16, 97:17, 98:12, 107:2, 114:8, 114:11, 118:3, 118:6, 119:20, 121:14, 121:19, 122:4, 122:9, 127:4, 132:22, 133:24, 135:1, 135:11, 135:16, 135:22, 136:12, 136:21, 137:25, 138:5, 138:6, 141:2, 141:11, 142:16, 142:22, 142:23, 143:15, 145:17, 146:21
**vehicle-type** [1] - 6:9
**vehicle-use** [1] - 31:11
**vehicles** [67] - 10:16, 10:17, 13:17, 13:19, 14:18, 18:1, 23:20, 25:1, 25:2, 25:9, 25:11, 26:15, 26:18,

26:21, 27:14, 28:18, 28:25, 29:6, 29:7, 32:16, 33:23, 45:23, 47:17, 48:3, 49:9, 50:3, 50:6, 50:8, 51:16, 51:25, 52:3, 52:4, 52:5, 52:16, 52:17, 52:20, 53:14, 53:19, 53:22, 54:3, 67:13, 67:17, 69:18, 83:10, 96:4, 105:12, 105:15, 105:18, 105:25, 106:3, 107:5, 113:12, 113:14, 113:23, 136:19, 139:2, 143:21, 146:13, 146:22, 147:9, 147:10, 147:25, 148:3, 148:11
**verse** [1] - 140:17
**version** [2] - 21:7, 147:24
**versus** [4] - 26:21, 58:14, 136:7, 139:19
**vicinity** [2] - 49:19, 70:9
**Video** [5] - 73:17, 73:23, 74:5, 74:12, 74:16
**video** [5] - 56:19, 70:13, 72:19, 72:24, 73:4
**videotaped** [1] - 115:20
**view** [9] - 12:7, 32:12, 47:25, 63:8, 86:16, 86:17, 86:22, 86:24, 136:19
**viewpoint** [2] - 18:21, 18:22
**VIN** [1] - 143:12
**vintage** [2] - 113:17, 147:10
**violating** [1] - 139:11
**visibly** [1] - 79:3
**visit** [2] - 116:8, 116:11
**visited** [2] - 115:7, 115:23
**voice** [1] - 95:2
**Voir** [2] - 3:3, 3:4
**voir** [5] - 40:6, 41:1, 41:2, 41:10, 60:10
**VOIR** [2] - 40:10, 60:13
**volume** [1] - 27:13
**voluntary** [2] - 33:22, 146:14
**volunteer** [1] - 24:7

**volunteers** [2] - 15:15, 15:16
**vote** [1] - 12:4
**VS** [1] - 1:6

## W

**wait** [1] - 99:7
**waiting** [3] - 74:25, 90:24
**walking** [1] - 35:1
**wants** [1] - 15:9
**warm** [1] - 51:19
**warning** [2] - 145:15, 145:19
**warnings** [1] - 139:11
**watch** [2] - 102:16, 115:19
**water** [20] - 14:17, 71:13, 71:14, 71:15, 73:12, 74:18, 74:19, 127:11, 127:12, 127:23, 128:4, 128:6, 128:8, 128:10, 128:17, 128:20, 128:22, 128:23, 144:23
**ways** [2] - 18:18, 46:22
**wear** [1] - 138:22
**wearing** [2] - 139:3, 141:2
**Webex** [1] - 12:20
**week** [2] - 5:23, 149:19
**weekend** [5] - 9:1, 149:11, 149:22, 150:5, 150:7
**weigh** [1] - 71:15
**weighed** [1] - 88:9
**weight** [9] - 42:20, 43:3, 71:17, 74:19, 127:13, 142:16, 142:22, 143:16
**weighted** [3] - 65:13, 66:6, 69:18
**weighting** [1] - 65:8
**weights** [8] - 65:3, 65:5, 65:9, 65:11, 65:13, 69:18, 78:9, 78:10
**welcome** [1] - 94:1
**welfare** [1] - 99:18
**west** [3] - 61:12, 93:9, 124:2
**West** [5] - 1:19, 1:19, 3:3, 3:4, 3:5
**WEST** [93] - 21:20, 24:2, 40:6, 40:9, 40:11, 41:3, 41:13,

41:16, 42:6, 42:12, 50:15, 50:19, 58:20, 58:23, 58:25, 59:3, 60:10, 60:14, 61:3, 64:18, 67:4, 67:24, 68:17, 70:21, 70:23, 74:23, 79:17, 80:24, 81:8, 81:20, 86:19, 86:23, 89:18, 89:22, 90:1, 91:4, 91:7, 91:11, 91:17, 92:3, 92:10, 92:17, 92:25, 93:22, 94:4, 96:12, 98:4, 98:15, 99:13, 99:16, 99:22, 100:5, 102:6, 102:17, 102:19, 106:18, 107:1, 107:14, 107:17, 107:19, 108:2, 108:4, 122:18, 122:24, 123:2, 123:6, 123:12, 123:15, 123:18, 123:20, 124:5, 124:9, 124:12, 127:20, 127:22, 132:6, 132:12, 132:14, 133:13, 133:19, 134:21, 134:24, 136:3, 139:8, 139:10, 140:1, 140:3, 141:15, 141:17, 146:1, 146:4, 149:12, 149:15
**west's** [1] - 43:5
**whack** [1] - 114:17
**wheel** [6] - 69:8, 76:7, 77:7, 79:11, 79:24, 142:7
**wheeled** [1] - 67:12
**wheeler** [1] - 28:22
**wheelers** [7] - 28:16, 28:17, 28:24, 106:5, 106:7
**wheels** [11] - 6:10, 28:19, 28:21, 65:25, 66:4, 66:7, 69:1, 78:16, 79:9, 117:19, 118:2
**whereas** [1] - 122:7
**whole** [3] - 17:25, 51:13, 67:17
**wide** [3] - 8:12, 143:3, 143:4
**width** [2] - 37:17, 72:5
**willing** [1] - 75:3
**windshield** [3] - 51:12, 51:13, 89:11

**wintertime** [1] - 51:17
**withdraw** [1] - 79:19
**witness** [9] - 4:13, 4:15, 94:6, 94:22, 99:6, 99:12, 115:7, 137:24
**WITNESS** [2] - 4:14, 136:2
**witnesses** [2] - 4:4, 4:5
**word** [4] - 51:1, 62:11, 140:22, 149:17
**words** [2] - 46:25, 119:13
**workers** [2] - 56:10, 56:11
**works** [8] - 11:22, 15:3, 39:2, 40:19, 46:2, 97:16, 135:20, 135:22
**world** [1] - 26:18
**worldwide** [1] - 8:11
**worry** [1] - 57:15
**writing** [1] - 124:20
**written** [1] - 20:10
**wrote** [1] - 117:11

## X

**Xponent** [1] - 116:18

## Y

**Yamaha** [1] - 26:14
**yaw** [5] - 84:24, 121:18, 122:11, 122:12, 122:17
**year** [5] - 10:23, 53:21, 101:11, 102:8, 147:5
**years** [14] - 7:15, 11:23, 16:17, 16:23, 29:17, 67:11, 68:10, 105:14, 106:16, 106:22, 134:20, 136:19, 145:8
**yellow** [1] - 16:7
**young** [7] - 76:18, 89:3, 89:5, 89:9, 90:4, 90:7, 90:14
**yourself** [3] - 5:3, 19:24, 102:8

## Z

**zero** [1] - 62:14
**zone** [3] - 145:21, 145:23
**Zone** [3] - 146:15, 146:25, 147:3
**zones** [3] - 147:21,

147:23, 148:10